FILED
CLERK, U.S. DISTRICT COURT

AUG 23 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

PRO PER.
JAN C BIRO
9245 – Regents Rd. – Apt. M416
92037 CA, La Jolla,
Phone: 858.352.6446
Email: JC.BIRO.MD@GMAIL.COM

-----------------------------------------------------------------------------------

# THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Western Division, Los Angeles

-----------------------------------------------------------------------------------

| | |
|---|---|
| **J.C. BIRO MD. PhD.** | Case No.: Number |
| | **2:21-CV-06835-JGB-MAA** |
| Plaintiff | |
| | **JURY TRIAL REQUESTED!** |
| v. | |
| | **COMPLAINT PURSUANT TO:** |
| **G. R. KEYES MD** | |
| **HON. W. SADLER** | **- 42 U.S.C § 1983 CIVIL ACTION** |
| **ATTY. C. PHILLIPS** | **FOR DEPRIVATION OF RIGHTS,** |
| **HON. A. RICCIARDULLI** | |
| **THE CITY OF LOS ANGELES** | **- 42 U.S.C § 1985 CONSPIRACY** |
| | **TO INTERFERE WITH CIVIL** |
| | **RIGHTS,** |
| Defendants | |
| | **- VIOLATION OF 1ST, 2ND, 5TH,** |
| | **6TH, 8TH, 14TH AMENDMENTS** |
| | **OF THE US CONSTITUTION,** |
| | |
| | **- RULE 60: RELIEF FROM A** |
| | **JUDGEMENT OR ORDER** |
| | |
| | **- INTENTIONAL INFLICTION OF** |
| | **SEVERE EMOTIONAL DISTRESS.** |
| | |
| | **- PC 118, 132, 134, 141, 148.5** |

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 1

1

## TABLE OF CONTENT

2

<u>Page</u>

Complaint …………………………………………………...…… 003

3

4

Jurisdiction ………………………………………………………004

5

Parties ……………………………………………………………004

6

7

Facts – Overview …………………………………………………006

8

Facts – Details by Defendant …………………………………009

9

10

   A. Defendant <u>**Dr Keyes**</u> …………………………………...009

11

      Claims against Defendant Dr Keyes ………………….……...010

12

      Demages ………………………………………………010

13

14

   B. Defendant City <u>**Attorney Phillips**</u> …………………………011

15

      Prosecutorial Immunity ……………………………………...013

16

      Claims against Defendant Attorney Phillips …………………014

17

      Demages ………………………………………………014

18

19

   C. Defendant Judge <u>**Hon. Sadler**</u> ………………………………015

20

21

      Case Law – Imposition of Involuntary Psychotherapy ………….....017

22

      Case Law – Political/Punitive Misuse of Psychiatry …………....  020

23

      Case Law – Successful Challenges of Absolute Immunity ……….022

24

25

   D. Defendant Judge <u>**Hon Ricciardulli**</u> …………………………024

26

27

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 2

28

Law Analyses …………………………………………………...026

The Question of Judicial Immunity  ………………………………030

E. Defendant **The City of Los Angeles** ………….……………….032

List of Claims by the Affected Defendants …………………..………035

Extraordinary Demages …………………………………………..…038

Prayer for Relief (Injunctive, Declaratory, Compensatory, Punitive) ...... 039

Exhibit 1. Who is Dr Biro?  ..………………………………...…041

Exhibit 2. IDENTIFICATION OF CALIFORNIA'S #1 *"PRONE TO*

*COMPLAINTS*" COSMETIC SURGEON DR G.R. KEYES…..043

Exhibit 3. UNFOUNDED STATEMENTS BY DR KEYES …………….…102

Exhibit 4. Imposition of psychotherapy by Defendant Hon Sadler ………103

Exhibit 5. Interview with Defendant Hon. Ricciardulli………………….…107

**COMPLAINT**

1. This action seeks injunctive and declaratory relief as well as money

damages [from those defendants who are <u>not</u> protected by absolute

immunity] because the defendants deprived him from his fundamental

constitutional rights and freedom and irreparably damaged his normal

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 3

private and professional life and health. Plaintiff alleges that four of the five

Defendants acted under color of state law (while the fifth became involved

through conspiracy) and violated Plaintiff's rights under 1st, 2nd, 5th, 6th, 8th,

14th Amendments of the Constitution of the United States. Plaintiff also

brings state law claims pursuant to this Court's supplemental jurisdiction.


**JURISDICTION**

2. This Court has jurisdiction over Plaintiff's federal claim under 28

U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over

claims, which are based on state law, under 28 U.S.C. § 1367.

3. Venue in the United States District Court for the Central District

Western Division is proper pursuant to 28 U.S.C. § 1391.

4. The complaint is timely because it relates to enforcement of a void

order by illegal imprisonment of Plaintiff on **August 28th 2019** by the trial

court and a procedurally defective "Opinion" issued by the reviewing Court

on **December 13th, 2019** and modified on **January 6th, 2020**.


**PARTIES**

5. **Plaintiff Dr Biro** is an individual who resides at La Jolla, CA. He is

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 4

Swedish American MD, PhD, received US Citizenship in 2011 based on his scientific merits (Section: *"Indiv w/Adv Deg or Exceptional Ability in the National Interest"*). He is in good standing, never punished before.

**See <u>ATT. 01</u>: WHO IS DR BIRO? ...................................<u>PAGE..041</u>**

6. **<u>Defendant Dr Keyes</u>** (not under color of law) is a Beverly Hill based cosmetic surgeon with an attractive public image, but with a carefully concealed background: He had been identified as CA's most sued cosmetic surgeon with at least 33 documented medical malpractice lawsuits. Never punished before. He is allegedly acting in conspiracy with defendants who are actors under color of law.

**See <u>EXHIBIT. 02</u>: IDENTIFICATION OF CA'S #1 "PRONE TO COMPLAINTS" COSMETIC SURGEON DR G.R. KEYES"[1] .<u>PAGE....043</u>**

7. **<u>Defendant Hon. Sadler</u>** (sued in personal and official capacity). He is former public defendant, acting under color of law as judge, since 2016, assigned to the Airport Courthouse in Los Angeles.

_____

[1] As it was filed as motions at the trial court (2018.01.30) as well as at the reviewing court (2019.11.04).

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 5

8. **<u>Defendant Attorney Phillips</u>** (sued in personal and official capacity) is prosecutor of the City of Los Angeles since ~18 years. Described even as Health Law lawyer in Los Angeles California.

9. **<u>Defendant Hon Alex Ricciardulli</u>** (sued in personal and official capacity) is judge on the appellate panel of the Division of Appalls Superior Court of California, Los Angeles. He is acting under the color of law.

10. **<u>Defendant City of Los Angeles</u>** (sued as municipality and as "person" under 42 USC Section 1983)[2].

## FACTS - Overview

11. This case originates from irreconcilable differences between Plaintiff, Dr Biro and Defendant Dr Keyes concerning the professional and ethical obligations of a physicians toward his patients/clients

12. Dr Keyes is a Beverly-Hill-based cosmetic surgeon who became the most sued cosmetic surgeon in California with at least 33 documented medical malpractice lawsuits in his carefully concealed background.

---

[2] Monell v. Dep. Soc. Services of New York City 436 US 658 1978.
JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 6

**See list of Lawsuits against Dr Keyes in <u>Exhibit 02</u> …<u>PAGE ..050</u>**

It is about 10-times more than the "average" for a doctor in his specialty and age.

13. Dr Biro - who is a Swedish-American doctor and scientist with clean background - wanted to initiate a collegial, unbiased "peer review" of Dr Keyes practices with the help of the medical board and specialist societies.

14. To prevent this "peer review" - with potentially catastrophic consequences for him, - Defendant Dr Keyes started a smear campaign against Plaintiff Dr Biro based on his personal opinion but unsupported by any evidence or witness.

15. Defendant Dr Keyes convincingly presented his opinion as facts (under oath!) to the Family Law Dep. of Supr. Court of Los Angeles and - after two unsuccessful petitions in 2013 & 2014 - he finally received a Civil Harassment Restraining Order (CHRO) against Dr Biro for 3 years (Dated: 2016.03.28).

16. Dr Biro allegedly violated the CHRO (in 2019) by continuing his efforts to initiate "peer review" of Keyes practices on the MBC and

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 7

Professional Societies. Dr Keyes pressed criminal charges against him for violation of a court order, under PC 166(a)(4).

17. Defendant City Attorney Phillips uncritically adopted the incriminating statements about Dr Biro and prosecuted Dr Biro for violation of a court order PC 166(a)(4). The jury found Dr Biro guilty in 2 cases of violation: a) sending 2 pamphlets to the Medical Board of California (MBC) describing his observations reg. Defendant Dr. Keyes and b) sending a humoristic pamphlets to other doctors, there one ex. -  addressed to an uninvolved doctor - unintentionally ended up in his mailbox that he shared with Dr  Keyes. Dr Keyes obviously identified himself with the cartoon character, "*Dr HollyCut*®"

18. The reviewing court reversed the judgement reg. the first case (a, harassment by writing "about" Keyes) but the second case (b, indirect contact with Keyes) remained in effect as well as the probation order on him. (Opinion dated: 2019.12.13, modified on 2020.01.06).

19. Dr Biro completed his probation and the trial court granted him early release (2021.06.24).

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 8

2021.08.22      COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL        8 OF 109

1
2
3

## **FACTS – Details by Defendants**

## **A. <u>DEFENDANT DR KEYES</u>**

4
5
6
7
8

20. Defendant Dr Keyes didn't accept that he became the #1 "*Prone-to-Complaint*" cosmetic surgeon in CA who was and is targeted for a long series of medical/ethical wrongdoings. His explanation is "anti-Semitism" as he happens to be Jewish.

9
10
11
12
13
14

21. Defendant Dr Keyes is using his religion as defense against professional criticism and he believes that Plaintiff Dr Biro is <u>a</u>) anti-Semite, or at least bigot, who <u>b</u>) anonymously harassed him on the internet and who is <u>c</u>) mentally instable and potentially violent.

15
16
17
18

22. Dr Keyes repeatedly presented his opinion as facts - verbally and in writing to Courts, under oath – but without any material evidence or witness.

19
20
21

**See <u>EXHIBIT 03</u>:  2016.03.04 - UNFOUNDED STATEMENTS BY DR KEYES …………………………..…………………….………<u>PAGE…102</u>**

22
23
24
25

23. Dr Keyes mislead the MBC, colleagues and Courts, blatantly misusing his respectable religion and sympathy of people for getting away with obvious wrongdoings.

26
27
28

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 9

24. Dr Keyes seriously demages Dr Biro as person and professional with the single purpose to prevent collegial insight into his dubious surgery practices and walk away from responsibility, now even the 34th time.

25. Dr Keyes acted in conspiracy with defendants Atty. Phillipson and Hon. Sadler (both persons acting under color of law).

26.    **Claims against <u>Defendant Dr Keyes</u>**:

*    42 U.S.C. § 1983; * 42 U.S.C. § 1985;

*     Malicious Prosecution,

*    Fraudulent Misuse of Court Resources;

*    Perjury: California Penal Code Section 118 PC,

*    Intentional Infliction of Several Emotional Distress;

•    Making False Reports of Crimes, PC 148.5;

•    Preparing & Offering False Evidence" [PC 132, 134, 141].

27.    **Demages <u>Defendant Dr Keyes</u>**

* Compensatory: yes, see separate notes

* Punitive: yes, see separate notes

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 10

## B. <u>DEFENDANT CITY ATTORNEY PHILLIPS</u>

28. Defendant city attorney Phillips – for the initiative of Dr Keyes - charged Dr Biro for violation of court order, under PC 166(a)(4) even if there was no probable case of any violation.

29. However defendant Phillips listened to Dr Keyes unfounded hearsay accusations against plaintiff Dr Biro and adopted and even magnified the false claims about Dr Biro without any fact checking.

30. The prosecutor presented Dr Biro to the court as a <u>**a**</u>) (potentially) dangerous <u>**b**</u>) anti-Semite (based on that Dr Keyes disclosed that he is Jewish), who is <u>**c**</u>)  lying about his professional background, <u>**d**</u>) is under police investigation in Sweden as well as in USA, <u>**e**</u>) illegally uses the MD title, <u>**f**</u>) anonymously harassed Dr Keyes on the internet.

31. Attorney Philips used false inculpatory evidences, relied on 2 perjured testimonies, and modified (falsified) evidence.

32. She, at the same time, suppressed exculpatory (Brody) evidence.

33. Prosecutor Phillips completely changed charges against Dr Biro from alleged violation of court order (a petty misdemeanor) to antisemitism/racism (that is very serious felony).

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 11

34. The words "JEW, JEWISH, SEMITE, ANTI-SEMITE" are present in the Reporters Trial Transcript 94 times (on total 815 pages) while the same words occurs 2 times in Biro's "charged" publications (on total 472 pages).

35. The words "MALPRACTICE, PEER-REVIEW" are present in the Reporters Trial Transcript 177 times (on total 815 pages) while the same words occurs 318 times in Biro's "charged" publications (on total 472 pages).

36. It seems to be compelling that Phillips was mainly speaking about racism, impersonation while Dr Biro was mentioning medical issues, like malpractice, peer-review.

37. Looking at the end result of the trial [guilty verdict for Dr Biro] we can say, that Dr Biro had been convicted for the prosecutor's allegations of racism and impersonation, while Dr Keyes was freed from peer-review for malpractice.

38. Another strong argument incriminating Dr Biro was, that he anonymously harassed Dr Keyes on the internet and the Los Angeles police started an investigation of that suspected crime.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 12

39. However, it turned out that there was no record about this alleged harassment and investigation anywhere. It was, probably a lie.

40. The prosecutor seems to have performed the pretrial investigation herself and it was done erroneously.

41. Investigative function by the prosecutor is not protected by absolute immunity.

**PROSECUTORIAL IMMUNITY**

42. Prosecutors are strongly protected by absolute and/or qualified immunities. Generally (simplified) absolute immunity applies for judicial (in courtroom) acts while qualified immunity for administrative (non-courtroom) activities. The absolute immunity applies to the task, not to the office.

43. Supreme Court said prosecutors have only qualified immunity for investigative acts (Kalina v. Fletdzer, 522 U.S. 118 (1997)). When the prosecutor takes over the task generally performed by the police, the prosecutor gets only qualified immunity.

44. Courts often look to is how discretionary is the act for the prosecutor? How much is it a matter of choice for the prosecutor to do it?

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 13

2021.08.22    COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL    13 OF 109

The less discretion the prosecutor has, the more it is ministerial, the greater

presumption is protected by absolute immunity, but the more discretion the

prosecutor has, the more there is a presumption it is qualified immunity[3].

**45. Claims against <u>Defendant Atty Phillips</u>:**

* 42 U.S.C. § 1983;

* 42 U.S.C. § 1985;

* Malicious prosecution,

*CONSPIRACY [PEN 182(a)(2, 3, 5)];

* Preparing & Offering False Evidence" [PC 132 or 134.];

* Fraudulent misuse of Court resources;

* Intentional infliction of several emotional distress;

- Preparing & Offering False Evidence" [California Penal Code

   sections 132 or 134].

- Section 141 of the California Penal Code]

**46. Demages:**

 * Injunctive relief: here vacating void judgment

_____

[3] 500 U.S. 478 (1991).
JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 14

* Declaratory relief: yes

*compensatory: yes/no, see separate notes

*punitive: yes/no, see separate notes

## C. <u>DEFENDANT JUDGE HON SADLER</u>

47. Defendant judge Hon. Sadler - presided the trial court (criminal) that convicted and sentenced the plaintiff.

48. Dr Biro repeatedly objected the general subject matter jurisdiction of a criminal court over a non-violent professional dispute between two senior doctors and the existence of any probable case.

49. Dr Biro objected and documented numerous occasions when the court acted in serious excess of its assumed subject matter jurisdiction and suppressed his efforts to effectively present his defense to the court and jury.

50. Dr Biro believes, that the judge acted **in complete absence of all jurisdiction** by imposition of involuntary psychotherapy - as condition of probation in the absence of any mental health history - of a misdemeanor convicted person (Dr Biro) and enforcing it with illegal arrest (2019.08.28)

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 15

and imprisonment without due process.

Additionally this punishment was excessively harsh on a senior medical professional for a substantially bagatelle misdemeanor crime.

51. One of the conditions of Dr Biro's probation was that he complete 26 sections of mental health cancelling. It was done and confirmed good mental health. (2018)

52. However the judge, defendant Sadler, issued a new order and mandated one year outpatient psychotherapy. The order was repeatedly opposed by Dr Biro (on the trial court as well as on the reviewing court) because it was not supported by any expert opinion or relevant trial proceeding. The court repeatedly ignored the plaintiff's request to provide any reason, plan, and purpose with the court mandated outpatient psychotherapy.

53. Consequently plaintiff Biro was unsuccessful to find any qualified psychotherapist who could accept him – a senior medical doctor in good standing – for therapy without some diagnoses and some understanding of the necessity of that therapy.

54. Defendant Sadler interpreted the lack of success to find therapist

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 16

2021.08.22      COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL      16 OF 109

as intentional disobedience to his order, arrested and jailed Dr Biro (71

years old MD) in the LA County jail.

55. On the second day in the jail a sort of observation and

psychological evaluation took place. The purpose with this became not

clear, but formally it was a court mandated inpatient commitment.


**CASE LAW AND COMMENTS ON**

**Imposition of involuntary psychotherapy as condition of probation in**

**the absence of any mental health history.**

56. "*The trial court committed plain error in imposing special condition*

*of  probation that defendant participate in mental health program*". -

838 F.3d 597 2016 WL 5485126.[4]

**57. *"The district court has wide discretion to impose upon a***

***defendant a term of supervised release as part of its sentencing***

***decision, but such conditions must be reasonably related to one***

_____

[4] United States v. Gordon - United States Court of Appeals, Fifth Circuit.
September 29, 2016 838 F.3d 597 2016 WL 5485126.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO:- 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 17

***of the following statutory factors: (1) the nature and***

***circumstances of the offense and the history and characteristics***

***of the defendant; (2) the need to afford adequate deterrence to***

***criminal conduct; (3) the need to protect the public from further***

***crimes of the defendant; and (4) the need to provide the***

***defendant with needed training, medical care, or other***

***correctional treatment in the most effective manner."*** **18 U.S.C.A.**

**§§ 3553(a)(1)-(2), 3583(d).**

58. *"…the very notion of psychotherapy carries the stigma of a*

*"mental or emotional problem" and so might in itself be embarrassing"*

(194 Cal.App.3d 254 239 Cal. Rptr. 400)[5]

59.    *"..Imposition of involuntary psychotherapy as condition of*

*mother's custody rights upon termination of juvenile court's*

*dependency jurisdiction violated mother's due process rights"*[6]

_____

[5] County of Alameda v. Superior Court of Appeal, First District, Division 2, California. August 20, 1987 194 Cal.App.3d 254 239 Cal. Rptr. 400
[6] In re Katherine M. Court of Appeal, First District, Division 2, - California. July 29, 1994 27 Cal.App.4th 91 33 Cal.Rptr.2d 298
JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 18

60. "*Imposition of release condition requiring defendant's participation in mental health program was inappropriate absent history of mental health issues*".[7] - 784 Fed. Appx. 211 2019 WL 3812776

61. "*...Imposition at defendant's sentencing of a condition to defendant's supervised release requiring defendant to participate in a mental health program was inappropriate, absent any evidence that defendant had a diagnosis requiring mental health treatment, had ever been treated for a mental health condition, or had a questionable mental...*" 2018 WL 454116 (C.A.5) (Appellate Brief)[8]

62. "*Plain error in imposing mental-health special condition seriously harmed fairness, integrity, or public reputation of judicial proceedings*". -927 F.3d 856 2019 WL 2520061[9]

_____

[7] United States v. Westbrooks United States Court of Appeals, Fifth Circuit. August 13, 2019 784 Fed. Appx. 211 2019 WL 3812776

[8] 2018 WL 454116 (C.A.5) (Appellate Brief) - United States Court of Appeals, Fifth Circuit. - UNITED STATES OF AMERICA, Plaintiff-Appellee, - Mario Alberto GARRIDO, Defendant-Appellant.

[9] United States v. Bree United States Court of Appeals, Fifth Circuit. June 19, 2019 927 F.3d 856 2019

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 19

63. *"Requiring defendant to undergo counseling as condition of supervised release was abuse of discretion".*[10] - 209 F.3d 1073 2000 WL 419900

## CASES AND COMMENTS ON

## Punitive, Political Misuse of Psychiatry

64.    **Aurora D'Angelo** was sent to a mental health facility for psychiatric evaluation after she participated in a rally in support of Sacco and Vanzetti.[11]

65. **Clennon W. King, Jr**., an African-American pastor attempted to enroll at the all-white University of Mississippi. The Mississippi police arrested him on the grounds that "any nigger who tried to enter Ole Miss must be crazy."[12] the Mississippi authorities kept him confined to a mental

_____

WL 2520061

[10] United States Court of Appeals, Eighth Circuit. April 19, 2000 209 F.3d 1073 2000 WL 419900

[11] Moshik, Temkin (2009). The Sacco-Vanzetti Affair. Yale University Press Publishers. p. 316.

[12] Tucker, William H. (2002). *The Funding of Scientific Racism: Wickliffe Draper and the Pioneer Fund*. University of Illinois Press. p. 119.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 20

hospital for twelve days before a panel of doctors established the activist's

sanity.[13]

66. **Senator Barry Goldwater**, the 1964 Republican nominee for the

Presidency, was declared having severely paranoid personality and was

psychologically unfit for the high office to which he aspired. [14] - 396 U.S.

1049 (1970).

67.    **Martha Beall Mitchell**, wife of U.S. Attorney General John

Mitchell, was diagnosed with a paranoid mental disorder for claiming that

the administration of President Richard M. Nixon was engaged in illegal

activities. [15]

68.    NYPD veteran **Adrian Schoolcraft**, who was coerced to falsify

crime statistics in his department and then became a whistleblower. In

2010 he was forcibly committed to a psychiatric hospital.[16] - 10 Civ. 6005

_____

[13] "Negro Pastor Pronounced Sane; Demands Mississippi Apologize". UPI.
Sarasota Journal 20 June 1958: 3.
[14] Ginzburg v. Goldwater, 396 U.S. 1049 (1970).
[15] People v. D. J. H., 1985/2005 (N.Y. Sup. Ct. Aug. 3, 2011)
[16] Schoolcraft v. City of New York
10 Civ. 6005 (RWS) (S. D. N. Y. Jun. 13, 2012)
JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 21

(RWS) (S.D.N.Y. Jun. 13, 2012).

## CASES AND COMMENTS ON

### Successful Challenges of Absolute Judicial Immunity of Judges.

69. Due process, unreasonable seizures, malicious prosecution[17] - 180 F.3d 770 1999 WL 427412

70. Non-judicial act, conspiracy[18] - 638 F.2d 848.

71. ..judge did not have absolute immunity from damages suit under 1983 for his decision to demote and dismiss probation officer.[19] – 484 U.S. 219 108 S.Ct. 538

72. …abused its discretion[20] - 520 U.S. 681 117 S.Ct. 1636

73. …judicial immunity is not a bar to prospective injunctive relief against judicial officer acting in her judicial capacity:

_____

[17] DePiero v. City of Macedonia - United States Court of Appeals, Sixth Circuit. June 23, 1999 180 F.3d 770 1999 WL 427412
[18] Harper v. Merckle - United States Court of Appeals, Fifth Circuit. Unit B March 05, 1981 638 F.2d 848
[19] Forrester v. White - Supreme Court of the United States January 12, 1988 484 U.S. 219 108 S. Ct. 538
[20] Clinton v. Jones - Supreme Court of the United States May 27, 1997 520 U.S. 681 117 S. Ct. 1636

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 22

*74. Individuals who were arrested for non-jailable misdemeanors and were committed to jail when they were unable to meet bail imposed by state magistrate brought suit under section 1983, claiming that magistrate's practice was unconstitutional.[21] - 466 U.S. 522 104 S.Ct. 1970*

*75. retaliatory discharge claim based on judges' claim of "absolute political immunity."[22] - 183 F.3d 962 1999 WL 494022*

76. corrupt conspiracy involving bribery of the judge[23] - 449 U.S. 24 101 S. Ct. 183

77. The absolute judicial immunity (is believed to) end at the border of subject matter jurisdiction.

**Claims against Defendant Hon Sadler:**

- 42 U. S.C. § 1983;

- 42 U.S.C. § 1985;

---

[21] Pulliam v. Allen - Supreme Court of the United States May 14, 1984 466 U.S. 522 104 S. Ct. 1970
[22] Meek v. County of Riverside - United States Court of Appeals, Ninth Circuit. June 24, 1999 183 F.3d 962 1999 WL 494022
[23] Dennis v. Sparks - Supreme Court of the United States November 17, 1980 449 U.S. 24 101 S. Ct. 183
JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 23

- Violation of 1ST, 2ND, 5TH, 6TH, 8TH, 14TH Amendments of US Const.;

- Void orders;

- Negligent Infliction of Severe Emotional Distress

**Demages**: yes

- Injunctive: Yes, Vacating void order - Fed. Rule of Civil Proc. Rule 60

- Declaratory: yes, see below

- Compensatory: Yes if absolute immunity is compromised.

- Punitive: Yes if absolute immunity is compromised.

### *D.* **DEFENDANT JUDGE HON. RICCIARDULLI**

78. The Division of Apelles reversed Dr Biro's conviction <u>Count 1</u>. Under "normal" conditions the remaining conviction <u>Count 2</u> and probation with conditions should also have been reversed and Dr Biro should have cleaned from all accusations for wrongdoing. However the conditions of appeal turned out to be far from ordinarily.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 24

78. The Appellate Opening Brief (AOB) – written by attorney –
contained some errors and facts were missing. Therefore Dr Biro decided
to write the Appellant's Response Brief (ARB) himself. However the brief
turned out to be too ambitious and delayed a few days by Biro's illness.
The reviewing court (represented **by judge RICCIARDULLI** alone), didn't
accept Biro's excuse and denied the admission of this brief. This was
surprising, because the same court granted as much as 120 days delay for
the admission of the Respondent's Brief (RB) to the people's attorney. This
event seems to be an obvious bias in favor of the respondent.

**See: EXHIBIT 04: OBJECTION TO DENIAL OF PERMISSION TO
FILE LATE APPELLANT'S RESPONSE BRIEF**[24] ……………**PAGE: 103**

79. The possible explanation for this bizarre discriminative behavior
of judge RICCIARDULLI was found on the internet, there he openly
disclosed his personal difficulties to criticize the wrongdoings of trial court
judges and admits that his judgements are based on "balancing" between

_____

[24] Filed at the Div. of Appeal on 2019.10.26
JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 25

1    his duty to serve justice and being a loyal and understanding colleague to

2
3    other judges.

4        80. Judge Alex Ricciardulli ratings reviews – 2015/03

5
6            "He said there is a humbling aspect to sitting in review of other

7
8            judges. "On one hand, you don't want to Monday morning

9            quarterback[25] what's happened in the trial court, but on the

10
11           other side you're making sure that justice was done," he said.

12           "Navigating between those two things is not always easy."[26]

13
14   See **EXHIBIT 05**: RICCIARDULLI RATING REVIEW ..........**PAGE107**

15
16
17                          **LAW ANALYSES**

18
19     81. Judge RICCIARDULLI didn't sign the final OPINION of the Div. of

20
21
22   _____

23
24   [25] Definition: "Monday morning quarterback" - *a person who passes judgment on and criticizes something*
     *after the event.* [From Oxford Language] -
25   https://www.google.com/search?q=Monday+morning+quarterback&oq=Monday+morning+quarterback+&aqs=chro
     me..69i57.1970j0j15&sourceid=chrome&ie=UTF-8 - Last accessed 2021.06.27
26   [26] Southern California Appellate News – March 3, 2015 - http://socal-appellate.blogspot.com/2015/03/dj-profiles-
     lasc-appellate-dept-judge.html - Last accessed 2021.06.27
27   JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
     DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
     VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
28   RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
     DISTRESS.- PC 118, 132, 134, 141, 148.5 - 26

Apelles reg. Biro's case. His signature appears only at two places in the docket, BR05423:

> 1) *10/30/2019 Order (appellant's motion for permission to file a late ARB is denied. The clerk is ordered to return the brief provided with his motion. Acting PJ Ricciardulli) - Filed by Court.*
>
> 2) *08/30/2019 Order (filed. Appellant's motion that the court reverse the judgment of conviction on the ground respondent failed to file a brief is denied. McKay, Kumar, Ricciardulli) - Filed by Court.*

82. The role of judge Ricciardulli in the appellate review is not clear. Was he assigned to the case or just interfered? Was his action a "judiciary act" (that a judge normally do) or some single, ad hock, mechanical (unintelligent) administrative disturbance?

83. Seeing the same judge granting 120 days late filing to the respondent but denying a few days delay to the appellant is a remarkable act, clearly showing signs of the presence of bias.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 27

*84. "Rule 8.811. Policies and factors governing extensions of time*

*(3) For a variety of legitimate reasons, counsel or self-represented litigants may not always be able to prepare briefs or other documents within the time specified in the rules of court. To balance the competing policies stated in (1) and (2), applications to extend time in the appellate division must demonstrate good cause under (b). If good cause is shown, the court must extend the time."*

85. Seeing the voluntary pleading of Judge RICCIARDULLI, Plaintiff tends to interpret the refusal of admission of his ARB as an intentional act. It suppress appellant's evidence and gave a chance to the defendant (People) to save some of the trial court's ruling. And this is exactly what happened. The Division reversed Biro's conviction for <u>Count 1</u>, but left conviction for <u>Count 2</u> intact even in the complete absence of evidence. This "diplomatic" act legitimized Biro's ongoing punishment (probation, mandatory outpatient commitment) as well as his false arrest and imprisonment.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 28

2021.08.22        COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL        28 OF 109

86. However, this *...I want to be a good boy, not a Monday morning quarterback*...[27] attitude is incompatible with the role of an appellate judge in the American Judiciary.

87. See for details: **California Code of Judicial Ethics[28]**

*"Canon 1 - A Judge shall Uphold the Integrity\* and Independence\* of the judiciary"*

*"Canon 3 - A Judge shall Perform the Duties of Judicial Office Impartially,\* Competently, and Diligently"*

**Claims against Defendant Hon Ricciardulli:**

- 42 U. S.C. § 1983;

- 42 U.S.C. § 1985;

- Violation of 1ST, 2ND, 5TH, 6TH, 8TH, 14TH Amendments of US Const.;

- Void orders;

———————————————

[27] These are the words of Plaintiff Dr Biro to interpret the public pleading of Hon Ricciardulli.
[28] https://casetext.com/rule/ca-rules-of-court/california-code-of-judicial-ethics

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 29

- Negligent Inflction of Severe Emotional Distress

**Demages**: yes

- Injunctive: Yes, Vacating void order - Fed. Rule of Civil Proc. Rule
60

- Declaratory: yes, see below

- Compensatory: Yes if absolute immunity is compromised.

- Punitive: Yes if absolute immunity is compromised.


**THE QUESTION OF ABSOLUTE JUDICIAL IMMUNITY WHEN THE
REVIEWING COURT IS COMPROMISED.**

88. Judges are protected by absolute judicial immunity, a doctrine
that is inconsistent with the Fourteenth Amendment. Under the doctrine of
judicial immunity, a victim can be forced to bear the full burden of a serious,
irreparable injury inflicted by a state-court judge in blatant violation of the
Constitution. The policy underlying judicial immunity – pronounced by
Supreme Courts – is that judicial immunity in effect is a necessary evil, the

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 30

2021.08.22        COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL        30 OF 109

price to be payed for "fearless" judiciary. However judges are capable of

causing enormous and irremediable harm.[29]

89. The proper method to challenge judicial errors (good-faith errors

or corruption) is appeal. If appeal indeed is the proper method of challenge,

the judiciary cannot justify granting immunity to judges who have prevented

an appeal from happening.

90. A judge thus remains unquestionably immune as long as he does

not take actions that intentionally and plainly prevent further review.

Denying access to appellate review usually waves the immunity of the trial

court judge.

91. But what happens if the appellate review is permitted but the

reviewing court is corrupted? The simultaneous presence of breaches in

judicial performance on the trial court as well as the relevant reviewing

court (additive effect) has absolutely devastating effect on the

administration of justice: justice is not served, an innocent party pays very-

_____

[29] Stump v. Sparkman, 435 U.S. 349 (1978)

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 31

very high price. <u>Therefore it is reasonable to assume, that access to biased</u> <u>reviewing court equals to no access at all</u>. It suspends the trial court's immunity and renders their judgement VOID (i.e. a nullity).

## E. **DEFENDANT THE CITY OF LOS ANGELES**

92. The City of Los Angeles is sued a municipality in official capacity as well as "person".

93. Suing cities as Persons under 42 U.S.C. 1983 is possible since the decision of Supreme Court of *Monell v. Dep. of Social Services of the City of New York – 436 US 658 (1978).*

94. The Office of City Attorney is a major power in interpreting and enforcing the law – recently under the leading of Attorney Mike Feuer.

95. Plaintiff insists, that the City failed to provide elementary medical/legal protection to – at least one citizen, Plaintiff Dr Biro - when appointing a prosecutor Phillips - with strong prejudice and weak sense of constitutional justice, - to incriminate him with the sole purpose of providing shelter to California's most sued cosmetic surgeon.

96. The preponderance of evidence supports the claim against the City,

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 32

97. Several judges participated in the "witch-hunt" against Dr Biro, some not mentioned in this complaints.

98. Four qualified criminal defense attorneys (not mentioned in this complaint) had been appointed, retained by Dr Biro for his defense, all failed because they were afraid to provide effective defense against the "will" of the City Attorney.

99. Plaintiff Dr Biro notified several responsible authorities about the ongoing miscarriage of justice by city prosecutor Phillips, including but not limited to: *Atty Mike Feuer (chief of the Office of City Attorney, 2019.06.07); *Atty. Windham, Mark E. (Chief Justice of the Airport Courthouse, 2019.06.17); Division of Appeals Spr. C LA, (2019.06.08). Plaintiff Dr Biro's prayers remained unanswered.

100. Plaintiff finds it very disturbing that Courts in LA – he has experience with – completely relied on hearsay statements from Defendant Dr Keyes while his repeated and consequent oppositions were ignored.

101. Plaintiff finds it very disturbing that Courts in LA – he has experience with – permitted Defendant Dr Keyes false allegations of anti-Semitism, bigotry without noticing that a honorable religion was misused by

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 33

the Defendant for a dishonorable purpose, namely to avoid responsibility for a long series of serious medical malpractice.

102. Consequently Plaintiff concludes that the City of Los Angeles has or permits a <u>policy</u> that is not in accord with the Fourteenth Amendment of the US. Constitution that instructs:

> "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

 **Claims against <u>Defendant City of Los Angeles</u>:**

* 42 U.S.C. § 1983;

* 42 U.S.C. § 1985;

* Malicious prosecution,

*CONSPIRACY [PEN 182(a)(2, 3, 5)];

* Preparing & Offering False Evidence" [PC 132 or 134.];

* Fraudulent misuse of Court resources;

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 34

* Intentional infliction of several emotional distress;

- Preparing & Offering False Evidence" [California Penal Code sections 132 or 134].

- Section 141 of the California Penal Code]

**Demages:**

* Injunctive relief: here vacating void judgment

* Declaratory relief: yes

*compensatory: yes/no, see separate notes


## 1.02  LIST OF CLAIMS BY THE AFFECTED DEFENDANTS

Plaintiff incorporates the preceding paragraphs by reference as if fully rewritten herein.

### 103. First Claim

42 U. S.C. § 1983--Against All Defendants

### 104. Second Claim

42 U.S.C. § 1985--Against All Defendants.

### 105. Third Claim

Violation of Plaintiff's Constitutional Rights as defined by

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 35

### 106. First Amendment:

Against Defendant Hon Sadler, Ricciardulli -

For issuing and maintaining Criminal Protective Order;

### 107. Second Amendment:

Against Defendant Hon Sadler, Ricciardulli -

For issuing and maintaining Criminal Protective Order;

### 108. Fifth Amendment:

Against Defendant Hon Sadler, Ricciardulli and Phillips.-

For deprivation of liberty without due process of law in Criminal case.

### 109. Sixth Amendment:

Against Defendant Hon Sadler, Ricciardulli and Phillips. -

For compromising Plaintiff's right to compulsory Process for obtaining

witnesses in his favor.

### 110. Eight Amendment:

Against Defendant Hon Sadler, Ricciardulli and Phillips -

For inflicting and maintaining cruel and unusual Punishment.

### 111. Fourteenth Amendment:

Against Defendant Hon Sadler, Ricciardulli, Phillips and the City of Los

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 36

Angeles -

For enforcing a law that abridge the privileges or immunities of citizen of the United States: and denying the Plaintiff within its jurisdiction the equal protection of the laws.

### 112. Fourth Claim

Fed. Rule of Civil Proc. Rule 60. - Against Defendants Sadler and Ricciardulli.

### 113. Fifth Claim

Based on 28 U.S. Code § 1367 - Supplemental jurisdiction.

Against Defendant Dr Keyes, - for Intentional Infliction of Severe Emotional Distress,

Against Defendants Hon Sadler, Hon Ricciardulli, Atty Phillips – for Negligent Infliction of Severe Emotional Distress.

### 114. Sixth Claim

### Claims for Potentially Criminal Actions (Fraud).

Based on 28 U.S. Code § 1367 – Supplemental jurisdiction.

- Against Defendant Dr Keyes and Defendant Attorney Phillips – for

• Preparing & Offering False Evidence" [California Penal Code

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 37

2021.08.22        COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL        37 OF 109

sections 132 or 134].

• Section 141 of the California Penal Code];

• Malicious prosecution

- Against Defendant Dr Keyes for

• Perjury - California Penal Code Section 118 PC,

• Making False Reports of Crimes, PC 148.5

## 115. EXTRAORDINARY DEMAGES

In additional to the well-known losses related to all similar cases, like, time, expanses, - Plaintiff suffered extraordinary demages:

116. a) His scientific works had been strongly distracted and deteriorated by the frustration and intimidation caused by his colleague, Defendant Dr Keyes and his powerful collaborators, Defendants Hon. Sadler and prosecutor Defendant Phillips. He lost the option to develop a fresh biotechnology patent (and years of creative working behind it). [Patent #: 8145437, issued: 03/27/2012]

117.b) Defendant Dr Biro developed depression and had been diagnosed with post-traumatic-stress-disorder (PTSD) directly after his

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 38

arrest and imprisonment 2019.08.28. This will probably follow him during
the rest of his life.

**Prayer for Relief**

118. A) Injunctive relief: Plaintiff Dr Biro already served his
punishment.

119. Therefore it is respectfully requested, that the Court applies the
Fed. Rule of Civil Proc. Rule 60(b)(4) as substitute remedy and completely
reverses his conviction on 2018.10.17 (partially already reversed on
appeal) as void and orders the complete sealing and destruction of all
related documents.

120. Furthermore it is requested that the Court orders the involved
psychiatrists to seal and destroy all records related to Plaintiff Dr Biro.

121. B) Declarative relief: Plaintiff Dr Biro's persecutive prosecution
and sentencing didn't answer the fundamental questions raised by the
initial, non-personal but strictly professional disagreement between two
senior doctors. The answer/solution provided by the involved representants
of the law (the defendants) is – as Plaintiff is able to cognize – strongly
dissatisfactory. Therefore a declarative relief is motivated.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR
DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, -
VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60:
RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL
DISTRESS.- PC 118, 132, 134, 141, 148.5 - 39

122.  C) Compensatory relief in an amount to be determined at Trial.  Plaintiff estimates his costs related to the 60 days spent on the trial Court and 38 days spent with court ordered un-consented consulting with psychiater – to be 100.000$ (one hundred thousand USD,  today) total.

123.  D) Attorney and consult costs: in an amount to be determined at trial.

124.  E) Punitive relief - in an amount to be determined at trial. Plaintiff Dr Biro estimates that min. 5.0M$ (five million USD) is needed – total – to reconstruct his scientific activity and benefit the USA, as promised and as hi certainly could under normal circumstances.

125.  It is not possible to estimate the demages and requested relief itemized by individual defendants, because 4 of 5 defendants have some form of immunity against monetary demages under 42 USC Section 1983.

Respectfully submitted,

Dated: 23rd August, 2021

Jan Charles Biro MD. PhD
Plaintiff – Pro Per.

JURY TRIAL REQUESTED! COMPLAINT PURSUANT TO: - 42 U.S.C § 1983 CIVIL ACTION FOR DEPRIVATION OF RIGHTS, - 42 U.S.C § 1985 CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS, - VIOLATION OF 1ST, 2ND, 5TH, 6TH, 8TH, 14TH AMENDMENTS OF THE US CONSTITUTION, - RULE 60: RELIEF FROM A JUDGEMENT OR ORDER- INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.- PC 118, 132, 134, 141, 148.5 - 40

# Jan Charles Biro MD. PhD



## PRACTICING THE 4-WAY TEST

*1) Is it the TRUTH? 2) Is it FAIR to all concerned? 3) Will it build GOODWILL and BETTER FRIENDSHIPS? 4) Will it be BENEFICIAL to all concerned?*



### SERVING SCIENTIFIC EXCELLENCE
Indiv. w/Adv Deg or Exceptional Ability in the National Interest (USA) since 2006



### DEGREES & POSITIONS
2012- recent – CEO – AffiSeq® Co



2002 - recent - Professor - Homulus Fnd - Los Angeles



1985 - recent - Honorary Professor - Karolinska Institute - Stockholm
1983 - PhD - Karolinska Institute - Stockholm



1985 - Spec. Int. Med - Karolinska Hospital – Stockholm;
1983 - Spec. Endocrinology - Karolinska Hosp. Sweden;
1974 – MD

## MAJOR SCIENTIFIC CONTRIBUTIONS

1. Proposing the concept of "estromedins" - 1979
2. Proposing: both DNA strands are transcribed - 1983
3. Proposing the Proteomic Code - 1983
4. Developing a new Blast method (BlastNP) - 2002
5. Proposing the "Cuprion" (PrP-Sc) model - 2003
6. Proposing a novel DNA model - 2003
7. Creating a Common Periodic Table of Codons and Amino Acids - 2003
8. Proposing: Protein-Protein Interaction Code - 2005
9. Proposing: Nucleic Acid Chaperons - 2006
10. Novel Method to design Affinity Peptides - 2007
11. Prediction of wobble bases - 2008
12. Full understanding of the "redundancy" of the Genetic Code - 2008
13. Publishing Principia Bi®o-Informatica - 2009
14. Completing Nirenberg's Genetic Code – 2010
15. "Discovering" and publishing the "Bias in the Nobel Prize" - 2011
16. Predicting novel tRNA kinetics & functions - 2012
17. Patenting AFFISEQ® - 2012
18. Firing the chief editor of TBioMed for "science censorship" - 2013

### PROFESSIONAL MEMBERSHIPS

Swedish Endocrine Society, American Endocrine Society, European Study Group of Steroid Hormones, European Society of Artificial Organs, Swedish Medical Association, American Association for Advancement of Science (AAAS), International Society of Computational Biology (ISCB), BIO: Biotechnology Industry Organization

### RECOGNISED

Who's Who in America - since 2004; Who's Who in Science and Engineering - since 2005; Indiv. w/Adv Deg or Exceptional Ability in the National Interest (USA) - since 2006; George Gamow Fellowship – 2007; Homulus Award for Scientific Excellence - 2008

### PUBLICATIONS & BOOKS

Creative Ideas in Molecular Biology & Bioinformatics, - 2010;
The Proteomic Code, 2009; Principia Bi(r)oinformatica, 2009; The utero-pituitary axis, 1983;
About 100+ scientific publications (all peer reviewed); Several patents and patent applications

### REFEREE

Bioinformatics, BMC Bioinformatics, Genome Biology, BMC System Biology, In Silico Biology, BMC Genomics, MEDAcorp., BMC TBioMed., Theoretical Biology Insights,
EXECUTIVE EDITOR: J. THEOR. COMPUT. SCI - OMICS

Department of Homeland Security
U.S. Citizenship and Immigration Services

**I-797, Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | CASE TYPE I140 |
|---|---|
| WAC-05-249-52700 | IMMIGRANT PETITION FOR ALIEN WORKER |

| RECEIPT DATE | PRIORITY DATE | PETITIONER |
|---|---|---|
| September 16, 2005 | September 15, 2005 | BIRO, JAN C. |

| NOTICE DATE | PAGE | BENEFICIARY A099 052 281 |
|---|---|---|
| June 2, 2006 | 1 of 1 | BIRO, JAN C. |

JAN C. BIRO
HOMULUS INFORMATICS
88 HOWARD 1205
SAN FRANCISCO CA 94105

Notice Type: Approval Notice
Section: Indiv w/Adv Deg or Exceptional
         Ability in the National
         Interest

The above petition has been approved. The approved petition will be stored in this office. If the person for whom you are petitioning is or becomes eligible to apply for adjustment of status, he or she should contact the local INS office to obtain Form I-485, Application for Permanent Residence. A copy of this notice should be submitted with the application, with appropriate fee, to this Service Center. Additional information about eligibility for adjustment of status may be obtained from the local INS office serving the area where he or she lives, or by calling 1-800-375-5283.

If the person for whom you are petitioning decides to apply for a visa outside the United States based upon this petition, the petitioner should file Form I-824, Application for Action on an Approved Application or Petition, with this office to request that we send the petition to the Department of State National Visa Center (NVC).

The NVC processes all approved immigrant visa petitions that require consular action. The NVC also determines which consular post is the appropriate consulate to complete visa processing.  It will then forward the approved petition to that consulate.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

Please see the additional information on the back.  You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
**Customer Service Telephone: (800) 375-5283**



**APPELLATE DIVISION OF THE SUPERIOR COURT**

**OF CALIFORNIA, COUNTY OF LOS ANGELES**

STANLEY MOSK COURTHOUSE

111 N HILL STR. - LOS ANGELES, CA 90012

_____

Appellate Division **No. BR054237**

_____

PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff and Respondent,

V.

JAN CHARLES BIRO,

Defendant and Appellant,

_____

From the Superior Court

For the County of Los Angeles

Trial Case No. 7AR00588-01

Honorable William L. Sadler

_____

**MOTION TO TAKE JUDICIAL NOTICE OF**

**CA'S #1 „*PRONE-TO-COMPLAINTS*" COSMETIC SURGEON**

**DR G.R. KEYES [UNDER THE COLOR OF LAW]**

To be considered together with the Briefs (AOB, RB, ARB).

Opportunity to Be Heard is requested.

CA Ev. Code § 451(f), § 452(d), (e) (2), (g), (h); § 454(a) (1); CRC Rule 8.252(a)

_____

JAN CHARLES BIRO MD. PhD

Appellant Pro Se

1281 – 9th Ave. – Apt. 3904

San Diego, CA 92101

Phone: (619)677 2623

JC.BIRO.MD@GMAIL.COM

Appellant Jan Charles Biro MD. PhD ("Appellant") moves the Court to take judicial notice of the following documents:

**Exhibit A**: **MOTION FOR JUDICIAL NOTICE [EVID 452 (d) (1) and (2)] – Dr Keyes' Court Cases** ….…… See even **CT 97 ……………** <u>**See p. 07**</u>

This motion had been filed at the trial court, but it was ignored. It lists the publicly documented cases (from the Court Indexes of the Superior Courts in Los Angeles and in Chicago) of medical malpractice lawsuits against "victim" (represented by the respondent).

It is significant for the recent appeal as evidence supporting appellant's opinion, that his actions (writings) to initiate "peer review" of Keyes' has strong and legitimate purpose.

This should be judicially noticed by the Division of Appeals accordingly to **CA Ev. Code § 452(d), (h); § 454(a) (1);**


**Exhibit B**: **AMY WALLACE - Face-off - The Confounding Case of Marchioni v. Keyes** ……………………………………………. <u>**See p. 10**</u>

This article - published by the LA MAGAZINE - had been filed at the trial court and it is even reproduced in **PEOPLE'S 10** [petition to the government, p.174]

It is significant for the recent appeal as evidence supporting appellant's opinion, that his actions (writings) to initiate "peer review" of Keyes' has strong and legitimate purpose.

This should be judicially noticed by the Division of Appeals accordingly to **CA Ev. Code § 451(f), § 452(d), (h); § 454(a) (1);**

**Exhibit C**: BIRO & COHEN: **Identification of the "Prone-to-Complaints" Cosmetic-Plastic Surgeons of California** - Printed Folder, 2017. – Available:  http://www.honestyenforcer.com/files/BIRO-COHEN_Identification-of-Prone-to-Complaints-PTC-Cosmetic-Plastic-Surgeons-of-California-2018.pdf ……………………………  **See p. 32**

This was admitted to the trial court as evidence.

This is significant for the recent appeal to explain the frequency of medical malpractice lawsuits against cosmetic surgeons in California and the danger of these PTC doctors on their consumers/patients and as evidence supporting appellant's opinion, that his actions (writings) to initiate "peer review" of Keyes' has strong and legitimate purpose.

The statistical evaluation of this study places Dr Keyes on the first place of the most sued cosmetic surgeons in CA, i. e. he is the #1 PTC of this state and of his specialty. [It is regarded by Dr Biro as a strongly dishonorable position]

This should be judicially noticed by the Division of Appeals accordingly to **CA Ev. Code § 452(d), (h); § 454(a) (1);**


**Exhibit D**: AB. Jena, et.al: Malpractice Risk According to Physician Specialty, N Engl J Med 2011; 365:629-36. - http://www.nejm.org/doi/pdf/10.1056/NEJMsa1012370 ............ **See p. 52**

It was not admitted to the trial court.

This article was used to calculate the extreme magnitude of Keyes malpractice frequency (33 registered cases) compared to the statistical average of all doctors in the same specialty and after the same number of years in practice. (~5). Dr Keyes has ca 7-times more medical malpractice cases than his colleagues has in average.

It is significant for the recent appeal as evidence supporting appellant's opinion, that his actions (writings) to initiate "peer review" of Keyes' has strong and legitimate purpose.

This should be judicially noticed by the Division of Appeals accordingly to **CA Ev. Code § 452(d), (h); § 454(a) (1);**


## LEGAL AUTHORITY FOR TAKING JUDICIAL NOTICE OF THE MATERIALS PRESENTED HERE

Judicial notice may be taken of the following matters

**CA Ev. Code § 451(f),**

Judicial notice <u>shall</u> be taken of the following:
(f) Facts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute.
*(Amended by Stats. 1986, Ch. 248, Sec. 43.)*


**§ 452(d),**

Judicial notice <u>may be</u> taken of the following matters to the extent that they are not embraced within Section 451:

(d) Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States.

(g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute.

(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy.

*(Enacted by Stats. 1965, Ch. 299.)*

**§ 454(a) (1);**

(a) In determining the propriety of taking judicial notice of a matter, or the tenor thereof:

(1) Any source of pertinent information, including the advice of persons learned in the subject matter, may be consulted or used, whether or not furnished by a party.

**CRC Rule 8.252(a)**

**Rule 8.252. Judicial notice; findings and evidence on appeal**

**(a) Judicial notice**

(1)  To obtain judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order.

(2)  The motion must state:

(A)  Why the matter to be noticed is relevant to the appeal;

(B)  Whether the matter to be noticed was presented to the trial court and, if so, whether judicial notice was taken by that court;

(C)  If judicial notice of the matter was not taken by the trial court, why the matter is subject to judicial notice under Evidence Code section 451, 452, or 453; and

(D)  Whether the matter to be noticed relates to proceedings occurring after the order or judgment that is the subject of the appeal.

(3)  If the matter to be noticed is not in the record, the party must serve and file a copy with the motion or explain why it is not practicable to do so. The

pages of the copy of the matter or matters to be judicially noticed must be consecutively numbered, beginning with the number 1.

*(Subd (a) amended effective January 1, 2015; previously amended effective January 1, 2009, and January 1, 2013.)*

**CONCLUSIONS**

1. Publicly available court records indicates that Dr Keyes had been sued for medical malpractice 33 times during his carrier as cosmetic surgeon.
2. He had been portrayed by the LA Magazine already in 2003 as a cosmetic surgeon with unusually high number of medical malpractice lawsuits against him, a doctor who cases much trouble and sufferings to his patients.
3. Dr Keyes is the # 1 Prone-to-complaints (PTC) cosmetic surgeon in CA accordingly a state-wide statistical study performed by Dr Biro & Dr Cohen in 2017.

The efforts of appellant Dr Biro to initiate professional, unbiased "peer-review" of Dr Keyes surgery practices is well motivated and legitimate reason to explain his criticism and legal actions against Dr Keyes.

Dated this 04th of November, 2019.

_____

JAN C BIRO MD PhD.

APPELLANT – PRO SE

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JAN 30 2018

Sherri R. Carter, Executive Officer/Clerk
By: _JORGE L. FAVELA_ Deputy

1  JAN C BIRO - Pro Se

2

3  **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, AIRPORT**
**COURTHOUSE –**
4  **11701 S. LA CIENEGA BLVD. LOS ANGELES, CS 90045.**

5

6

7  **GR KEYES** – UNDER THE COLOR OF LAW "THE OFFICE OF CITY ATTORNEY"

8  Plaintiff, Cross Defendant

9  vs.

10

11  **JAN CHARLES BIRO MD. PHD,**

12  Defendant, Cross-Complainant

13  .

14

CASE NO.: **LAX7AR00588-01**

ASSIGNED FOR ALL PURPOSES TO **JUDGE HON. W. SADLER**
Dept.: **W90**
DATE: **JAN 28, 2018 – TRIAL PREP**
TIME: 8:30 AM
CRT: 01

**DR BIRO'S EVIDENCE # 11**

**MOTION FOR JUDICIAL NOTICE [EVID 452 (D) (1) AND (2)] – DR KEYES' COURT CASES.**

15      Alleged "victim" Keyes is a fluent user of court services: we
16  know about 33 malpractice litigations against him (significant court
17  events) and additional 20 there he was plaintiff or defendant in small
    claims court cases (less significant cases from our point of view).
18      These numerous court cases identifies him as a *"Prone-to-
19  Complaints"* physician. [1,2]

20

21  Dated this 29th of JAN, 2018.

22

23                                  Jan Charles Biro MD – Defendant
24                                  & Cross Complainant – *Pro Se*

25  _____

26

27  [1] **J.C. BIRO MD. & D.F. COHEN PHD: Identification of the "Prone-to-Complaints" [PTC] Cosmetic/Plastic Surgeons of California – 2018 -** https://hon astvenforar.com/files/BIRO-COHEN.pd?
[2] Studdert DM, Spittal MJ, Bismark MM: The PRONE Score: An Algorithm for Predicting Doctors' Risks of Formal Patients Complaints Using
28  Routinely Collected Administrative Data, - 24 BMJ Quality and Safety 360 (2015).
DR BIRO'S EVIDENCE # 11 MOTION FOR JUDICIAL NOTICE [EVID 452 (D) (1) AND (2)] – DR KEYES' COURT CASES. - 1

| THE COURT CASES OF GR. GEOFFREUY R. KEYES | | | |
|---|---|---|---|
| | CASE # / PLAINTIFF | DEFENDANT | |
| 1 | SS004384 | | |
| | FITZGERALD WINIFRED M | KEYES GEOFFREY R | med.malp. |
| 2 | BC088108 | | |
| | CYNTHIA WHITNEY | GEOFFREY R. KEYES, M.D., ET AL | med.malp. |
| 3 | BC222244 | | |
| | ELIZABETH MEDEARIS | GEOFFREY R KEYES MD ET AL | med.malp. |
| 4 | BC059827 | | |
| | GLORIA ARRASMITH | GEOFFREY KEYES, M.D. | med.malp. |
| 5 | BC409218 | | |
| | JACQUELINE ETESSAMI ET AL | KEYES SURGERY CENTER ET AL | med.malp. |
| 6 | BC490652 | | |
| | JAN C BIRO | GEOFFREY KEYES | med.malp. |
| 7 | SC068455 | | |
| | KAY MARCHIONI | GEOFFREY R. KEYES,M.D. ET. | med.malp. |
| 8 | SC020340 | | |
| | STEVE BELISLE | CEDAR SINAI MEDICAL CENT. | med.malp. |
| 9 | 93K34891 | | |
| | MANDEL, CARYN | KEYES, GEOFFREY MD | med.malp. |
| 10 | SC053933 | | |
| | MARY MAZZARISI | STATE OF THE ART SURGERY | med.malp. |
| 11 | 85L016818 | | |
| | Alvin Jenkins | Geoffrey Keyes | med.malp. |
| 12 | 88L012020 | | |
| | Ana B. Diaz | Geoffrey Keyes | med.malp. |
| 13 | 87L017319 | | |
| | Andrea Rose | Geoffrey R. Keyes | med.malp. |
| 14 | 76L010980 | | |
| | Angela V. Swinney | Geoffrey Keyes | med.malp. |
| 15 | SC018402 | | |
| | Anna Maria Giangregorio | Geoffrey R. Keyes | med.malp. |
| 16 | BC088108 | | |
| | Cynthia Whitney | Geoffrey R. Keyes | med.malp. |
| 17 | 82L024587 | | |
| | Dennis Sievert | Geoffrey Keyes | med.malp. |
| 18 | 86L008452 | | |
| | Dennis Sievert | Geoffrey R. Keyes | med.malp. |
| 19 | BC222244 | | |
| | Elizabeth Medearis | Geoffrey R. Keyes | med.malp. |
| 20 | SC0533933 | | |
| | Estate of Joanne Mazzarisi | Geoffrey R. Keyes | med.malp. |
| 21 | 81L017396 | | |
| | Florence Stafford | Geoffrey Keyes | med.malp. |
| 22 | 83L020187 | | |
| | Gail Minark | Geoffrey Keyes | med.malp. |
| 23 | BC059827 | | |
| | Gloria Arrasmith | Geoffrey R. Keyes | med.malp. |
| 24 | 89L000527 | | |
| | JoAnne Krueger | Geoffrey R. Keyes | med.malp. |
| 25 | 85L019515 | | |
| | Jose Fontanez | Geoffrey R. Keyes | med.malp. |
| 26 | SC068455 | | |
| | Kay Marchioni | Geoffrey R. Keyes | med.malp. |

DR BIRO'S EVIDENCE # 11 MOTION FOR JUDICIAL NOTICE [EVID 452 (D) (1) AND (2)] – DR KEYES'
COURT CASES. - 2

| | THE COURT CASES OF GR. GEOFFREUY R. KEYES (CONT.) | | |
|---|---|---|---|
| | **CASE # / PLAINTIFF** | **DEFENDANT** | |
| 27 | 81L003299 | | |
| | Kenneth Moskal | Geoffrey Keyes | med.malp. |
| 28 | 81L019383 | | |
| | Maryann Geraldi | Geoffrey Keyes | med.malp. |
| 29 | 85L024229 | | |
| | Michael McCarty | Geoffrey Keyes | med.malp. |
| 30 | 89L008345 | | |
| | Niurka Guervara | Geoffrey Keyes | med.malp. |
| 31 | 913538 | | |
| | Patricia Bacall | Geoffrey R. Keyes | med.malp. |
| 32 | 83L020186 | | |
| | Tari Gradman | Geoffrey Keyes | med.malp. |
| 33 | SS004384 | | |
| | Winifred Fitzgerald | Geoffrey R. Keyes | med.malp. |
| | | | |
| 34 | 95C00562 | | |
| | KEYES, GEOFFREY R. M.D. | JOHN ALDEN LIFE INS | |
| 35 | SC077938 | | |
| | GEOFFREY R. KEYES, M.D. | PATRICIA BACALL | |
| 36 | WEC141408 | | |
| | KEYES GEOFFREY R | ALLIED VAN LINES INC | |
| 37 | BS140762 | | |
| | GEOFFREY R KEYES MD | JAN C BIRO | |
| 38 | BS151935 | | |
| | GEOFFREY R. KEYES | JAN C. BIRO | |
| 39 | BS160192 | | |
| | GEOFFREY ROBIN KEYES | JAN CHARLES BIRO | |
| 40 | 96C02421 | | |
| | KEYES, R. M.D. GEOFFREY | MONTANO, ARLENE | |
| 41 | BC265222 | | |
| | GEOFFREY R KEYES ET AL | MID CENTURY INSURANCE COMPANY | |
| 42 | 96C02421 | | |
| | KEYES GEOFFREY R, KEYES MARY A | ALLIED VAN LINES INC., | |
| 43 | 904884 | | |
| | GEOFFREY R KEYES M D PC | OLAIZ, JAMES | small |
| 44 | 94S00666 | | |
| | GEOFFREY R. KEYES | CHADWICK POPE | small |
| 45 | 94S00292 | | |
| | GEOFFREY R. KEYES, M.D. | ALICIA RODRIGUEZ | small |
| 46 | 94S00291 | | |
| | GEOFFREY R. KEYES, M.D. | ANTHONY MORALES | small |
| 47 | 94S00293 | | |
| | GEOFFREY R. KEYES, M.D. | TRICIA BATTISTIN | small |
| 48 | 10S00490 | | |
| | KEYES, GEOFFREY R | GONZALEZ, GEORGE | small |
| 49 | 94S01738 | | |
| | KEYES, GEOFFREY R., M.D. | BETANCOURT, CONNIE | small |
| 50 | 913538 | | |
| | BACALL, PATRICIA S. | KEYES, GEOFFREY R. M.D. | small |
| 51 | 12SB0298 | | |
| | BIRO DR., JAN CHARLES | KEYES DR., GEOFFREY R | small |
| 52 | 07SB1199 | | |
| | CHANDLER, G. NANCY | GEOFFREY R. KEYES, M.D., F.A.C | small |
| 53 | 92S06952 | | |
| | WINIFRED M. FITZGERALD | GEOFFREY R. KEYES, MD | small |

DR BIRO'S EVIDENCE # 11 MOTION FOR JUDICIAL NOTICE [EVID 452 (D) (1) AND (2)] – DR KEYES'
COURT CASES. - 3

1  JAN C BIRO - Pro Se

2

3      **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES, AIRPORT**
       **COURTHOUSE –**
4
       **11701 S. LA CIENEGA BLVD. LOS ANGELES, CS 90045.**
5

6
   **GR KEYES** – UNDER THE COLOR OF        CASE NO.: **LAX7AR00588-01**
7  LAW "THE OFFICE OF CITY ATTORNEY"
                                            ASSIGNED FOR ALL PURPOSES TO
8  Plaintiff, Cross Defendant                 **JUDGE HON. W. SADLER**
                                           Dept.: **W90**
9                                          DATE: **FEB 01, 2018 – TRIAL PREP**
   vs.                                     TIME: **8:30 AM**
10                                         CRT:  **01**

11 **JAN CHARLES BIRO MD. PHD,**           `DEFENDANT BIRO'S`
                                           `EVIDENCE #5 - FACE OFF`
12 Defendant, Cross-Complainant

13

14          Article by Amy Wallace: Face-off: The Confounding Case of

15 Marchioni v. Keyes – 2003.

16

17          Dated this 01th of FEB, 2018.

18

19                                    _____

20                                    Jan Charles Biro MD – Defendant

21                                    & Cross Complainant – *Pro Se*

22

23

24

25

26

27

28

   DEFENDANT BIRO'S EVIDENCE #5 - FACE OFF - 1

Printed for personal use only



# Face-off: The Confounding Case of Marchioni v. Keyes

One women sued Keyes alleging that a piece of a surgical instrument was left lodged in her face. Another woman sued alleging that an eye-lift performed by Keyes left her unable to shut her eyes.

Posted on September 4, 2003 by Amy Wallace



They all want to help Kay. The former insurance agent, the general contractor, the emergency medical, the retired air force reservist, the newspaper marketing executive—these people, and others, too, are speaking out on Kay's behalf. Only one has met her in person. Still, all say that in Kay's story, they recognize their own. They live in Alabama, Illinois, and Southern California. Before Kay called and introduced herself, none of them knew the others existed. Kay—Kindergarten teacher in the Chicago public schools—filled them in. There were more than 20 like them, she said, with just over two decades, each had filed a lawsuit against a plastic surgeon named Geoffrey Keyes. Many of those suits had been filed in Chicago. Then, after Keyes moved his practice to Los Angeles in 1989, more were filed here. Kay was the 23rd person to sue but the first to discover she was not alone.

One women sued Keyes alleging that a piece of a surgical instrument was left lodged in her face. Another sued Keyes claiming that a chin implant he'd put in was shifting and that she'd had excessive and unnecessary scarring. The family of a woman who had her breast reduced by Kelles alleged that he shouldn't have performed the surgery because the woman was already in the hospital being treated for anorexia. Two women claimed their noses had partially collapsed after surgery by Keyes. Another woman sued alleging that an eye-lift performed by Keyes left her unable to shut her eyes.

When Kay tracked these people down, a few who had settled their lawsuits against Keyes refused to talk. But those whose law-suits had been unsuccessful found themselves rooting for her. "The theme all along gas been 'Okay, we know we can't pursue it any farther, but maybe somebody can get this guy," says Robert Krueger, a Chicago-area retiree who says his late wife, JoAnne, underwent two surgeries to repair her airway after Keyes operated on her deviated septum. "Maybe somebody can pull this guy off the street."

Kay Marchioni wants to be that somebody She wants it like she has wanted almost nothing else. Marchioni, who is 59 years old, has been tireless—obsessive, even—about researching Keyes's life. In the three years since Keyes operated on her face, she has tracked down every lawsuit filed against the doctor and created a Web site, www.geoffreykeyeslawsuits.com, to list them. She has double-checked the veracity of every item on his curriculum vitae, questioned his medical school classmates, assembled his family tree.

"How many patients know all these things about their doctor?" Marchioni says, her voice a mixture of sadness and pride. She can tell you that Keyes began losing his hair before he completed his residency. She can tell you what he likes to wear to court: blue blazers and khaki slacks. She can even tell you the name of his most well known client: Linda Tripp, the former friend of Monica Lewinsky

Marchioni has called Tripp, just like she has called so many other former patients of Keyes. Several who have never met Marchioni feel they know her well enough to call her by her first name. "Have you talked to Kay?" they'll ask. Chances are, the answer is yes.

Dr. Geoffrey Robin Keyes is handsome—a lean six-footer with a strong jaw and a prominent brow. In the black-and-white portrait in his Web site, www.keycare.com, he looks friendly and confident in a turtleneck sweater, his arms folded across his chest, his slender face caught in a half smile. In person, though, his blue eyes are most striking. Alert, intelligent, Keyes's eyes make you feel you know him better than you do.

"I'd love to tell you the whole story," he says one June morning It is the second day of jury selection in Marchioni v. Keyes, and the doctor has just arrived at the Santa Monica courthouse. As Marchioni predicted, he is wearing khakis. In the hallway outside Department O, Keyes says the Marchioni lawsuit is one big lie. "The media needs to

hear this," he says. "I'll tell you everything. When you see what transpires in this courtroom, when you hear who I am, I think you'll understand."

Keyes is a 56-year-old graduate of Case Western Reserve University and Loyola University Chicago's Stritch School of Medicine. He is board certified in both plastic surgery and otolaryngology, or surgery of the head and neck. He estimates there are only 400 doctors in the country who have that double certification. He is the author or coauthor of numerous scientific papers with titles like "Tumors of the Major Salivary Glands." He is on the board of the American Association for Accreditation of Ambulatory Surgery Facilities, the nation's largest outpatient accrediting body. He is the founder of the Keyes Surgicenter, a sixth-floor suite in the Beverly Sunset Medical Building at the corner of Doheny and Sunset Boulevards, where he performs face-lifts, eye-lifts, rhinoplasry, breast augmentation, tummy tucks, liposuction, and laser surgery usually on an outpatient basis.

Keyes comes from a family of doctors. His father was a family practitioner in Youngstown, Ohio; his brother-in-law is the chief of orthopedic surgery at Northwestern University in Evanston, Illinois; and his wife is the head of anesthesiology at UCLA's Jules Stein Eye Institute. But it is Keyes whose specialty helps define Los Angeles for the rest of the world.

L.A. is a place where physical perfection and enduring youth are not just admired but created. There are more plastic surgeons here than in any other metropolis in the world except New York. For years shape-shifting entertainers such as Michael Jackson and Cher have fueled the public's interest in certain surgeons. Occasionally, one of these celebrity doctors gets sued. In January, for example, movie producer Mike Medavoy and his wife, Irena, sued Dr. Arnold Klein, alleging complications resulting from Botox injections. Now TV shows like FX's dramatic series Nip/Tuck and ABC's reality show Extreme Makeovers (in which Beverly Hills surgeons guide the wholesale restructuring of the faces and physiques of ordinary Americans) are focusing public attention on another, larger sector of the plastic surgery economy: the doctors who operate on the rest of us.

Keyes is one of those surgeons. He is not known to have worked on anyone famous, other than Linda Tripp. He finds new clients and makes his living as most plastic surgeons do: through advertising, word of mouth, competitive pricing, and publicity. He received a lot of media exposure after Tripp's surgery "Linda Tripp: Her Plastic Surgeon Talks," read the headline on the cover of People in January 2000. Appearances on Good Morning America, 20/20, and Dateline NBC followed.

That's where Marchioni first saw him, though now Keyes sounds as if he wishes she hadn't. "She's scars" he says. "This woman and her associates—whoever she has gotten together with—they've tried to demonize me. There's nothing she's said about this case that is true."

Of the 104 members of the California Society of Plastic Surgeons who practice in Los Angeles Country, only one has been sued more times than Keyes during the last 20 years. To be sure, the number of lawsuits filed against a practitioner matters less than the outcome of those suits. It is the rare doctor who has never been a defendant. Liability experts say one lawsuit per year of practice is about average, with 80 percent of those suits being dismissed. A recent Time cover story lamented that the skyrocketing cost of malpractice insurance is causing doctors in some states to stop performing risky procedures. "Read the Time magazine article," Keyes says when asked about his lawsuits. "See why people have suits."

In California, though, there is another side to the malpractice crisis—one that Marchioni feels has hindered her ability to take Keyes to court. A state law that caps the amount that juries can award to plaintiffs in medical malpractice cases has made it difficult, she says, to get a lawyer to try her case. Consumer advocates agree with Marchioni that the cap—which limits so-called noneconomic (or "pain and suffering") judgments to $250,000—discourages lawyers from representing all but the wealthiest "medmal" plaintiffs. Malpractice cases are notoriously expensive to try. When the amount that can be won is limited, lawyers who are paid on contingency have less incentive to take them on.

"Innocent patients who cannot prove large wage loss or medical bills ... often cannot find attorneys because the economics do not add up for lawyers, whose contingency fees are also limited under the law," Jamie Court, executive director of the Santa Monica-based Foundation for Taxpayer and Consumer Rights, wrote earlier this year on the op-ed page of the Los Angeles Times. "The law generously compensates the rich, but turns injured patients who are less well off into victims a second time."

As President Bush and other Republican leaders push for a cap similar to California's to be adopted nationwide, Marchioni v. Keyes shows just how much is at stake for both physician and patient.

"Geoffrey Keyes left his mark on me," Marchioni says, running a finger over a white two-and-a-half-inch scar on her chin. "I'll never be the same." Keyes, though, feels much the same about Marchioni. "Everybody is really quick to saS 'Oh, this poor schoolteacher and this evil plastic surgeon,'" he says, his voice rising with frustration. "But this is my career. I deserve to be put in a good light."

Marchioni lives a long way away from Doheny and Sunset, in a small apartment on the South Side of Chicago. She is divorced and has a grown son who lives in Cincinnati. She has no pets. She loves to garden, though she doesn't have a plot of her own. She is an avid reader: She's devoured all of Scott Turow's legal thrillers. She talks with warmth about the kid's she's taught over the years. Marchion is police, intelligent, and sometimes unexpectedly funny. But there is a formality about her—a distance. You get the impression this is a woman who spends a lot of time alone.

In the summer of 1999, a quarter-sized growth behind Marchioni's right ear was diagnosed as a fast-growing squamous cell carcinoma tumor (a form of skin cancer.) She flew to New York to have it removed at Sloan-Kettering Institute. Another lesion was renowed from her left leg in December. "Sloan-Kettering was fantastic. Fabulous doctors. Just wonderful," she says. But by the summer of 2000,"after over a year of just one thing after another—of juggling my classroom and teaching my children and wondering when I was going to die," she was worn down. When her doctors declared her cancer free, she decided to give herself a treat.

"My eyelids were kind of droopy" Marchioni says. She didn't have much money—she drives a 1992 Toyota Camry with an odometer that reads 286,000—but she decided to splurge. "Didn't expect to look 18. I knew how old I was. But I wanted to look better."

To look better—don't we all want that? But plastic surgery offers something more: the hope that we can transform not just how we appear but how we walk through the world. The pursuit of physical perfection is a peculiarly modern notion, embraced by many Americans as both desirable and essential. We accept as a given that to be beautiful is to be happy More and more of us each year also take comfort from the belief that in the hands of a plastic surgeon, we can be fixed.

Marchioni was no different. When Good Morning America's Charles Gibson introduced Keyes as "the plastic surgeon responsible for [Linda Tripp's] transformation," Marchioni was intrigued. She called the Keyes Surgicenter and spoke to an administrator, who encouraged her to come west. "She told me, 'California is the plastic surgery capital of the country, and Beverly Hills is the center of it," Marchioni recalls. Keyes's office is actually in West Hollywood; it sits on the wrong side of Doheny But it was close enough for Marchioni. In June 2000, she sent photographs of herself and a handwritten letter.

"First, let me say I am not the mean-looking taciturn person these pictures of me look like," she wrote. "I was shocked when I saw these! I guess I need'the works,' but I don't think I can afford it."

Marchioni had a phone consultation with Keyes. As many surgeons do, he recommended what should be done without meeting Marchioni face-to-face, relying instead on her photos. At some point they agreed what she would pay him: $12,000. Meanwhile, Marchioni studied photos of Tripp, whose rejuvenation seemed remarkable. "I thought, 'Well, if he can make her look that much better, I bet then he can do my eyelids,'" she recalls. Marchioni called the Medical Board of California, which informed her that Keyes's license was in good standing. Weeks later, she drove her Camry to O'Hare Airport and boarded a plane for Los Angeles.

What happened next is in dispute. Keyes insists that Marchioni asked for a full face-lift—he points to her letter about needing "the works" as proof, as well as consent forms that his handwriting expert says were signed by Marchioni. (She and her handwriting expert claim the forms are forged.) Keyes says she received excellent medical care. Marchioni says she got nothing of the kind.

Marchioni says she only consented to surgery on her upper and lower eyelids but that Keyes cut around her chin and her ears—an area that she had specifically asked him to avoid because of her cancer. Both flaps of cartilage that shield the ear canals appeared to have been removed, and she says the surgery caused blood clots in her ears and an infection. Marchioni would complain of excessive scarring, an uneven hairline, numbness of the face and cheeks, and loss of feeling in her left leg—a result, she alleges, of having spent eight hours lying on her side under general anesthesia, which she says she asked not to receive.

Before she left Los Angeles, Marchioni says, she confronted Keyes about her most noticeable scar—two and a half inches of suturing on her chin. His reaction, as described in her complaint, was bizarre. First, she says, he told her that he cut open her chin in order to show his anesthesiologist her "good German musculature." Then Keyes became enraged, Marchioni says. "Keyes's face turned red and he quickly left the room," she alleges. "He returned with a large open book, which depicted several color photos of a surgery in progress, graphically showing an individual's facial skin detached from bloody muscle. He thrust the open book in front of [my] face, shouting, 'Look at this! This is what I did to you, that's why you look like this! Don't ever question me! Never!'"

Keyes says no such exchange took place." I have never raised my voice in the operating room or with a patient in my career," he says. How long would I be in practice if I was doing those types of things?"

Marchioni stayed in Los Angeles just long enough to have Keyes remove her sutures. Then she went home to heal. Twelve days after her surgery, Marchioni was watching The Tonight Show when she heard Jay Leno say that Linda Tripp's chin implant had "started to move."

"According to the New Tork Post, the plastic surgery that LindaTripp had on her face didn't take," Leno said. "Well, of course it's moving around. She's used to having four other chins leaning on it to hold it up. You take those three chins away and it's going, 'Hey!'" Marchioni sat up straighter in bed. Tripp had had problems with Keyes, too?

There's a grim joke that plastic surgeons tell one another. "How do you know you're in the wrong plastic surgeon's office? Mike Wallace and a 60 Minutes crew are sitting in the waiting room." On the other hand, for a doctor whose business relies on luring a steady stream of new patients, there's nothing more valuable than good press.

Long before Leno began joking about Tripp, Keyes's association with her had landed him on national television. For a few weeks in January 2000, Keyed was everywhere. On Good Morning America, he explained how chin implants could "balance the face," though he stressed that cosmetic surgery was not for everyone. "This is surgery of the psyche," he said, warming that people recovering from a trauma—a divorce, a death in the family—were not good candidates. "If you put this type of surgery on top of emotional crisis, you're asking for a lot of trouble." He picked up the same theme on

Dateline. "No surgical procedure can improve your inner self," he said, as photos of Tripp flashed on the screen. "That's a spiritual thing." On 20/20, Keyes said, "Linda Tripp is not different from any other woman or man in her age group. She came in with expectation to have some of the aging process improved, and that's what she achieved."

---

*This feature was originally published in the August 2000 issue of* Los Angeles *magazine*

In the ruthlessly competitive world of L.A. plastic surgeons, the impact of this exposure can't be overestimated. Whether it's being included on a women's magazine list of "Top Doctors for the Most Wanted Procedures Coast to Coast" or getting quoted in Us Weekly discussing Pamela Anderson's implant removal, positive media exposure gives a doctor credibility. Writing a book (like Dr. Robert Kotler's recent Secrets of a Beverly Hills Cosmetic Surgeon: The Expert's Guide to Safe, Successful Surgery) or creating a DVD series (like Dr. Garth Fisher's new five-volume The Naked Truth About Plastic Surgery: A Home Consultation with a Prominent Beverly Hills Plastic Surgeon) lends a certain respectability. But when it comes to impressing the greatest number of prospective clients, nothing beats the television interview.

Keyes's TV victory lap was the kind of attention that publicists—and many L.A. plastic surgeons have them—fantasize about. Tripp was a recognizable figure not known for her beauty. To be positioned as the doctor who had turned homely to glamorous was pure gold.

At the time, Tripp said nothing. In July 2000, though, just as Marchioni went in for surger3; an outline of a proposed Tripp autobiography began quietly making the rounds in New York. Tripp was trying to sell a book by hinting she would tell all about the Clintons. "Convenient Scapegoat," one chapter was titled. "Subpoenaed Again," read another. But toward the end of the outline, she also took a swipe at Keyes. Chapter 28 was titled "Under the Knife," and a summary of its contents read: "True story (not so pretty) behind my plastic surgery. Fixing Doc Hollywood's butchery." Publishers passed on the book.

It wasn't until February 2nd that Tripp broke her silence. Appearing on Larry King Live, she looked great, and King told her so, complimenting her plastic surgeon on a job well done. Tripp told him all credit was due to a Virginia doctor named Mark Richards. Six months after Keyes had performed Tripp's face-lift, it turns out, Tripp had sought out Richards to fix Keyes's work—an operation she would later describe as "major repairs, nine hours."

"He brought me back," Tripp said of Richards. "He actually did the corrective surgery because my first surgery was such a disaster. And that doctor," she said, referring obliquely to Keyes, "went on a 15-minutes-of-fame television talking tour, which was horrible."

For his part, Keyes says Tripp never told him she was unhappy with his work. "There was no complication whatsoever on Linda Tripp," he says. "Period." Keyes still has excerpts of the Good Morning America and Dateline interviews on his Web site, and until recently, callers to his office who asked if Keyes was the doctor who "did" Tripp were told yes.

For Marchioni, meanwhile, the revelations about Tripp's dissatisfaction validated her own complaints. Marchioni was certain that she wanted to sue Keyes. If only she could find a lawyer.

"I'd say I approached 40 lawyers in L.A.," she says. "They'd want pictures and documents, and I'd FedEx it to them so they'd get it as quickly as possible. And then a couple of weeks later they'd send it back U.S. mail. 'Sorry' they'd say. Then they'd add the standard boilerplate: 'This is not to say that your case does not have merit.'"

No one spelled out their reasons for turning her down. Keyes's lawyers would later argue that the lack of interest only proved her case was weak. But Marchioni felt there was another reason for the lawyers' lack of enthusiasm: the state law that caps the amount that juries can award to medical malpractice plaintiffs. "It was because of the cap," she says. "They felt it wasn't worth their time."

Marchioni would have been a great private investigator. She is organized. She is persistent. She faxes constantly. "Here is a plastic surgeon who is personally acquainted with Geoffrey Keye's," she will write, sending along a name and phone number in Wisconsin. Another day comes this." I located six more pages of names from Keye's medical school class." Keyes is Marchioni's crusade, and her devotion never flags.

It wasn't always this way. "The first time I talked to Kay, she was very deferential. Kind of scared," says Lana Feldman, an attorney who had previously represented another plaintiff against Keyes. "The next time I heard from her, month later, she was like a different person almost. Like: 'I had made up my mind. I am not just going to sit back and take this.'"

What ignited Marchioni—what would eventually prompt her to spend more than $50,000 of her retirements savings, post an additional $52,000 in bonds, and invest hundreds of hours of her time—was her discovery of Keyes's other dissatisfied patients. At first she sought out their lawsuits to get the names of their lawyers. She needed to file suit before the one-year statute of limitations expired. She thought maybe a lawyer who'd already sued Keyes might want to take him on again.

But what began as a legal referral strategy quickly became a source of psychic fuel. Each case she read—first the eight Southern California cases, then the 14 Chicago cases—spoke of heartbreak and disappointment. With every complaint she read about Keyes, she was struck by similarities to her own.

There was Ana Diaz (Keyes plaintiff no. 12), a 27-year-old secretary who had gone to
Keyes to have her breasts reduced. Her cup size was F—so large that she was
experiencing curvature of the spine and had to put athletic socks under her bra straps to
keep them from cutting into her flesh. She says Keyes told her he'd make her a C.
Instead, she ended up barely an A. But that's not the only reason she sued. After the
surgery she alleged, her body had trouble healing. She was in the shower one day
when her nipples fell off. "They were lost when they washed down the drain," she says.
Because she worked in the Chicago hospital where she'd undergone surgery she easily
obtained a copy of her postoperative report and was horrified by what it said. "It blew
me away: 'Radical double mastectomy' I thought, 'That's not what I signed up for,'" she
says. But a week later, according to Diaz and another hospital employee who recalls
seeing the document, the record had been replaced with one that said "Bilateral breast
reduction."

When Diaz complained, she says, Keyes dismissively offered to give her breast
implants. She declined. For years afterward, she alleges, her scars would erupt in boris.
Diaz says Keyes offered a $200,000 settlement (an assertion Keyes would neither
confirm nor deny), but she rejected it. The case went to trial, with Keyes's attorneys
arguing that because Diaz was a large woman—more than 200 pounds—he had trouble
estimating how much tissue to take. They also noted how well things were going for
Diaz. Since the surgery she'd become an Allstate insurance agent with a $58,000 salary
she had found a new boyfriend, and she had vacationed in Hawaii. "She's making more
money and working less in recent years," Keyes's lawyer said in his closing argument.
"She's doing fairly well." In 1994, a jury sided with Keyes.

Patricia Bacall (Keyes plaintiff no. 21) sued Keyes for $5,000 in small-claims court after
he operated on her nose, chin, and eyes in 1998. "My chin implant was so large that I
looked like a female Jay Leno," Bacall, a Los Angeles graphic designer and yoga
instructor, said in a declaration filed in the Marchioni case. Keyes operated twice more
to address her complaints. But "again the chin implant was too large and gave me a
strange appearance," Bacall's declaration said. At the first court appearance for her suit,
Keyes approached Bacall. "His demeanor was threatening and intimidating," according
to the declaration. "He said, 'You can't possibly win against me! I will beat you!'" Bacall
had paid $8,000 for the operations. Keyes paid her $2,500 to drop her complaint.

Elizabeth Madearis (Keyes plaintiff no.22) claimed Keyes had botched her chin implant,
using outmoded methods and cutting her unnecessarily in places (Keyes settled the
case). Marchioni read Madearis's complaint and heard echoes of her own. "Plaintiff has
sustained severe and permanent injuries, losses and damages including ... trauma and
damages to the nerves, muscles and soft tissues of the mouth and face," the complaint
read. Madearis also listed other maladies, including "grossly oversized, unwarranted
and unnecessary incision under the chin, resulting in scarring and disfigurement;
improper suturing of the neck, leaving puncture scarring."

"I [was] trying to scream," Madearis, a Glendale hypnotherapist, said in her sworn
deposition, describing how a local anesthetic failed to numb her pain. "I tried to look at

him straight in the eye and speak to him to tell him that I could feel him cutting into my neck.... I was trying to say 'pain.' I kept trying to say that word over and over.... He's in there cutting away."

Marchioni looked at the words "unnecessary incision" and felt a pang. Keyes denied it, but that's what Marchioni said he'd given her: an unnecessary incision on her chin. Marchioni called Lana Feldman, the attorney who had represented Madearis in her suit against Keyes. Feldman, too, was struck. "Here were two people that had never talked to each other, never met each other, came from different parts of the United States," she says. "What was remarkable was that in terms of the issues that were of concern to me in the Madearis case that seemed to be bizarre, Kay was saying the same thing. Parts of their stories were substantially similar."

Feldman didn't feel she could afford to take Marchioni's case. "I am a sole practitioner," she says. "Medical malpractice cases are not easily won. It would be waves of discovery and an extensive amount of time. Lawyers need to pay the bills, too." But she vowed to help Marchioni find another lawyer.

Marchioni was running out of time. She'd filed a letter of intent to sue, which gave her another three months. But as she was turned down by lawyer after lawyer, she realized she was going to have to write the complaint herself She turned to Marinka Peschmann—the ghostwriter on Linda Tripp's book proposal—whom Marchioni tracked down after hearing Leno's monologue. Together they pored over a 1992 lawsuit filed against Keyes by Gloria Arrasmith (Keyes plaintiff no. 16), who alleged that part of a scissors had been left in her face during surgery (the case was settled). Using Arrasmith's suit as a template, the two women hammered out a 26-page complaint that alleged personal injuries due to medical negligence, battery, lack of informed consent, falsification of documents, and intentional infliction of emotional distress. Fourteen months after her surgery on September 19, 2001, Marchioni became Keyes plaintiff no. 23.

Marchioni couldn't help herself. Once she knew about the others, she wanted to talk to them. Not everybody was happy to hear from her. Marianne Medema (Keyes plaintiff no. 4) was spooked. The emergency medical technician, who sued Keyes in 1981 after breast implants he inserted got infected and had to be removed, had married—and changed her name—twice since then. "I don't know why Kay would go and intrude on my life like that," she says. "She found my home phone number, which is not listed. It was weird."

Medema, whose lawsuit was dismissed, she says, after her medical records went missing, was uncomfortable when Marchioni sent her a Christmas card, no return address, to the fire department in Roselle, Illinois, where she works. Still, she was curious. "Twenty-three years later, I'm disfigured," she says, explaining why she filed a declaration in support of Marchioni's lawsuit. "Just like Kay."

Gail Mattucci (Keyes plaintiff no. 7) welcomed Marchioni's call. It had been 22 years, she says, since a nose job Keyes performed caused her nose to partially collapse. When she complained to Keyes at the time, she says, "I remember he just talked to me like I was bothering him. He literally had this forceps locked in my nose, and he said, 'How dare you tell me you don't have an airway.'" On another occasion, Mattucci claims, Keyes became irate and yelled at her: "Get out of my office!" She sued, and lost. Now a vice president of sales and marketing for the Chicago Tribune, Mattucci told Marchioni she would pay her own way to come to California for the trial. She was eager to look Keyes in the eye one more time.

"I told Kay, 'I'll be on the next plane,'" Mattucci says. Diaz told Marchioni the same thing. They were talking pretty regularly now—Diaz was coaching her on how to get through the stress of a trial, passing on a recipe for mojitos and recommending hot baths. Talking to the plaintiffs, Marchioni became convinced she had found a community to which she belonged.

Marchioni found Michael McCarty (Keyes plaintiff no. 10) at his home in Boaz, Alabama. He provided her with a written declaration about Keyes, whom he holds partially responsible for the amputation of his right leg below the knee after he was injured in a car accident. "Geoffrey R. Keyes thinks he is God," wrote McCarty, whose lawsuit was dismissed. "He is quite the opposite."

Dennis Sievert (Keyes plaintiff no. 5) met Keyes after he fell off a 40-foot ladder, crushing his jaw. After Sievert's most serious injury—a partially severed artery in his neck—was repaired, he complained repeatedly to Keyes about discomfort in his leg. Keyes downplayed his symptoms, saying it was natural to be sore after a fall, according to Sievert. Keyes never ordered an X ray. Finally, after three weeks of excruciating pain, Sievert's wife, Lydia, insisted they find an orthopedist.

"Sure as shit, the leg is broken," says Sievert, a general contractor in Chicago. When he went back to Keyes for a follow-up on his jaw, he says, the doctor noticed his new cast. "He says, 'What happened?' I said, 'Well, it was broken.' He goes, 'No.' I still remember how cocky he was. I mean, he just gave you that impression of 'I'm the best there is.' He wanted you to know that he was different than everybody else."

Lydia Sievert says when Marchioni and her husband get on the phone, it's as if they are speaking a language that only Keyes's patients can understand. "We ought to have, like, a club—a little reunion at the Hilton or something," she adds, only half joking.

These former plaintiffs, however riveting their stories, are easy to malign. They are self-interested. They have an ax to grind. They have no surgical training. Legally speaking, they are probably irrelevant because most judges would exclude their testimony as prejudicial. By banding together, some argue, they diminish their credibility. "There's a lot of creative lawsuiting going on right now in terms of patients seeking out other patients and trying to bring together a posse, if you will, that is then in a lynching mode," says Dr. James H. Wells, president of the American Society of Plastic Surgeons.

Keyes goes even further, claiming that the reason his accusers so often seem to corroborate one another is that, at Marchioni's urging, they tailored their stories for maximum impact. "She went to everyone who ever sued me, and she colluded with some people," he says. 'There was collusion: 'Let's make these declarations fit so we can really achieve what we want to achieve.'" Marchioni and her fellow plaintiffs deny this.

There are also those who are willing to speak on Keyes's behalf. "His reputation is excellent," says Wells, a Long Beach surgeon who vouches for Keyes's credentials while noting that he's never seen him work.

Dr. Richard Ellenbogen, a plastic surgeon whose office is four floors below Keyes's, says, "He's a super surgeon and a super nice guy." Ellenbogen has consulted on patients with Keyes, though he, too, has never observed him during surgery. "There are some bad dudes in town—real hacks. But he isn't one of them," says Ellenbogen, who sends students in his advanced aesthetic surgery seminar to watch Keyes work. "On a one to ten scale, with me being a ten and all the other plastic surgeons being below that—I'm just kidding, of course—he's close to a ten."

Dr. Richard Sperling, who supervised Keyes in the late 1970s when he was a plastic surgery resident at University of Illinois Chicago Medical Center, calls Keyes "a very capable guy"

Several other doctors and nurses who have worked closely with Keyes and were asked to comment on his strengths and weaknesses either didn't return phone calls or let their assistants answer for them. Apparently they didn't want to get involved. "Sorry" said one nurse, having checked with her boss. "He won't talk to you about him."

"A lot of times doctors don't want to testify'" says David Olan, a Los Angeles attorney That only makes malpractice cases more difficult to win. In 1998, Olan sued Ellenbogen and Keyes on behalf of a family whose daughter had died on the operating table while getting a nose job (the case against Keyes was quickly dismissed; Ellenbogen settled). "But 80 percent of cases have a defense verdict at trial, in part because you not only have to show negligence, you must prove that a doctor breached the standard of care in the community—a much more subjective thing," he says. These days, Olan rarely represents malpractice plaintiffs. Like Feldman, he says that California's cap on pain-and-suffering awards makes these cases, which can take years, a costly gamble.

Of the patients who sued Keyes over the years, several had difficulty finding doctors who would testify against him. Taft Gradman (Keyes plaintiff no. 6), a 24-year-old Chicago woman, was five feet four, weighed 69 pounds, and was in the hospital being treated for anorexia when Keyes performed a breast reduction on her, court records show. Her family pursued the lawsuit even after their daughter died in a car accident in 1988, determined to show that Keyes should not have operated. But they couldn't find a doctor who would say that on the stand.

"You don't take an anorexic and start doing breast reduction surgery I mean, are you nuts? But that's not good enough" to prove malpractice, says John Lally the Gradmans' attorney In the absence of expert testimony, Lally recalls, the judge ruled from the bench, siding with Keyes "because we didn't have any expert to say he shouldn't have performed the surgery"

Andrea Rose (Keyes plaintiff no. 11) faced a similar hurdle. She filed suit in 1987, alleging that an eye-lift performed by Keyes left her unable to close her eyes. Another doctor partially repaired the lids, but she still sleeps with an eyeshade and has problems keeping her eyes lubricated. "They tear. They're sensitive to light. They still won't close all the way" says Rose, who currently runs her own beauty products company. Her suit went nowhere. "My lawyer could not get a reputable doctor to stand up in court and say, 'It was definitely a botched job. The guy took too much out,'" she says. Every doctor she approached agreed she'd had a "bad result," she recalls. But none would go so far as to say Keyes had committed malpractice. Her lawyer told her to drop the case. "He said, 'I can't take this to trial because we won't win.'"

Several former patients of Keyes found that even the doctors who had repaired their alleged injuries were unwilling to testify. The Sieverts claim that Keyes's attempt to reconstruct Dennis's shattered mandible was a failure that left him unable to chew solid food. After he found a new doctor and underwent extensive reconstructive surgery, he sued Keyes, the ladder company, and others.

Both Sievert and his wife recall that just after the reconstructive surgery his new doctor—a woman to whom he says he owes his life—wrapped his head tightly and gave careful instructions to the nursing staff: Leave the bandages in place for 24 hours.

"She told everybody there, 'Nobody takes this bandage off but myself.' Well, the day after the surgery; who comes walking into my room at 6 a.m.? Dr. Keyes," says Sievert. "He took the bandage off to see what she did, then tried to wrap it back up like nobody had done anything to it. When she came in around 9 a.m., she knew. She was mad." (Keyes denies Sievert's story).

Nevertheless, the new doctor told the Sieverts she wouldn't testify. Eventually, they dropped Keyes from the suit in order to speed up the settlement.

Only one doctor has spoken openly about her reservations concerning Keyes. Dr. Dawna Gutzmann, an Illinois psychiatrist, was a resident at Chicago's Ravenswood Hospital in the late 1980s and assisted Keyes during surgery between five and ten times, including the breast reduction Keyes performed on Diaz. While Gutzmann cautions that she is not a trained surgeon, she says what she observed of Keyes's surgical style sticks in her mind more than 15 years later.

"Most surgeons that I've worked with, you feel like you're in the presence of a true artist who treats his material as though it were sacred—like a sculptor approaches a piece of marble: lovingly as flit were fragile," Gutzmann says. "You get the sense they have a

reverence for the body, for the delicacy of the tissue. The surgeons that don't have that attitude, it shows in the way they touch the person. Keyes is a charming person. And I think in some ways that charm probably invites confidence from his patients. But to me his confidence exceeded his actual ability. I'm not saying that he was performing malpractice. It was just how he handled the tissue. When I compare his technique to other surgeons I've worked with, he wasn't in the top ten."

We're in the vanity business. We make people feel better about themselves," says a plastic surgeon in the new television series Nip/Tuck. His partner corrects him: "What we do here is let people externalize the hate they feel about themselves." A billboard advertising the show has gone up on Sunset Boulevard, not far from Keyes's office. It shows a woman's face wrapped in gauze, with fresh stitching visible around one eye. "Truth," says the slogan, "is only skin deep."

For Keyes, the truth of this case lies deeper. "I have empathy for any patient with any problem," he says. "But the way things are said can make any situation sound terrible." Take Andrea Rose, who can't shut her eyes. Keyes says—and eye specialists confirm—this is not an uncommon result of eye-lift surgery "That can happen with any plastic surgeon," he says. "It doesn't mean the result of the surgery is 100 percent bad."

What of someone like Elizabeth Madearis, who had a chin implant inserted and then removed? "You hear 'A chin implant was taken out.' People say 'Oh, my goodness, that's awful,'" says Keyes. "Well, that's a five-minute operation, taking a chin implant out. You just go right through the same incision and pull it out. Do you think there's anyone who does chin implants or breast implants or any of these procedures who doesn't have to take them out from time to time? It's the nature of the beast. And it's not because anything wrong was done."

"Remember this," he says. "If I had lost those suits, you could give credibility to the people making these statements. But they didn't prevail."

Doctors who specialize in performing nonessential surgeries have to be persuasive, and Keyes is particularly so. "What you should do is schedule a consultation," he told me when I first asked to meet with him to discuss the Marchioni suit. The best way to get to know him, he said, was to see through the eyes of a patient. "We'll pretend you want to do something, and I'll do it just like I do it," he said. "I'm the perfect person to talk about what's going on in health care today."

While Keyes was coming on strong, Marchioni was behaving oddly. It was impossible to know whether this reflected her true personality or signaled that the stress of the case and the long odds she was facing were finally getting to her. Conversations with her began to feel more like a trip through the looking glass. She seemed increasingly paranoid. There was talk of Keyes having paid off plaintiffs' lawyers—charges she had no evidence to support. Then Marchioni got a call from the Los Angeles County Coroner's office about a death allegedly involving Keyes. She called me, certain that a new case had prompted the inquiry. When I called Lieutenant Erik Arbuthnot, a

supervising coroner investigator, he confirmed he had opened—and closed—an
investigation.

"Kay Marchioni called the L.A. County Fire Department to find out how many ambulance
responses there had been to [Keyes's office] address," Arbuthnot said. "They asked
why She said this doctor was doing things that he shouldn't be doing." Then Marchioni
mentioned the woman who had died during a nose job. In fact, though Keyes had been
named as a co-defendant in that case, he was not involved in the surgery (the suit
against him was dismissed). But the fire department official she'd reached didn't know
that. "They immediately put her on hold and called Sheriff's Homicide," Arbuthnot said.
"Since it was involving a death in L.A. Country, they called me." He looked into the case
and found the coroner had already evaluated it. He closed the file.

Marchioni was hearing her own echo. It was as if she were running up a flight of stairs,
hearing footsteps behind her. But even after I told her of Arbuthnot's explanation, she
seemed unconvinced that the footfalls were her own.

Then I discovered Marchioni's other lawsuit. Earlier this year, she filed a discrimination
complaint in federal court against the City of Chicago's board of education and the
principal of her elementary school. Marchioni alleges that the principal made aggressive
sexual advances on her, then suspended her as retribution when she filed a complaint
with the Equal Employment Opportunity Commission. As in her case against Keyes, she
also alleges battery and intentional infliction of emotional distress.

The school board has countered that the principal suspended Marchioni after ordering
an investigation into "numerous complaints of verbal threats and abuse by [Marchioni]
towards her students"—an allegation that Marchioni calls outrageous. The case has yet
to be resolved. But as I pored over the file, I began to wonder if Marchioni was someone
who always turned to the courts to remedy life's wrongs.

"It's amazing, isn't it? That I get to meet two of these guys," Marchioni said when I asked
about her second lawsuit. "It's the left jab and the right hook. But I can't just walk away
Too many people have."

Just as Marchioni's rough edges were showing, though, so was Keyes's fabled
arrogance. Despite his complaints about the litigiousness of patients, he had filed his
share of lawsuits, too. Most appeared to be small claims actions against patients who
skipped out on their bills. But he also sued his moving company in 1989, his life
insurance company in 1995, and his home insurance company in 2001.

In our conversations he made it clear he believed Marchioni wasn't the only person who
had it in for him. "Let me ask you a question. Anybody who you've talked to face, where
was the big problem?" he asked, referring to his former patients who had filed suit. I
thought of Rose, whose right eye is noticeably bigger than her left. I thought of Diaz's
scarred and misshapen chest.

"Anyone who sues you, they throw the book at you. They call it battery you name it. They say everything they possibly can to show you in a bad light," he said. "Why do you have to write a story about just me when there's so much out there? Why don't you take a few other plastic surgeons in town and look at their lawsuit histories? To single me out because of this woman, to let her manipulate the media, is not fair."

But who was manipulating whom? Hadn't he used the media to capitalize on Linda Tripp? "There are volumes to be written about that situation," he said, adding that should this article turn out to his liking, he might consider telling all about Tripp. "Someday, maybe, I'll give some consideration to giving you a very interesting story" he said, "because I was privy to of stuff."

ALTHOUGH MARCHIONI filed her suit in September 2001, she didn't retain a lawyer until early 2002. "I'd thought I'd find someone who was going to be as outraged as I was. They were going to get on their white charger and take this out of my hands," she says. A Los Angeles attorney named Pete Lesser took the case for four months. They parted ways after what Lesser told the court was a "breakdown in communication." She next teamed up with Laura Kail, a San Diego trial lawyer with nearly 20 years' experience, and it was Kail who helped her make the most chilling allegation against Keyes.

"The simplest explanation for the assertion of facts made against the defendant, could be explained by the use of sadism in the practice of medicine," read a declaration, filed with the court, by a Michigan forensic psychologist named Dr. Richard D. Walter. He had come to this opinion after reviewing declarations filed by several other Keyes patients. He had never met Keyes. But he asserted that Keyes showed signs of a"deviancy called 'picquerism.' ... In practice, the 'picquer' derives pleasure from cutting and penetration of body with foreign objects."

Kevin Hillyer, Keyes's lawyer in the Marchioni case, called Walter's allegation ridiculous and said he was confident that no judge would allow it to be used at trial. "Surgeons operate on people," he says. "If you're a surgeon and you enjoy your job, does that make you a sadist?" If anyone was deriving pleasure from the surgery and its aftermath, he suggests, it was Marchioni herself.

Keyes and his attorney were particularly incensed by Marchioni's Web site, which lists the case numbers of all the suits that have been brought against him. They had asked Marchioni to take it down. She refused. Bill Moore, the site's administrator, says that later he received an anonymous phone call. "It was a man," Moore recalls. "He said, 'We just suggest you remove the site.' He said it was a defamation of character. I said, 'Funny I thought it was a declaration of character.' That didn't seem to go over too well."Two weeks later, Moore says, a hacker shut down his server twice, deleting Marchioni's Web site and about 240 others and knocking out a backup server.

The case was getting murkier. What was becoming clear, though, was this: The courthouse is a lousy place to seek the truth. Just because a malpractice plaintiff loses

a case doesn't mean she got the medical treatment she deserved. Just because there are complications in the operating room doesn't mean the doctor is to blame. Both Keyes and Marchioni spoke in absolutes. To her, Keyes was a doctor gone bad. To him, Marchioni was a vindictive liar. What was most vexing was that it seemed next to impossible for a patient to determine which doctors to avoid. And vice versa.

Marchioni thought the best way to find a reputable doctor was to call the Medical Board of California. She was mistaken. According to a government investigation completed last year in Sacramento, even as complaints from patients to the board increased, enforcement activity declined. Too many cases were closed without investigation, and there was no mechanism to ensure that the board's records of doctor misconduct were kept current. In fact, the inquiry found, the medical board was misleading the public.

"The Board keeps entirely secret from the public information about potentially dangerous doctors in the Board's possession," reads a fact sheet on a bill designed to address some of the problems. Also kept secret: "... information about physicians who have repeatedly paid significant sums in medical malpractice settlements. Notably, every other stakeholder—hospitals, medical groups, and medical malpractice insurers—not only are able to obtain this information, they insist upon it as a pre-requisite of doing business with a doctor. Only the patient—the only stakeholder who could die—is kept entirely in the dark."

Legislation that took effect this past January promises improvements, including disclosure of doctors who have paid three, four, or more medical malpractice settlements over $30,000. But as the new law seeks to close loopholes, it opens new ones. For example, the actual amounts of medical malpractice settlements are not disclosed—each is simply listed as having been above average, average, or below average. The board's database does not include settlements that were reached before this year.

Given that, Marchioni says the best advice she has for someone considering plastic surgery is: "Go to the courthouse and check the records."

But doctors, too, are at risk. "People sit in our chairs, we don't know who they are," Keyes says at one point. "We try to evaluate their mental stability and all types of things surrounding their rationale for coming to see us. But one of the hardest things to analyze is sociopathy. You can miss a sociopath. "He pauses, letting his words sink in. "I'm not making any implications about anybody. I'm just giving you a broad, general discussion of what we go through. But sociopaths are very clever. They may purposely try to fool you in order to get what they want."

Kail was finding Marchioni increasingly difficult. In March of this year, the lawyer negotiated a $29,000 settlement to be paid by Keyes's anesthesiologist, who was a codefendant in the suit. Notably the amount was just low enough to escape being reported to consumers by the state medical board. Kail told her client they needed the money from the settlement to pay for expert witnesses to testify against Keyes. It was a

matter of letting the little fish go in order to hook the bigger one. Keyes had also offered a $29,000 settlement, but Marchioni wouldn't sign either agreement. In the case of the anesthesiologist, Marchioni alleged that she had not authorized Kail to approve the deal. (Kail said she had.) In April, after ten months on the case, Karl asked the judge to release her from her duties. It was two days before the trial was to begin.

"I emotionally cannot go forward with this. It's affecting my health," Kail said at a heating in which she called Marchioni "vitriolic." Kail reiterated that she believed Marchioni's case had merit. She just couldn't take it to trial. "I get faxes from her that are not the kinds of faxes a lawyer wants to receive: 'You have not subpoenaed Linda Tripp properly!' 'Your behavior is outrageous,'" Kail said, fighting tears. "I do not believe I can give her what she needs."

Judge Richard Neidorf chastened Kail—"You should have a thick skin. You're a trial lawyer"—but ultimately cut her loose. He postponed the trial for 60 days but warned that there would be no more delays. Then he offered some advice.

"Your allegations are bizarre," he told Marchioni. "They may be true, but they'll be very difficult to prove. Jurors might say 'Hey, who cares? It's not like you went to the emergency room with appendicitis or something you didn't create. You had elective surgery'" In three years of hearing medical malpractice cases, he told her, he'd seen only one victorious plaintiff: a man whose doctor admitted on the stand he'd removed the wrong kidney "It's hard to get a lawyer to take these cases in the first place," Neidorf said, predicting that her chances of finding a lawyer now were just one in a hundred. "If you can't find a lawyer, you'll represent yourself. And you'll never win."

A few days later Marchioni called me to say she'd heard from Linda Tripp. "She's in chemotherapy right now and cannot travel," said Marchioni, reporting that Tripp was recovering from breast cancer. "But she's willing to do whatever she can—a taped video conference, a sworn statement. This just shows I'm telling the truth."

Tripp's lawyer confirmed that the phone conversation had taken place after Marchioni hired a process server to subpoena Tripp. I'd been leaving messages at the Christmas Sleigh, Tripp's store in Middleburg, Virginia, for weeks. Finally, her lawyer faxed a statement from Tripp. "I regret that anyone would have made a decision to choose a surgeon based on erroneous information apparently made available to the media by Dr. Keyes," she wrote. "I was fortunate to find a wonderfully professional physician, Dr. Mark Richards, six months following my experience with Dr. Keyes to perform all of the necessary corrective work."

Late one night, as the trial approached, Ana Diaz says she was getting ready for bed in her Chicago apartment when she got an anonymous phone call. "It was a man's voice," she says. "He said, 'If you're thinking of coming to California, don't do it. I can get you in either Chicago or California.' And I said, 'Bring it on, honey' and I hung up on him." She called a girlfriend at the police department who said in order to trace the call, Diaz had to file a report. "I wanted to help Kay" she says. But she decided against it.

June 4 was trial day. As predicted, Marchioni had failed to find another lawyer—in part, she says, because Kail had placed a lien to make sure she got paid first. Marchioni sat at the prosecution table, her jaw set, her hands clasped in her lap. She pleaded with Judge Neidorf, asking for another delay. She said she did not know the whereabouts of her case file. She protested that she was unprepared to represent herself. "I didn't expect this," she said.

"You should have expected this," Neidorf said. This was one of the oldest cases on his docket, and he was eager to get it resolved. "I think you're playing games. This is the time to try this case."

Things went quickly after that. Neidorf ruled that several former Keyes patients would not be permitted to testify. Then a pool of prospective jurors was led in. Keyes was not in the courtroom. His lawyer asked the jury pool not to hold that against him. The doctor had patients to see.

Many of the prospective jurors had opinions about—and experience with—plastic surgery. "I have a personal philosophy that plastic surgery outside of birth defects is frivolous," said one young mother. "I think when you decide to have plastic surgery, you've bought the ticket, you see the show." But she was in the minority.

A Korean American lawyer revealed she'd had surgery to put a fold in her eyelid. A publicist confessed to two nose jobs. A young man said he was in the midst of suing a plastic surgeon himself. "I have the scars to prove there was negligence," he told the judge. Another young woman revealed "two botched laser surgeries" performed by another doctor. "I found out later that several people had lawsuits against him," she said. A photo researcher said her mother had had plastic surgery "with a pretty bad outcome," and so had she.

There were those who disapproved of Marchioni for turning a medical dispute into a legal one. A retiree said that when his wife had recently been diagnosed with cancer, her surgeons "saved her life. We would not have sued if something had gone wrong," he said. "I'm very prejudiced against medical malpractice suits, which drive doctors out of the practice of medicine."

But a Sherman Oaks textile salesman said he was sympathetic because Marchioni didn't have a lawyer. "I don't think the plaintiff stands a chance," he said. "It's like a Little League team playing the Dodgers." Keyes's attorney countered: "But if the Bad News Bears had the ability to subpoena the Yankees and demand that they play a game, would you feel sorry for them then?" The textile salesman paused. "No," he said finally "But I wouldn't attend the game."

When it was her turn to question the jury pool, Marchioni stood up and told the judge she was unqualified to serve as her own lawyer. Too late, he said. She asked the jurors nothing, but occasionally wiped away tears. During a break, out in the hall, she said, "I feel like I'm going to my own execution."

The next day, June 5, Keyes came to court. He wore a dark blazer, a gray dress shirt, cuffed khaki trousers, and a stern face. Marchioni wore pink. Defendant and plaintiff did not greet each other. He took a seat behind his lawyer. She sat alone, a single orange file folder before her on the wooden table. Neidorf swore in the jury delivered some pretrial instructions, and then asked Marchioni to call her first witness.

"I don't have anyone to call," she said.

"Do I hear a motion?" the judge asked. Keyes's lawyer moved for dismissal. Three years and tens of thousands of dollars had been spent. Marchioni looked dazed. Keyes shifted in his seat. Neidorf picked up his gavel. "Case dismissed," he said.

Four days later, on June 9, Keyes's assistant called me to cancel my consultation with the doctor. On June 11, attorneys for Keyes and his anesthesiologist asked Neidorf to issue a judgment of nonsuit because Marchioni had called not a single witness. He did so. The order serves as a decision on the merits in Keyes's favor and enables the surgeon to try to collect about $30,000 in court costs from Marchioni. (His attorney's fees will be paid by insurance.)

"I won the lawsuit in short order," Keyes says, "because there was no aspect of it that was true."

They had all tried to help Kay but in the end, she had no one but herself. Keyes's attorney says that was her own fault. "We were prepared to show that she has had a falling-out in one way or another with everyone she comes across," he says.

Still, Marchioni wasn't the only one responsible. "You would never want to do cosmetic surgery on someone who has just gone through a divorce, just had a loss, a death in the family had some major emotional crisis," Keyes had told Good Morning America. Yet wasn't Marchioni, a recent cancer survivor who'd been in the hospital only six months before, just such a person? When I raised this with Keyes after the trial, he scoffed. "She was a few years down the pike from that problem," he said. "I was a head and neck cancer surgeon for 14 years. She had skin cancer. That presented no risk."

A few weeks after the dismissal, I received a fax from Marchioni. Now she was suspicious of me, too. "How horrible it will be," she wrote, "if I have not only been victimized by Dr. Keyes but then am subsequently victimized by Los Angeles magazine."

In July Keyes's lawyers got busy. One called Bill Moore, telling him to take down Marchioni's Web site or risk legal action. Another sent a summons to Patricia Bacall, whose 1999 lawsuit Keyes had settled. Keyes is suing her for breach of contract, alleging that when she submitted a declaration in the Marchioni case, she broke the confidentiality agreement she'd signed when she got her $2,500 check. If Bacall's defense—that she filed the declaration only because she was subpoenaed by Marchioni's attorney—doesn't hold up, she will owe Keyes at least $50,000.

Keyes is also considering filing one more lawsuit. According to one of his lawyers, the defendants would be Marchioni and "those acting in concert with her." The charge: defamation and malicious prosecution.

Copyright 2012, Los Angeles magazine

Print

# Identification of the "*Prone-to-Complaints*" *[PTC]* Cosmetic/Plastic Surgeons of California[1].

### J.C. BIRO MD. & D.F. COHEN PHD[2]

**The Honesty Enforcer®[3]** – San Diego, CA – jan.biro@att.net

**ABSTRACT**

We wish to introduce a method to identify cosmetic surgeons who were involved in unusually large number of serious conflicts with their consumers (traditionally called patients) and were the subject of serious criticism (complaints). The method is based on the collection and publication of the surgeons' court history (publicly available data, lawsuits for alleged "medical malpractice"). This pilot study involved accessing the court files of 1440 licensed cosmetic/plastic surgeons in California (40% of total 3572 specialists) and identified 2414 medical malpractice records (i.e. 1.7 lawsuits/surgeon in average). As few as **25** licensees had more than 10 malpractice records, and they (1.7%) were responsible for 17% of the lawsuits against cosmetic surgeons. However 43% of doctors had no court complaints at all.

Correcting the court data with the number of years the physicians had after graduation (PGY) or after licensing (PLY) we could predict the number of lawsuits which might be expected at the end of their medical carrier and we predicted that **36** additional persons (2.5%) might be expected to have more than 10 malpractice lawsuits.

Eighty six persons in this study (5.9%) had already been the subject of some form of disciplinary actions by the Medical Board of California (MBC). The official MBC records added **72** (5.0%) more licensee to our observation list of controversial cosmetic surgeons. Noticeably, the number of disciplinary actions (remarks) by the MBC is generally less than 5% for doctors working in 6 major medical specialty (anesthesiology, surgery, medicine, gynecology, pediatric and psychology), however it is more than 6% for physicians in plastic surgery and facial reconstructive surgery and it riches to 12-18% (i. e. 2-3 times the average) for those licensed in cosmetic surgery as subspecialty.

The court records and the disciplinary actions altogether identified **133** licensees – 9.2% of all licensed cosmetic/plastic surgeons in CA - as "*Prone-to-Complaints*" (PTC) providers of cosmetic surgery services, there 97 (6.7%) are manifest, while 36 (2.5%) are potential PTC doctors.

These 3 categories of manifest and "developing" PTC doctors are responsible for 859 court complaints today (35% of total) and the prognosis suggests that they will increase the total court-complaint-burden of

---

[1] First draft was completed on December 23, 2017

[2] "Private Attorney General" [CCP 1021.5]. The "private attorney general'' concept holds that a successful private party plaintiff is entitled to recovery of his legal expenses, including attorneys fees, if he has advanced the policy inherent in public interest legislation on behalf of a significant class of persons. - BLACK'S LAW DICTIONARY 129 (6th ed. 1990) (sub-definition of "Attorney General") (quoting Dasher v. Haus. Auth. of Atlanta, 64 F.R.D. 722, 729 (N.D. Ga. 1974)).

[3] www.honestyenforcer.com – under construction (Dec. 2017).

1

the cosmetic/plastic surgery by 54 % in ~ 15 years. Consequently some form of restrains (by colleagues, law-enforcement and consumers) on these PTC surgical-artisans should certainly and dramatically improve consumer satisfaction (including medical safety) and clean up the controversies around "beauty-doctors".

Publication of this information on the internet - as a comprehensive, interactive database - might significantly help the potential cosmetic surgery clients in their successful orientation between misleading, marketing 'excesses' and real professional honesty of cosmetic surgery service providers and avoid unnecessary complications (simply by being informed and avoiding these controversial, PTC actors).

## INTRODUCTION

We performed a 5-6 year-long study on the *CONDITIONS OF COSMETIC SURGERY IN CALIFORNIA*[4]. The original purpose of this study was to collect reliable data to promote cosmetic surgery as a modern way to further improve the life quality of middle-aged men (in addition to the well-known medical methods, like hormone substitution[5], diet, exercise, et. cetera).

However our initial enthusiasm for cosmetic surgery quickly cooled down when we discovered that the insider reality of cosmetic surgery practices is very much different from the carefully nurtured fabulous external, public image[6]. However some studies on the medical and legal history of cosmetic surgery quickly revealed that controversies around this activity are not new and it's deviant nature (from plastic surgery and traditional medicine) having been in the focus of professional- and media attention many times[7], including several lawsuits and even a congressional hearing[8] and numerous critical publications. The main criticism is directed against the "beauty doctors" for 1) their "blatant commercialism", 2) "deceptive advertising" 3) and the lack of proper and necessary specialist training. These activities are regularly resulting in severe bodily disfigurements and deep, emotional scares to thousands of cosmetic surgery clients who became the *victims* of some unprofessional, unethical activity (that is camouflaged to be a regular, legitimate, medical and humanitarian service in the interest of a "patient").

Cosmetic surgery is a commercial activity after all, there a medically educated and licensed person (who could be a *doctor* if he was treating sick persons) is selling medical/surgical know-how to healthy persons, consumers (who could be *patients* if they were sick)[9]. (But they aren't). The cosmetic surgery consumer selects and purchases a surgery to satisfy his/her ideas of "*beauty*". This is, or should be, formally a regular business transaction like buying a car or ordering a diner in a restaurant. But it isn't. The involvement of the "*white rock*" confuses everybody. It gives status to the service provider: he is a "*doctor*", not a merchant or trader. It gives status to the consumer: he is a "*patient*" who receives a "*treatment*" i.e. something he "*needs*" (and not just satisfies

---

[4] Biro JC, Cohen DF: *Conditions of Cosmetic Surgery in California* – 2018 (in press).

[5] The first author of this article, JCB, is licensed endocrinologist, educated on the Royal Karolinska Hospital/Institute in Sweden (the same Institute that is responsible for awarding the Nobel Prizes in Physiology/medicine).

[6] Biro JC, Cohen DF: "*Petition to the Government for a Redress of Grievances*": Legal and Ethical Controversies Indicate the Incompatibility of Traditional v. Commercial Medicine/Surgery and the Need for Separation, January 2017, Limited edition by Homulus® Press, San Diego – reprint in progress 2018.

[7] Sullivan DA: Cosmetic Surgery – *The Cutting Edge of Commercial Medicine in America*, - Rutgers University Press, New Brunswick, New Jersey, 2001.

[8] Congressional Hearing in 1989, "*Unqualified Doctors Performing Cosmetic Surgery*"

[9] "*A doctor who has made the decision to go into cosmetic surgery has decided to be a businessman*"; "*Elective procedures have become a consumer product, and consumerism necessitates an ability to finance*". - Barry, Ellen, "Life, Liberty, and the Pursuit of Lipo," The Boston Phoenix, News & Opinion, dated Apr. 6, 1998.

2

her desires). This arrangement is seemingly good and acceptable for everybody, until something goes wrong. What happens when the product ("the beauty on demand") doesn't show up? There is no *product warranty*, there is no way to *return* the unsuccessful surgery. The consumer might believe that he was dealing with a doctor and files a complaint at the MBC, but this licensing agency will not find any malpractice: an 'asymmetric face', a 'bumpy nose' is not medical malpractice. The unhappy consumer may go to the Courts but the Courts will send her to the MBC (they also believe that everything under the shadow of a white rock is "medical", i.e. not their subject matter jurisdiction). The constitutionally warranted "*day in court*"[10] means 2-3 minutes before a judge in these cases. The citizen can look for an attorney for help, but the plaintiff's attorneys are effectively excluded from most of the medical malpractice cases by MICRA[11]. All attorneys are representing doctors who have strong legal budget (malpractice insurances).

Large number of medical and legal efforts having been done to adopt cosmetic surgeons and their activities to the regular norms of the American Society (there consumer protection is important), as well as to the historical standards of medical ethics (there the "patients'" interest is paramount and supersedes the monetary interest of the doctors). However it became a depressing reality that organized cosmetic surgeons "*have the power, ability and cohesiveness to stall and frustrate the majority of efforts*"[12] in this direction.

Today, the only way to avoid cosmetic surgery related trouble is to make a good choice and go to an honest and professional surgeon who will really deliver that he promises. That's the key. But. Cosmetic surgery is a business, an activity for profit. Far away from the ethical code of the American Medical Association (AMA) that requests that "*Under no circumstances may physicians place their own financial interests above the welfare of their patients*[13]". Crocked "beauty doctors" do everything that they can to avoid objective, fact-based comparison. They are simply misleading in their advertisements and during the pre-operative meetings with their potential clients. They are using (misusing) their psychological education and pursue the ignorant public to sign up for a surgery. What happens after the surgery is no longer their problem that is the attorney's and the malpractice insurance company's.

We assume, that it is only about 10% of cosmetic surgeons who are *disturbingly* dishonest, while 90% does good or acceptable job. But the consumer's dilemma remains: how to identify these 10%, potentially very dangerous doctors in time, i.e. before appointing them for a surgery? The MBC knows well who are these controversial actors, but they will not disclose it to the public. Insurance companies are also operating under secretes, the registry of arbitration awards[14] is also closed for regular persons, like consumers.

*The consumers are often totally, desperately (and even fatally) on their own when facing the medical-legal monopoly (conspiracy?) of our society.*

There is only one single source of information that is still available for the public (after considerable trouble and expanses) and that is the Court Indexes and the related databases. Retrieving the medical malpractice cases is the only way today to estimate the risk for potential conflict with a doctor. Filing a medical malpractice claim on a Court against a doctor is a very serious form to express very strong complaints, no doubt about that. It is not important if the doctor was found guilty for wrongdoing or not, the bare existence of the legal complaint is a serious "red flag" for any future potential clients of the sued doctors.

Here we present our pilot study for this consumer dilemma.

---

[10] Legal Definition of "day in court": a day or opportunity to appear in a legal proceeding to be heard or to assert one's rights – Merriam-Webster - https://www.merriam-webster.com/legal/day%20in%20court

[11] MICRA - Medical Injury Compensation Reform Act of 1975. MICRA caps compensation for what are known as "non-economic" damages – including life-altering situations. It was intended to lower medical malpractice liability insurance premiums for healthcare providers in CA by decreasing their potential tort liability.

[12] Ibid as in reference 6 & 7

[13] Code of Medical Ethics Opinion 11.2.2 - AMA Principles of Medical Ethics: II

[14] National Practitioner Data Bank - https://www.npdb.hrsa.gov/

3

**METHODS & RESULTS**

**A.  MBC records.**

**The Physician and Surgeon Database**[15] lists (accessed on Nov. 8th, 2017) totally **135,375 persons**[16] with "Current" license in California [i.e. the Licensee meets requirements for the practice of medicine in California]. At about **61,196** are active patient care MDs[17]. The licensees are listed under **138** categories, corresponding to their specialties there primary and secondary specialties are separated.

The license's **"secondary status"** lists the critical "remarks" (disciplinary actions) against physicians in 37 categories (REF_SecondaryStatusCodeModifier). There are **12.707 remarks** altogether [~ one remark/11 licensee = 9 %], issued against **8535** doctors [one or more remark/16 doctors = 6.2 %].

The frequency of remarks and the number of disciplined doctors shows a moderate variation around the 5% resp. 3.3% average in the 6 major medical specialties (anesthesiology, surgery, medicine, gynecology, pediatric and psychology). Somewhat higher frequencies are seen in plastic-/facial plastic surgeries. However remarks against cosmetic surgeons are 4-5-times (SIC!) more frequent than the average for the entire "big" medical profession, which is – of course – a highly significant difference. (**Table I.** and **Figure 1.**) Additional information had been provided by the Court records which also support the prominent position of cosmetic surgeons in collecting complaints. (See **Table IV.**)

**Table I**
**FREQUENCY OF "REMARKS" IN MAJOR SPECIALTIES IN CALIFORNIA - 2017**

| SPECIALTY (PR/SEC) | LICENSE (#) | REMARKED LIC.(#) | REMARK/LIC (%) | SPECIALTY (PR/SEC) | LICENSE (#) | REMARKED LIC.(#) | REMARK/LIC (%) |
|---|---|---|---|---|---|---|---|
| **ANESTH1** | 8698.0 | 258.0 | 3.0 | **COSMSURG1** | 296.0 | 56.0 | 18.9*** |
| **ANESTH2** | 2139.0 | 85.0 | 4.0 | **COSMSURG2** | 675.0 | 81.0 | 12*** |
| **GENSURG1** | 4182.0 | 199.0 | 4.8 | **FACPLARE1** | 345.0 | 28.0 | 8.1 |
| **GENSURG2** | 1789.0 | 83.0 | 4.6 | **FACPLARE2** | 595.0 | 36.0 | 6.1 |
| **INTMED1** | 18881.0 | 611.0 | 3.2*** | **PLASTSUR1** | 1870.0 | 111.0 | 5.9 |
| **INTMED2** | 12807.0 | 349.0 | 2.7*** | **PLASTSUR2** | 615.0 | 41.0 | 6.7 |
| **OBGYN1** | 6946.0 | 383.0 | 5.5 | **UNI-COS1** | 174.0 | 44.0 | 25.2*** |
| **OBGYN2** | 1771.0 | 101.0 | 5.7 | **UNI-COS2** | 344.0 | 50.0 | 14.5*** |
| **PEDIATRC1** | 11199.0 | 174.0 | 1.5*** | **UNI-FAC1** | 223.0 | 11.0 | 4.9 |
| **PEDIATRC2** | 4359.0 | 98.0 | 2.2*** | **UNI-FAC2** | 331.0 | 0.0 | 0*** |
| **PSYCH1** | 9976.0 | 428.0 | 4.3 | **UNI-PLA1** | 1431.0 | 76.0 | 5.3 |
| **PSYCH2** | 2235.0 | 98.0 | 4.4 | **UNI-PLA2** | 410.0 | 21.0 | 5.1 |

MEAN:6.6+/--1.1% [S.E.M., n:24] - *** :p<.001 - significant difference from the group's mean value

---

[15] Available from Medical Board of CA. - http://www.mbc.ca.gov/Breeze/License_Verification.aspx
[16] 2015-2016 Annual Report – MBC - http://www.mbc.ca.gov/Publications/Annual_Reports/annual_report_2015-2016.pdf
[17] California Physicians - California Healthcare Almanac Quick Reference Guide – Aug. 2017 - http://www.chcf.org/~/media/MEDIA%20LIBRARY%20Files/PDF/PDF%20C/PDF%20CaliforniaPhysiciansQRG2017.pdf

4



**Figure 1: Frequency of "remarks" in some major specialties in CA – in 2017.** The number of licensees (blue bars, left axis) and the percentage of licensees with "remarks" (green bars, right axis) are compared. The left blue bars and the left edge of the green bars indicates "primary" while the opposite sides indicates the "secondary" specialties. Data were taken from **Table I**.

### B. COURT records.

Court Indexes and legal tools are another valuable sources of information about a physician. The Court Index of the Superior Court of CA, Los Angeles[18] and the LexisNexis®[19] - are examples for his approach.

We have accessed the court history of **1440** randomly selected licensees of total **3572** (accessed on 2017.11.15). This is a pilot study, but the result can be regarded as representative, as it involved 40% of the doctors in question. We identified **2414** different lawsuits for "medical malpractice", that is in average **1.67 lawsuits/doctor**. [This is certainly less than the real number of lawsuits, as the court databases are geographically distributed and no integrative database covers all courts and all cases].

The distribution of court complaints is not even between licensees, not even close. A few doctors are preferentially sued on courts: 20% of doctors are responsible for 60 % of all complaints and 56 % of surgeons covers all complaints [i.e. 44 % of doctors have no lawsuits at all. The 25 most "Prone-to-Complaints" (PTC) doctors [>10 known malpractice complaints; 1.7%] collected 410 court complaints [17%] altogether. (**Figure 2.**)

This simple counting of the number of court complaints (#CC) provides a general picture about the recent general complaint-burden of the entire specialty in question. However to evaluate the impact of the individual doctors we need to take into consideration the years of the particular doctor in practice [post-

---

[18] Party Name Search - https://www.lacourt.org/paonlineservices/civilindex/cipublicmain.aspx?
[19] https://www.lexisnexis.com/en-us/gateway.page

5

graduate years (PGY) or post-licensing years (PLY)] and the patient volume (working hours, turnover)[20]. In our selection the average PGY and PLY were 30.21+/-0.3 and 25.37+/-0.3 years (mean+/-S. E. M.), respectively.

To eliminate the influence of differences in the PGY and PLY of different doctors, we calculated the expected number of court complaints 45 years after the graduation (#CC-45PG) and 40 years after receiving their license (#CC-40PL), using the equations:

$$\text{#CC-45PG = #CC/PGY*45 and #CC-40PL = #CC/PLY*40 or #CC-PX = [#CC-45PG + #CC-40PL]/2}$$

(There the #CC are the number of recent, counted Court Complaints for alleged medical malpractice; PGY and PLY are the calculated years after graduation or licensing, respectively.)

The prediction of expected lawsuits (#CC-PG45 and #CC-PL40) provides, understandably, a different set of PTC persons than the courted #CC values. The persons with high predicted values are in the risk to collect numerous additional "real" complaints - as they have many active years before them - if they don't improve their relation to their consumers. By this way, the #CC are the picture of "today", while the #CC-PG45 and #CC-PL40 values are the visions of the "future".



**Figure 2: Complaint Frequency of 1440 Cosmetic Surgeons in California – 2018.** The number of individual court complaints (for medical malpractice) (#CC) of 1440 cosmetic surgeon were sorted in descending order and compared to the share in the total 2440 (100%) court complaints accumulated by all entire specialty (%CC). MBC sanctions [RECL: 86 licensees] were indicated by yellow bars. The estimated number of future court complaints 40, 45 years after licensing and graduation, respectively (#CC-40PL

---

[20] PGY and PLY data have been calculated from the year of graduation and licensing (both available from the licensing board, MBC) however the patient volume is very difficult to estimate.

6

and #CC-40PG) are indicated by the two brownish lines. The variation of the age of the physicians are indicated by the variation of PGY around the mean PGY=30 years and expressed as PGY [%] (oscillating blue line across the middle of the figure).

## C.  IDENTIFICATION of the "*Prone-to-Complaints*" *[PTC]* Licensees.

The actual number of court complaints (#CC) combined with the two calculated prognostic values (#CC-PG45, #CC-PL40, 3CC-PX) might provide a simple numerical approach to identify "established" and "developing" PTC medical service providers. Licensees who already collected (#CC) or have the calculated potential (#CC-PG45 or #CC-PG40 or #CC-PX) to collect more than 10 court complains were regarded to be PTC persons.

We regarded even the doctors with MBC-remarks [RECL.] as PTC personalities (even in the absence of any court record) as the MBC remark is always the consequence of some extremely serious complaint against that doctor. A remark against a licensee doesn't necessarily means that he/she has many court complaint too.

The #CC [>10], #CC-PG45 [>10], #CC-PL40 [>10] and MBC remarks [given value =10] altogether identified 133 licensees. (**Table III, Figure 3**).



**Figure 3: Identification of the "Prone-to-Complaints" (PTC) Cosmetic Surgeons of California – 2018.** The recent Court Complaints completed with eventual MBC remarks (#CC-R) of 1440 cosmetic/plastic surgery licensees were plotted against the calculated (predicted) numbers of Court Complaints (#CC-PX).  Licensees with 10 or more recent (blue area, C), predicted (grey area, B) or both (yellow area, D) Court Complaints were identified as PTC individuals. This method identified 133 PTC persons [D: 30 (2.1%), C: 67 (4.6%), B: 36 (2.5%)] while the remaining (green area), A: 1307 (90.8%) remained in the non-PTC category (belonging to A), green empty area).  Compare to Table III.

7

Table III : Identification of the "Prone-to-Complaints" Cosmetic Surgeons of California – 2018
List of the 133 Identified PTC Licensees [Preliminary*] - (See **APPENDIX**)

## D. SPECIALTY profile

The recent collection of 1440 licensees contains 3 subspecialties (cosmetic, COS; facial- reconstructive, FAC; and plastic, PLA) each further divided into two subgroups, primary and secondary (1 and 2), depending on the physicians priority to practice them. These subspecialties are very different from each other, regarding their patients/consumers, priorities, ethical commitments, et cetera. Therefore, it was important for us to examine the possible differences in the frequency of PTC actors. However, many doctors register and practice different subspecialties in combination or alternatly during their active time as surgeons. Others register, say plastic surgery as primary specialty, but in reality they practice exclusively cosmetic surgery. Therefore the classification for PTC frequency analyses is difficult and has its limitations. However it is still possible to approach the question, with proper caution, because there are 805 physicians in our pool who are registered to practice only one subspecialty [referred as UNI specialists in this study]. They may have other registered subspecialty within other medical discipline, but outside the COS, FAC, PLA group. (Combination of specialties ENT (Ear, Nose & Throat) and COS are, for example, rather popular today). (**Fig. 4, Table IV**).

The subspecialty search for PTC persons showed one significant difference, namely that cosmetic surgery is heavily populated by PTC personalities. There are more PTC doctors (30%), more complaints (6%) in the COS1, COS2 groups than in in any other groups. The difference is statistically strongly significant, up to 5-fold differences. We found the less PTC doctors and less complaints in the FAC1, 2 groups. Generally there is no difference between primary (1) and secondary (2) specialties regarding the PTC doctors and consumer complaints.

**Table IV.**

### FREQUENCY OF "PTC" LICENSEES IN DIFFERENT SUBSPECIALTIES

| T | #CC+RECL | | | | | | | | GROUP | #CC-PX | | | | | | | | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | COS1 | COS2 | FAC1 | FAC2 | PLA1 | PLA2 | 805.0 | 1461.0 |   | COS1 | COS2 | FAC1 | FAC2 | PLA1 | PLA2 | 805.0 | 1461.0 |   |
| O | 6.4 | 6.1 | 1.8 | 1.7 | 2.3 | 2.2 | 2.7 | 2.3 | Mean | 5.0 | 4.5 | 2.4 | 2.4 | 2.7 | 2.3 | 2.8 | 2.5 | O |
| T | 1.0 | 1.3 | 0.3 | 0.4 | 0.2 | 0.3 | 0.2 | 0.1 | S.E. | 0.8 | 1.1 | 0.4 | 0.5 | 0.2 | 0.3 | 0.1 | 0.1 | T |
| A | 7.7 | 7.3 | 2.7 | 2.7 | 4.2 | 3.5 | 4.7 | 4.3 | S.D. | 6.0 | 6.1 | 3.1 | 3.5 | 4.1 | 3.1 | 4.2 | 4.0 | A |
| L | 60.0 | 34.0 | 73.0 | 53.0 | 477.0 | 108.0 | 805.0 | 1461.0 | N | 60.0 | 34.0 | 73.0 | 53.0 | 477.0 | 108.0 | 805.0 | 1461.0 | L |
|   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
| P | 16.3 | 16.7 | 12.5 | 11.0 | 16.0 | 12.5 | 15.5 | 15.5 | Mean | 17.2 | 17.7 | 12.8 | 18.2 | 15.2 | 12.1 | 15.5 | 15.1 | P |
| T | 1.6 | 1.9 | 1.5 | 1.0 | 1.0 | 0.8 | 0.7 | 0.6 | S.E. | 2.5 | 4.8 | 2.1 | 0.0 | 1.3 | 0.4 | 1.0 | 0.7 | T |
| C | 6.9 | 5.8 | 2.1 | 1.4 | 5.7 | 2.3 | 5.7 | 6.1 | S.D. | 7.0 | 9.6 | 2.9 |   | 6.8 | 0.8 | 6.6 | 6.0 | C |
|   | 18.0 | 9.0 | 2.0 | 2.0 | 30.0 | 8.0 | 69.0 | 97.0 | N | 8.0 | 4.0 | 2.0 | 1.0 | 26.0 | 4.0 | 45.0 | 73.0 |   |
|   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |   |
|   | 30.0 | 26.5 | 2.7 | 3.8 | 6.3 | 7.4 | 8.6 | 6.6 | PTC [%] | 13.3 | 11.8 | 2.7 | 1.9 | 5.5 | 3.7 | 5.6 | 5.0 |   |

#CC+RECL.: VALUE 10 IS ADDED TO #CC [COUNTED COURT COMPLAINTS] WHEN MBC SANCTIONS [RECL.] APPLIED [CALCULATED].
#CC-PX: AVERAGE OF CALCULATED/EXPECTED COURT COMPLAINTS 45 YEARS AFTER GRADUATION [#CC-45PG] AND 40 YEARS AFTER LICENSING  [#CC-40PL] [CALCULATED]

8



**Figure 4: Frequency of "Prone-to-Complaints" Physicians in Subspecialties.** The actual and predicted (PGL40) complaint frequencies (#CC) of 805 UNI specialists are plotted together (upper part of the figure) or separated into 6 sub-specialty groups (lower part of the figure in order of: COS1, COS2, FAC1, FAC2, PLA1, PLA2). The presence of MBC remarks (R), (sanctions), are indicated by yellow bars. A value of 10 had been added to the #CC of the affected licensees (#CC+RECL) to combine the information from MBC (remarks, sanctions) and Courts (malpractice complaints) to a single numerical value which is suitable for statistical analyzes. (See even Table IV for statistical evaluation).

### E.  GEOGRAPHIC profile

Investigation on the 10 largest cities in California showed that there is a significant correlation between the number of cosmetic surgeons acting in that areas and the number of actual or predicted number of complaints against them, [$R^2$=0.85 and $R^2$=0.87, respectively]. The correlation between the number of doctors and the number of PTC persons or the complaints against PTC licensees is much less significant [$R^2$=0.67 and $R^2$=0.59, respectively]. The possible interpretation is that the number of doctors is not the only determinant of the size of the PTC subgroup. The geographic differences are large. As much as 68-73% of all complaints are directed against PTC doctors in Los Angeles and Fresno. At the same timer Sacramento, Palo Alto and Pasadena have no PTC doctor related complaints at all.

Los Angeles is clearly the largest contributor to the PTC doctors and associated complaints. [As much as 14 cosmetic surgeons (13.5%) have already been the subject of MBC investigations and were "awarded" with sanctions].

9



**Figure 5: "Prone-to-Complaints" (PTC) Cosmetic Surgeons in California – 2018.** The PTC-licensees related statistics for 11 largest cities in CA are sorted in descending order of the number of licensees (N, light grey area). The number of all complaints (#CC+RECL-ALL) and the number of complaints against PTC doctors (#CC+RECL-PTC) are indicated by yellow and blue bars, respectively. The number of PTC doctors (n, dark gray area) and the proportion of complaints against PRC doctors to the complaints against all doctors (#CC-PTC/ALL (%) are indicated by middle-grey areas. A value of 10 had been added to the #CC values when MBC remarks (sanctions) were present (RECL). The inserted numerical values indicate the number of cases and the result of the statistical analyzes (MEAN+/- S. E. M).

## F.   ESTIMATION of the annual medical malpractice risk

Our recent sample of cosmetic/plastic surgeons and their medical malpractice court cases in California contain 1440 licensees, 2414 (100%) court cases altogether. The recent status and outcome of these cases (November 2017) are summarized in **Table V.**

**Table V.**
**THE "DESTINY" OF COSMETIC SURGERY RELATED MALPRACTICE**
**COMPLAINTS IN CALIFORNIA - 2017**

| COURT ACTION/EVENT | # | % |
|---|---|---|
| COURT COMPLAINTS – FOR ALLEGED MEDICAL MALPRACTICE | 2490 | 100 |
| [PTC RELATED] | [410] | [17] |
| | | |
| DISMISSED | 1821 | 73 |
| PENDING [DEC. 2017] – 37 FOR JURY TRIAL | 335 | 13 |
| OTHER / UNKNOWN | 186 | 7 |
| COMPLETED WITH ARBITRATION | 59 | 2 |
| VERDICT | 53 | 2 |
| SUMMARY JUDGMENT | 36 | 1 |

TOTAL # OF PHYSICIANS: 1461; TOTAL # OF DEFENDANTS: 836 [57%]; PTC DEFENDANTS: 25 [1.7%]

10

The 355 pending cases (on 2017.11.21) were owned by 831 doctors which means that at a given date 831/1462, 57% of all licensees having unsettled, ongoing malpractice allegations. This indicates a very high level of malpractice-complaint risk for Californian cosmetic/plastic surgeons, considering that the estimated annual malpractice risk in other states is ~13%.[21] [An alternative explanation of this 4.4x difference might be that the transition time of malpractice complaints is much longer in CA than in other states]. However to be sued or convicted for malpractice are two different events: at least 75% a court accusations becomes dismissed without any consequences for the targeted doctor and only a fraction results in monetary sanctions or disciplinary actions.

The "beauty" doctor's attitude to court complaints (and complaints to the MBC) is therefore rather relaxed. *"Complaint? And what? I will be cleared anyway."* The attitude of medical malpractice insurance companies seems to support this view. The Doctors Company, for example, recognized that doctors are spending too much time with malpractice lawsuits (as much as 10% of their professional time) and encourages their members to focus on their work instead and let the Company's aggressive lawyers take care of the court trouble[22]. The company's opinion is that "the overwhelming majority of malpractice lawsuits are found to be at best fruitless, and at worst frivolous"[23]. The PTC doctors can sleep well in this sunny state.

### G. ESTIMATION of the future development of malpractice complaints

It is challenging to compare the average recent #CC values with the calculated average #CC-PG45 and #CC-PL40 (which predicts the #CC in about 20 years from now, in 2038) and speculate about a trend for the development of PTC persons in the cosmetic surgery business.

Extrapolation of the recent #CC values suggests that the number of PTC licensee will rapidly increase by about 200% and the malpractice complaints against them also by about 200% - that will be ~ 130% above the ("normal", time related) increase of complaint against the entire cosmetic surgery industry - in CA, during the next 20 years or so. (**Table II**)

Prediction of the feature on the individual level might be difficult, however a statistical look at the future, for a longer perspective, will definitely provide valuable insights. Exercising some friendly and collegial supervision over the developing ("maturing") PTC doctors might initiate some positive changes in their conflicting personalities and slow down the "legal carrier" of these surgical artisans.

---

[21] AB. Jena, et.al: Malpractice Risk According to Physician Specialty, N Engl J Med 2011; 365:629-36. - http://www.nejm.org/doi/pdf/10.1056/NEJMsa1012370
[22] The Doctors Company emphasizes that it provides the most "relentless" and "the industry's most aggressive" defense of medical malpractice claims against its members, creating an atmosphere in which The Doctors Company has self-proclaimed "their resolve to fight rather than settle." – from Medical Malpractice Insurance Company Profiles , 2011 - https://www.medicalmalpracticelawyers.com/blog/medical-malpractice-insurance-company-profits/
[23] The Doctors Company's Dubious Medical Malpractice Statistics by Kennedy MS – 2011 - https://www.litigationandtrial.com/2016/02/articles/attorney/medical-malpractice-1/the-doctors-company/

11

**Table VI**

**PREDICTION OF COMPLAINTS & SANCTIONS AGAINST COSMETIC SURGEONS IN CALIFORNIA IN 2033**

| YEAR | 2017 [RECENT STATUS] | | 2033 [PREDICTION] | | | (+)15 |
|---|---|---|---|---|---|---|
| **CATEGORY 1 [COMPLAINTS]** | RECENT - # CC | % | #CC-45PG | # CC-40PL | % (AVERAGE) | CHANGE [%] |
| # LICENSEE [ALL] | 1461.00 | 100 | 1461.00 | 1461.00 | 100.00 | 0 |
| #CC [ALL] | 2490.00 | 100 | 3626.00 | 4056.00 | 146-163 (154) | (+)54 |
| # CC / # LICENSEE | 1.70 | 100 | 2.48 | 2.78 | 146-163 (154) | (+)54 |
| # LIC. [PTC] | 25.00 | 100 | 61.00 | 78.00 | 244-312 (278) | (+)178 |
| # CC [PTC] | 410.00 | 100 | 934.00 | 1279.00 | 228-312 (270) | (+)170 |
| # CC [PTC] / # LIC. [PTC] | 16.40 | 100 | 15.31 | 16.40 | 93-100 (96) | 0 |
| **CATEGORY 2 [SANCTIONS]** | SANCTIONS | % | PREDICTION 1 | PREDICTION 2 | % (AVERAGE) | CHANGE [%] |
| # SANCTIONS [ALL] | 87.00 | 100 | 127.02 | 141.81 | 146-163 (154) | (+)54 |
| # SANCTIONS / # LIC [ALL]*100 | 6.00 | 100 | 8.76 | 9.78 | 146-163 (154) | (+)54 |
| # SANCTIONS [PTC] | 14.00 | 100 | 34.16 | 43.68 | 228-312 (270) | (+)170 |
| # SANCTIONS [PTC] / # PTC*100 | 56.00 | 100 | 56.00 | 56.00 | 100-100 (100) | 0 |

## DISCUSSION

### 1. The cosmetic surgeon's "mission impossible"

Every physician is living in some kind of (manifest or concealed) conflict of interest with their patients. To cure a disease is directly against the personal monetary interest of the physician: a cured patient is a lost consumer, at least temporarily. This conflict is well recognized by the medical societies and that is the origin of the medical ethics. It is clear for most physicians today that ethical rules, like "*don't cause harm*" or "*prioritize the pat's interest*" [above your own] are essential to build good-will, maintain the trust of the patients and promote the long-term prosperity of the entire medical community.

No physician is an almighty God who can perform miracles. The real power of physicians – that is based on science and understanding and not just on empty psychology – is very, very limited. Most patients know that and not expect from their physicians that they will solve every possible and impossible bodily discomforts for them. They can forgive the shortcomings of medicine and their doctors if the relationship between physician and patient is open, transparent and honest. There is only one major source of conflict between doctors and patients and that is *dishonesty*, when the doctor consciously and intentionally lies to his patient[24]. No person can accept betrayal of genuine trust.

Doctors as highly respected professionals are enjoying the duties and privileges of "professional autonomy[25]", which means that they can decide almost everything regarding their profession, nobody can or will interfere. This privilege involve supervision,

---

[24] The only still existing exception is the "*therapeutic privilege*" whereby a physician may be excused from revealing information to a patient when disclosing it would pose a serious psychological threat, so serious a threat as to be medically contraindicated.
[25] "Professional autonomy means that physicians as professionals discipline themselves automatically, and engage in medical care for their patients with the spirit of positive freedom". - From Hashimoto N: Professional Autonomy, JMAJ, 49(3):125-127, 2006

12

"regular peer review" of each other and keeping the profession clean from crooked actors.  As the "*noblesse oblige*" the professional autonomy has its obligation too.

Can the cosmetic surgery avoid violating the two most important ethical rules of the medical profession? Where is the limit of tolerance - of the society, courts, other "regular doctors" - for that type of misuse of an honorable profession and its well-deserved professional privileges? There seems to exist two major, very difficult dilemmas for our cosmetic surgeons: a) *maximizing profit without hurting too much of their consumers*; b) *be honest with their consumers, without losing them as clients*.

Cosmetic surgery is a commercial activity which is primarily profit oriented, there licensed doctors are selling medical technology and know-how to consumers. It has nothing to do with the traditional doctor/patient relationship, because the doctor is not treating any disease and the consumer is healthy (not patient).

The commercial medicine is a relatively new phenomenon. The difference between the traditional (patient oriented) and the new commercial (profit oriented) medicine is well recognized – and criticized – by the medical experts, but poorly understood by the general public[26]. The most obvious nature of the cosmetic surgery is the excessive and over-promising advertisement, and its ability to gain non-realistic expectations. The patient's interest is not primary for cosmetic surgeons which is against the ethical code of the medical profession. [AMA[27]]

## 2. *The consumer's "mission impossible"*

Consumers usually want to know exactly what are they buying, and the consumer laws provide effective support for them. Medical services are exceptions. There is no warranty for the outcome of any medical action. The "*doctor always does his best, but the nature and nurture not always cooperate*" – says that – and that is *never* the doctor's fault. Cosmetic surgeons are very skillfully using (misusing) this public ignorance.

California has a very doctor-friendly climate. It is impossible to obtain the complaint history of a doctor.

1) The MBC is very slow and bureaucratic organization, there often only public scandals results in necessary actions[28] [29]. The board's collaboration with the HQES-OAG[30], that is necessary to the enforcement of medical laws, is the constant source of frustration for the legislator.[31]

---

[26] Ibid. as in reference 5 & 6.
[27] Ibid. as in reference 11.
[28] Wolfe, S. (2011, August). Letter regarding performance of Medical Board of California - Public Citizen. Retrieved from http://citizen.org/letter-regarding-performance-of-medical-board-of-california
[29] Fellmeth J.. (2005). Final Report - Enforcement Program Monitor. MBC. Retrieved from http://www.mbc.ca.gov/publications/enforcement_report_final.pdf
[30] Health Quality Enforcement Section (HQES) of the Office of Attorney General (OAG)
[31] BACKGROUND PAPER REGARDING ISSUES TO BE ADDRESSED BY THE DEPARTMENT OF CONSUMER AFFAIRS, OFFICE OF THE ATTORNEY GENERAL, AND THE OFFICE OF ADMINISTRATIVE HEARINGS. Oversight Hearing by the Senate Committee on Business, Professions and Economic Development and Assembly Committee on Business and Professions. 2016, Mar. 9. Issue 6, 25. Transfer of MBC Investigators and use of the vertical prosecution model. Retrieved from http://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/DCA%20Background%20Paper%202015-16.pdf

13

2)  The plaintiff's attorneys are practically banned by the MICRA[32] from the medical malpractice market. An unhappy cosmetic surgery consumer has serious difficulties to find an attorney who is willing to represent him/her before the Court. To be a *pro se* litigant and try to represent yourself before judges is just a wasting of time and emotional resources.

3)  There are numerous cosmetic surgery related societies. Each one is proudly announcing in their society rules their non-compromising commitment to the quality and high ethical standards. But these are only empty words; in reality the member's loyalty to each other and their commercial success is much higher than their commitment to their consumers, or the Ethical Code of the profession. Complaint to these societies will remain unanswered[33]. (It is a well-known observation by persons in published, media cases as well as the authors personal experience based on investigative contacts with several societies in CA, like California Society of Plastic Surgeons, CSPS or Los Angeles Society of Plastic Surgeons, LASPS; AAAASF; The Rhynoplasty Society, American Board of Cosmetic Surgery in CA, ABCS-CA; Aesthetic Surgery Education and Research Foundation, ASERF; American Society of Plastic Surgery, ASPS; California Society of Facial Plastic Surgery, CSFPS.[34])

Consequently the cosmetic surgery consumers are and remain desperately alone in any kind of consumer complaints against the massive, well-organized, professional money-making pact/conspiracy of "beauty-doctors"[35]. [This opinion is also based on media references, publicly available rapports (few) and our own very personal and thorough professional investigations[36]].

There are numerous trade organizations in America - which are serving, primarily, the monetary interest of a branch. People are used to it and the consumer laws and associations seems to provide some fundamental protection against the excesses of these trade organizations. However trade organization which are "camouflaged" to Professional Medical Societies are outside of the protective eyes of the legislator and they are permitted to exist and benefit "big" of the public ignorance. People loves and respect their doctors. It is the result of the humanitarian image of the traditional (patient oriented) doctors, that millions of medical professionals built up under thousands years. The key to this success is the doctors' commitment to the Ethical Code of the Medical profession, most importantly the principle of "*don't make harm*" (Hippocrates) and the *doctors' ability to place their own monetary interest second to the health related interest of their patients[37]*.  Cosmetic surgeons [with numerous exceptions, of course] often violate these [and other] fundamental ethical rules.

The 20/80 rule ("*the law of the vital few*")[38] is well recognized by experts monitoring medical activities. It is a well-established observation that a small group of doctors accounts for large parts of all patient

---

[32] Ibid as referred in 9.

[33] Ibid as referred in 3, 4, 5, 6.

[34] Ibid as referred in 3, 4.

[35] [NOTE: The authors will clearly state, that they are not nurturing any anti-profit or egalitarian ideas. The authors believe that competition, market economy benefit the society and serve the interest of the public [consumers]. However "competition" is meant to be with products and services where the better products and services should lead to healthy profit, lower prices and consumer-satisfaction. Competition with "words" ("lies") is against the fundamental ideologies of capitalism, socialism and any major political or religious concept. Lies and dishonesty is and remains only lies and dishonesty in any time and at any place].

[36] Ibid as referred in 4 & 5.

[37] Ibid as referred in 12.

[38] The **Pareto principle** (also known as the **80/20 rule**, the **law of the vital few**, or the **principle of factor sparsity**) [1] states that, for many events, roughly 80% of the effects come from 20% of the causes. - *Bunkley, Nick (March 3, 2008), "Joseph Juran, 103, Pioneer in Quality Control, Dies", New York Times.*

14

complaints. Additionally it is feasible to predict which doctors are at high risk of incurring more complaints in the near future[39, 40]

### 3. *Caveat emptor[41]: un-orthodox ways of getting informed about a doctor in California*

Information about a doctor is extremely restricted for the public. There are public consumer ratings, of course, however these ratings are manipulated by the rated persons and therefore they are serving, mostly, as advertisements. The media frequently picks some extreme cause if the unhappy consumer is laud enough, but these causes have mostly entertainment value and will not change anything. We have experienced that some doctors learned to control the media: their attorneys often effectively threaten the publisher and the negative publication is gone in 24 hrs.

There remains only tree ways to obtain some realistic picture about the real value of a doctor's medical works and develop some legal strategy for public protection. They are *a) utilizing public court databases; b) distributing information via direct, non-mediated (uncensored), personal, social media; c) organizing direct, collective, unmediated public efforts to restrain unprofessional, dishonest surgery service providers.*

We used the available (public) **Court Databases** and related proprietary services (LexisNexis) to monitor complaints against cosmetic/plastic surgeons in California. This is an effective method, because initiation of a lawsuit against a physician for medical malpractice is certainly qualifying as a serious complaint. The bare existence of a court record is a sign of failure for the targeted doctor (no matter what the outcome of the case might have been)[42]

We are well aware of the existence of fake claims against medical professionals by claimants who has clearly and only monetary motives. However the malpractice risk according to physician specialty – that exists for every practicing doctor - is statistically measurable.  The annual risk for malpractice lawsuit is estimated to be ~6-7% for all medical specialties in America and ~13% for plastic surgery.[43] The estimated average number of a "normal" plastic surgeon is one claim every 100/13=7.7 years, or ~5 after 40 active years in practice.

---

[39] Bismark MM, *et al*: Identification of doctors at risk of recurrent complaints: a national study of healthcare complaints in Australia - BMJ Quality & Safety 2013; 22:532-540. - http://qualitysafety.bmj.com/content/22/7/532

[40] Studdert DM, Spittal MJ, Bismark MM: The PRONE Score: An Algorithm for Predicting Doctors' Risks of Formal Patients Complaints Using Routinely Collected Administrative Data, - 24 BMJ Quality and Safety 360 (2015).

[41] "Let the buyer beware" - Under the principle of caveat emptor, the buyer could not recover damages from the seller for defects on the property that rendered the property unfit for ordinary purposes. The buyer had no express warranty ensuring the quality of goods.

[42] Utilizing the public information in Court Databases against the medical community has a history in USA. This method was first used by the consumer's attorneys (CAALA) in the battle against doctors over MICRA controversies.[42] In 1985, when a telephone hotline opened up to warn doctors about litigious patients (SIC!), CAALA retaliated by creating a hotline that patients could call to see whether their doctor had been sued for malpractice during the prior 10 years[42, 42] This hotline irritated the doctors (they called it *"a sham and a shame, a miscarriage and a corruption of justice"),* but otherwise it had no public benefits.

[43] Ibid as referred in 20.

15

The average frequency of malpractice lawsuits is relatively low in our pilot material, only ~1.7 court complaint / cosmetic-plastic surgeon (all times, all ages[44]) and the predicted average max. 40 years after licensing or 45 years after graduation is ~3/doctor. We certainly underestimated the number of malpractice lawsuits[45].

We identified 25 cosmetic/plastic surgeons who were defendants in 10 or more malpractice lawsuits. However this count didn't take the number of years in practice into consideration. Considering the years after graduation and licensing we **calculated the expected number of lawsuits** at the end of the physicians' carrier (after 40-45 years in active practice). By this way we predicted, that additional 36 physicians have the potential to pass our 10 Court Complaints / doctor limit some times in the future, during their active period as cosmetic surgeons.

**Disciplinary actions** against a physician by the licensing agency (with or without the involvement of any Court) are probably the most alarming form of expressed and significant dissatisfaction with the professional actions of a licensee. Generally less than 5% of the doctors have remarks from the MBC, but cosmetic surgeons keeps the "record" with 12-18%.

Disciplinary actions (86) added further persons to our list of PTC physicians, (mostly those who hadn't been identified by their court history, some having no court records at all).

Our 3 way of identifying "risky doctors" lead (all-together) to the list of 133 licensees who we classify as PTC physicians. It is 9.2% of all cosmetic/plastic surgeons in our pilot collection of 1440 licensees.

### 4. Past Behavior is the Best Predictor of Future Behavior

Our statistical data provides information about a large group of physicians and events in the past (malpractice lawsuits, disciplinary notes). The value of this kind of studies to predict medico-legal events at the individual doctor level is, of course, the subject of discussion.[46] The individual predictive value is certainly low for doctors with few (not above the average) complaints, however it is increasing, exponentially, with increasing number of previous complaints. It had been suggested, that recurrence was virtually certain for doctors who had experienced 10 or more complaints, with 97% incurring another complaint within a year.[47]

Doctors with PTC label might – and certainly will – argue, that they have especially difficult, complex consumers and they have nothing to do with the high number of complaints against their surgery practices. This argument might work for traditional (patient oriented doctors) who has little or no influence to choose

---

[44] The average time in practice for doctors in our pilot material is ~25.2 years after licensing (1217 licensee) or 30.1 years after graduation (1200 licensee).

[45] The reason is that court data are stored in local court houses (there are many) and even the best available collections might miss cases. Consequently some doctors are correctly monitored, but others are not (under reported). This is an error that we can't correct (for a reasonable cost).

[46] Rolph JE. Some statistical evidence on merit rating in medical malpractice insurance. J Risk Insur 1981; 48 (2):247–60.  & Danzon PM Liability for medical malpractice. J Econ Perspect. 1991;5:51–69.

[47] Note 3 above. "Doctors named in a third complaint had a 38% chance of being the subject of a further complaint within a year, and a 57% probability of being complained against again within 2 years (figure 2A). Doctors named in a fifth complaint had a 59% 1-year complaint probability and a 79% 2-year complaint probability. Recurrence was virtually certain for doctors who had experienced 10 or more complaints, with 97% incurring another complaint within a year."

16

their patients. A commercial (profit oriented) doctor, cosmetic surgeon, has maximal discretion as medical professional to select his clients. The freedom of a cosmetic surgeon to select his/her consumers (healthy buyers of medically not necessary services) is certainly not limited by medical necessity, rather by monetary/profit considerations.  The vast majority of cosmetic/plastic surgeons has not this kind of problems, 85% of all doctors on our pilot material has no or less than 3 court records.

[The personal, professional quality of doctors (experience, education, manual skills) is certainly varying. A below average quality doctor can be very valuable for sick patients and under special circumstances, due to the attitude, that "*a doctor with some shortcomings is still better, than no doctor at all.*"  It is certainly not true for commercial doctors, there "*only the best is good enough*", i.e. worth for the private money of an already wellbeing consumer. Consequently the worst cosmetic surgeons are under the worst economic pressure and "*need to take any case*". Not surprisingly they will end up as PTC actors.]

Consequently we are confident that our selection criteria is very generous and it pinpoints only individuals who will almost certainly be the subject of further serious consumer complaints.

We want to be on the safe side and not accidentally target anybody, even if the purpose of our pilot study is not to present an absolutely certain prediction of future medico-legal events on the individual physicians level. We want to assist and guide potential cosmetic surgery consumers to select their future cosmetic surgeon, knowingly what they are doing and avoid physicians with documented history of serious consumer complaints, i.e. not falling blindly for the glamorous marketing efforts of crocked actors. This initiative is certainly necessary when the designated authorities (MBC, Courts, HQES of OAG, and Professional Societies) are not up to their duty to supervise the quality of a service provided by licensed commercial doctors and enforce the obedience to the well-established standards of good medical care/service and to the professional Ethical Code of the AMA.

5. *"Draining the swamps[48]" in California.*

The medical/pharmaceutical industry developed to the most controversial area of the modern American life. This is a complex area that engages many persons. Everybody has some opinion about it, mostly without knowing what they are speaking about. In such "messed up" situations we can't expect reliable guidelines from medical-, legal- or political authorities. We need to go back to the core facts and start the problem solving from the beginning. The core facts, the statistics, tells us very clearly, that our health care system is sick, the medical organizations often misuse the traditional professional autonomy in their own interest, there is no adequate supervision over the activity of doctors. We should face the facts, that there are some doctors, probably not more than 10% of all, who are not benefiting their patients and without them we ("The People") would feel much better.

There were numerous efforts before to condemn the cosmetic surgery for its eccentric nature and profoundly deviant practices. However all these efforts failed, this specialty grows and gains in power. The services of "beauty doctors" are attractive for the (ignorant) public and the actors are skilled to keep their weaknesses concealed from the potential consumers. Dreaming about beauty can cost whatever it wants to

---

[48]To keep the mosquito population (PTC doctors) low and combat malaria (medical greed and dishonesty).

17

cost. Therefor we prefer a continued positive attitude toward cosmetic surgery as a specialty and will focus our critics toward those doctors who are responsible for most of the bad reputation of this "beauty industry".

Identifying the PTC actors is the first step to clean up this specialty from fraudulent doctors, provide the potential consumers the possibility to make informed decision when choosing his or her "body-sculptor" and, by that way, secure the consumer rights even in this white-rock territory.

**CONCLUSIONS**

Motivated by the lessons we learned under our professional study on "THE CONDITIONS OF COSMETIC SURGERY IN CALIFORNIA, 2011-2017" we developed a method to identify "*Prone-to-Complaints*", PTC cosmetic surgeons. The intention is to provide reliable, honest, uncorrupted guidance to potential cosmetic surgery clients to make informed decisions about their choice of cosmetic surgeon and avoid those who were documentedly involved in unusually serious or unexpectedly high number of conflicts (which lead to court complaints for medical malpractice) with their clients. This pilot study is the first step to develop an interactive, web-based and client-managed referral system and consumer based quality monitoring tool.

It might turn out that cosmetic surgery is a PTC specialty[49]. In that case it might be necessary to separate the recently developing consumer (profit) oriented commercial medicine from the traditional (patient oriented) medicine/surgery and, by this way, protect the integrity of the original, honest, ethical medical profession and the safe, secure and humanitarian care of the sick (patients) without continued confusion and unhealthy compromises.

**Abbreviations**

| | | |
|---|---|---|
| PTC | - | PRONE TO COMPLAINTS |
| PGY | - | POST-GRADUATION-YEARS |
| PLY | - | POST-LICENSING-YEARS |
| MBC | - | MEDICAL BOARD OF CALIFORNIA |
| AMA | - | AMERICAN MEDICAL ASSOCIATION |
| #CC | - | NUMBER OF COURT COMPLAINTS [COUNTED] |
| #CC-45PG | - | NUMBER OF COURT COMPLAINTS 45 YEARS AFTER GRADUATION [CALCULATED] |
| #CC-40PL | - | NUMBER OF COURT COMPLAINTS 40 YEARS AFTER LICENSING [CALCULATED] |
| #CC-PX | - | AVERAGE OF #CC-45PG AND #CC-40PL [CALCULATED] |
| RECL. OR R | - | RECLAMATION BY THE MBC [USED SYNONYMOUSLY TO REMARKS, SANCTIONS] |
| #CC+RECL. | - | VALUE 10 IS ADDED TO #CC WHEN MBC SANCTIONS APPLIED [CALCULATED] |
| #CC+R | - | VALUE 10 IS ADDED TO #CC WHEN MBC SANCTIONS APPLIED [CALCULATED] |

---

[49] The exact distinction between plastic- and cosmetic surgery was not possible, because of the lack of reliable records. Many so called plastic surgeons are practicing occasionally or exclusively cosmetic surgery. The clear-cut distinction would be desired, because plastic surgery is traditional (patient oriented), while cosmetic surgery is commercial (profit oriented) activities. This mixing of two different "qualities" probably leads to the under estimation the proportion of PTC doctors in cosmetic surgery while the opposite happens with plastic surgery.

18

**Acknowledgement**

We wish to express our great appreciation to our numerous friends, supporters and advisors for helping us to walk the 6 years long journey in the swampy landscape of the medical and legal domains of California. We especially thank to Erica Moore for her tireless help with the compilation of the original data from Courts and MBC.


**APPENDIX**

**THE [PRELIMINARY] LIST OF THE *"PRONE-TO-COMPLAINTS"* [*PTC*] COSMETIC SURGEONS OF CALIFORNIA – January 2018.**

19

## IDENTIFICATION OF THE "PRONE-TO-COMPLAINTS" COSMETIC SURGEONS OF CALIFORNIA - 2018©

| CAT. | PTC# | Lic__ | FN | MN | LN | City | YOL | YOG | R | #CC | #CC+R | #CC-PX |
|------|------|-------|----|----|----|------|-----|-----|---|-----|-------|--------|
| D1 | 1 | 383 | N | V | C | Long Beach | 1975 | | Y | 29 | 39 | 28 |
| D2 | 2 | 272 | G | T | B | CULVER CITY | 1974 | 1970 | | 34 | 34 | 31 |
| D3 | 3 | 263 | W | A | G | LOS ANGELES | 1974 | 1970 | 71 | 24 | 34 | 22 |
| D4 | 4 | 301 | A | M | S | WEST COVINA | 1976 | 1972 | 78 | 23 | 33 | 22 |
| D5 | 5 | 274 | H | G | B | NEWPORT BEACH | 1965 | 1966 | 79 | 19 | 29 | 15 |
| D6 | 6 | 845 | M | | O | LOS ANGELES | 2003 | 1997 | 78 | 18 | 28 | 43 |
| D7 | 7 | 396 | D | L | M | LOS ANGELES | 1979 | 1978 | 71 | 17 | 27 | 18 |
| D8 | 8 | 302 | R | K | S | LOS ANGELES | 1976 | 1969 | 71 | 17 | 27 | 11 |
| D9 | 9 | 340 | M | P | S | DEL MAR | 1972 | 1970 | 79 | 17 | 27 | 15 |
| D10 | 10 | 652 | S | S | O | BEVERLY HILLS | 1998 | 1994 | 71 | 16 | 26 | 31 |
| D11 | 11 | 262 | F | | S | SAN FRANCISCO | 1968 | 1964 | 50 | 15 | 25 | 14 |
| D12 | 12 | 389 | J | B | C | SANTA MONICA | 1982 | 1975 | 71 | 13 | 23 | 14 |
| D13 | 13 | 310 | R | | E | LOS ANGELES | 1975 | 1968 | 78 | 13 | 23 | 12 |
| D14 | 14 | 357 | G | M | M | BAKERSFIELD | 1977 | 1975 | 71 | 12 | 22 | 12 |
| D15 | 15 | 295 | T | A | G | FRESNO | 1975 | 1974 | 78 | 10 | 20 | 10 |
| D16 | 16 | 434 | J | A | A | LOS ANGELES | 1987 | 1982 | | 19 | 19 | 24 |
| D17 | 17 | 297 | S | M | M | LA JOLLA | 1975 | 1969 | | 19 | 19 | 11 |
| D18 | 18 | 411 | R | A | Y | VISALIA | 1983 | 1981 | | 19 | 19 | 11 |
| D19 | 19 | 845 | S | C | S | LA MESA | 1998 | 1988 | 70 | 8 | 18 | 14 |
| D20 | 20 | 846 | P | G | L | LOS ANGELES | 1998 | 1991 | 78 | 7 | 17 | 13 |
| D21 | 21 | 747 | J | P | H | BAKERSFIELD | 2001 | 1999 | 78 | 5 | 15 | 12 |
| D22 | 22 | 576 | D | M | K | SAN DIEGO | 1986 | 1984 | | 14 | 14 | 10 |
| D23 | 23 | 158 | G | M | T | WEST HOLLYWOOD | 1968 | 1967 | | 14 | 14 | 12 |
| D24 | 24 | 574 | H | | M | BEVERLY HILLS | 1986 | 1984 | | 13 | 13 | 17 |
| D25 | 25 | 113 | R | M | S | LOS ANGELES | 2010 | 2009 | 70 | 3 | 13 | 11 |
| D26 | 26 | 381 | M | | M | LOS ANGELES | 1979 | 1971 | | 12 | 12 | 12 |
| D27 | 27 | 865 | J | T | C | NEWPORT BEACH | 2002 | 1991 | | 11 | 11 | 23 |
| D28 | 28 | 693 | S | | Y | ENCINO | 1990 | 1989 | | 11 | 11 | 16 |
| D29 | 29 | 837 | R | F | G | PLEASANTON | 1997 | 1992 | | 10 | 10 | 10 |
| D30 | 30 | 459 | V | B | B | GLENDALE | 1999 | 1985 | | 10 | 10 | 12 |
| C38 | 68 | 836 | H | H | L | BEVERLY HILLS | 1997 | 1992 | 78 | 2 | 12 | 2 |
| C39 | 69 | 663 | R | | M | RANCHO MIRAGE | 1998 | 1980 | 70 | 2 | 12 | 3 |
| C40 | 70 | 420 | J | R | V | VAN NUYS | 1985 | 1982 | 78 | 2 | 12 | 2 |
| C41 | 71 | 417 | A | K | C | LOS ANGELES | 1985 | 1976 | 76 | 2 | 12 | 2 |
| C42 | 72 | 319 | T | T | H | SAN JOSE | 1978 | 1967 | 71 | 2 | 12 | 2 |
| C43 | 73 | 334 | F | | A | BEVERLY HILLS | 1979 | 1965 | 78 | 2 | 12 | 2 |
| C44 | 74 | 252 | L | A | S | WOODLAND HILLS | 1973 | 1963 | 81 | 2 | 12 | 2 |
| C45 | 75 | 285 | R | W | S | SANTA MONICA | 1966 | 1963 | 77 | 2 | 12 | 2 |
| C46 | 76 | 103 | S | S | L | LOS ANGELES | 2008 | 1998 | 47 | 1 | 11 | 3 |
| C47 | 77 | 618 | H | | Y | DOWNEY | 1997 | 1995 | 81 | 1 | 11 | 2 |
| C48 | 78 | 647 | S | T | V | HUNTINGTON BEACH | 1991 | 1990 | 48 | 1 | 11 | 2 |
| C49 | 79 | 481 | S | | D | DOWNEY | 1990 | 1988 | 78 | 1 | 11 | 2 |
| C50 | 80 | 609 | R | H | C | WEST HOLLYWOOD | 1988 | 1985 | 77 | 1 | 11 | 1 |
| C51 | 81 | 600 | J | K | B | GARDEN GROVE | 1987 | 1981 | 78 | 1 | 11 | 1 |
| C52 | 82 | 430 | M | | G | ORANGE | 1992 | 1971 | 81 | 1 | 11 | 1 |
| C53 | 83 | 515 | H | C | M | FULLERTON | 1983 | 1982 | 81 | 1 | 11 | 1 |
| C54 | 84 | 400 | M | | N | HEMET | 1988 | 1981 | 78 | 1 | 11 | 1 |
| C55 | 85 | 344 | G | B | R | LODI | 1979 | 1977 | 52 | 1 | 11 | 1 |
| C56 | 86 | 385 | M | V | E | NEWPORT BEACH | 1979 | 1974 | 71 | 1 | 11 | 1 |
| C57 | 87 | 225 | R | P | G | OAKLAND | 1967 | 1966 | 71 | 1 | 11 | 1 |
| C58 | 88 | 525 | N | T | D | SAN JOSE | 2006 | 1994 | 48 | 0 | 10 | 0 |
| C59 | 89 | 450 | S | T | M | DALY CITY | 1981 | 1980 | 70 | 0 | 10 | 0 |
| C60 | 90 | 227 | P | J | V | NEWPORT BEACH | 1968 | 1966 | 71 | 0 | 10 | 0 |
| C61 | 91 | 349 | D | J | P | BERKELEY | 1977 | 1976 | 71 | 0 | 10 | 0 |
| C62 | 92 | 870 | J | N | C | LOS ANGELES | 2004 | 2002 | 76 | 0 | 10 | 0 |
| C63 | 93 | 833 | W | H | B | LOS ANGELES | 1996 | 1993 | 76 | 0 | 10 | 0 |
| C64 | 94 | 104 | J | R | H | SAN DIEGO | 2008 | 2001 | 78 | 0 | 10 | 0 |
| C65 | 95 | 517 | G | G | C | SANTA ROSA | 1993 | 1986 | 70 | 0 | 10 | 0 |
| C66 | 96 | 346 | W | F | K | WINDSOR | 1977 | 1975 | 80 | 0 | 10 | 0 |
| C67 | 97 | 723 | V | D | | LOS ANGELES | 2000 | 1993 | 81 | 0 | 10 | 0 |
| C1 | 31 | 304 | A | K | G | CERRITOS | 1976 | 1969 | 70 | 9 | 19 | 8 |
| C2 | 32 | 303 | T | R | V | SAN DIEGO | 1968 | 1967 | 71 | 9 | 19 | 8 |
| C3 | 33 | 608 | K | F | C | FRESNO | 1987 | 1986 | 76 | 7 | 17 | 9 |
| C4 | 34 | 536 | D | G | G | BEVERLY HILLS | 1983 | 1983 | 78 | 7 | 17 | 9 |
| C5 | 35 | 442 | G | T | F | CERRITOS | 1981 | 1974 | 47 | 7 | 17 | 7 |
| C6 | 36 | 722 | T | K | P | LA MESA | 1990 | 1990 | 79 | 6 | 16 | 9 |
| C7 | 37 | 756 | R | A | S | LA JOLLA | 1992 | 1988 | 50 | 6 | 16 | 9 |
| C8 | 38 | 686 | P | E | C | DEL MAR | 1988 | 1988 | 48 | 6 | 16 | 8 |
| C9 | 39 | 642 | C | J | S | LA MESA | 1988 | 1986 | 48 | 6 | 16 | 8 |
| C10 | 40 | 511 | D | C | H | LOS ANGELES | 1983 | 1982 | 71 | 6 | 16 | 7 |
| C11 | 41 | 427 | A | B | B | SAN FRANCISCO | 1980 | 1979 | 48 | 6 | 16 | 7 |
| C12 | 42 | 551 | J | J | S | ENCINO | 1994 | 1994 | 91 | 5 | 15 | 9 |
| C13 | 43 | 550 | T | T | N | FOUNTAIN VALLEY | 1995 | 1987 | 48 | 5 | 15 | 8 |
| C14 | 44 | 500 | Y | M | K | ESCONDIDO | 1996 | 1976 | 78 | 5 | 15 | 7 |
| C15 | 45 | 439 | A | A | H | OXNARD | 1987 | 1975 | 50 | 5 | 15 | 6 |
| C16 | 46 | 368 | K | J | O | TEMECULA | 1981 | 1980 | 91 | 5 | 15 | 6 |
| C17 | 47 | 400 | M | H | A | TORRANCE | 1978 | 1978 | 91 | 5 | 15 | 5 |
| C18 | 48 | 371 | A | | Z | GILROY | 1981 | 1972 | 78 | 5 | 15 | 5 |
| C19 | 49 | 319 | D | N | M | OXNARD | 1976 | 1975 | 71 | 5 | 15 | 5 |
| C20 | 50 | 872 | M | L | M | BEVERLY HILLS | 2004 | 1982 | 50 | 4 | 14 | 8 |
| C21 | 51 | 696 | R | | T | SAN CLEMENTE | 1999 | 1997 | 47 | 4 | 14 | 7 |
| C22 | 52 | 763 | C | S | V | TORRANCE | 1993 | 1991 | 71 | 4 | 14 | 7 |
| C23 | 53 | 500 | S | A | M | SANTA ANA | 1993 | 1991 | 71 | 4 | 14 | 5 |
| C24 | 54 | 411 | R | B | B | LOS ANGELES | 1984 | 1978 | 81 | 4 | 14 | 5 |
| C25 | 55 | 374 | T | E | S | MODESTO | 1981 | 1969 | 71 | 4 | 14 | 4 |
| C26 | 56 | 413 | F | H | C | BREA | 1979 | 1969 | 91 | 4 | 14 | 4 |
| C27 | 57 | 771 | M | M | S | NEWPORT BEACH | 1998 | 1998 | 49 | 3 | 13 | 7 |
| C28 | 58 | 752 | M | E | M | BEVERLY HILLS | 2001 | 1995 | 77 | 3 | 13 | 6 |
| C29 | 59 | 617 | B | S | S | BAKERSFIELD | 1997 | 1996 | 71 | 3 | 13 | 6 |
| C30 | 60 | 554 | B | J | E | TEMECULA | 1995 | 1994 | 48 | 3 | 13 | 6 |
| C31 | 61 | 608 | W | J | M | NEWPORT BEACH | 1988 | 1988 | 53 | 3 | 13 | 5 |
| C32 | 62 | 769 | B | J | C | RIVERSIDE | 1993 | 1989 | 70 | 3 | 13 | 5 |
| C33 | 63 | 532 | U | M | B | SAN JOSE | 1994 | 1987 | 71 | 3 | 13 | 5 |
| C34 | 64 | 491 | G | P | M | BEVERLY HILLS | 1991 | 1989 | 71 | 3 | 13 | 5 |
| C35 | 65 | 424 | M | S | R | RANCHO MIRAGE | 1988 | 1972 | 78 | 3 | 13 | 4 |
| C36 | 66 | 339 | D | M | M | BEVERLY HILLS | 1977 | 1972 | 70 | 3 | 13 | 4 |
| C37 | 67 | 723 | P | V | D | LOS ANGELES | 2000 | 1993 | 78 | 2 | 12 | 4 |
| B1 | 98 | 121 | C | N | C | GREENBRAE | 2012 | 2002 | | 6 | 6 | 28 |
| B2 | 99 | 692 | A | | T | LONG BEACH | 1999 | 1997 | | 9 | 9 | 19 |
| B3 | 100 | 723 | S | J | R | DANVILLE | 2000 | 1995 | | 9 | 9 | 19 |
| B4 | 101 | 874 | T | | B | NEWPORT BEACH | 1999 | 1999 | | 7 | 7 | 18 |
| B5 | 102 | 102 | H | | L | FULLERTON | 2008 | 2002 | | 5 | 5 | 17 |
| B6 | 103 | 774 | M | M | Y | SANTA MONICA | 2001 | 2000 | | 7 | 7 | 17 |
| B7 | 104 | 941 | M | S | E | LA JOLLA | 2006 | 1996 | | 6 | 6 | 16 |
| B8 | 105 | 798 | L | N | N | WARSAW | 2015 | 1999 | | 2 | 2 | 16 |
| B9 | 106 | 127 | P | T | N | LOS ANGELES | 2013 | 2012 | | 2 | 2 | 16 |
| B10 | 107 | 104 | L | W | T | PASADENA | 2008 | 1997 | | 5 | 5 | 15 |
| B11 | 108 | 858 | A | S | M | LAGUNA BEACH | 2004 | 1998 | | 6 | 6 | 15 |
| B12 | 109 | 845 | P | S | N | BEVERLY HILLS | 1998 | 1992 | | 8 | 8 | 15 |
| B13 | 110 | 143 | J | Y | K | WOODLAND HILLS | 2016 | 2013 | | 1 | 1 | 15 |
| B14 | 111 | 834 | R | E | D | ENCINO | 1996 | 1993 | | 8 | 8 | 14 |
| B15 | 112 | 867 | W | | B | LOS ANGELES | 2006 | 1993 | | 6 | 6 | 14 |
| B16 | 113 | 440 | M | K | O | BEVERLY HILLS | 2000 | 1981 | | 4 | 4 | 14 |
| B17 | 114 | 757 | R | D | H | BEVERLY HILLS | 1992 | 1988 | | 9 | 9 | 14 |
| B18 | 115 | 862 | J | T | L | ELK GROVE | 2001 | 1989 | | 7 | 7 | 14 |
| B19 | 116 | 906 | J | G | R | ORINDA | 2005 | 1999 | | 5 | 5 | 14 |
| B20 | 117 | 873 | G | D | M | LOS ANGELES | 2004 | 1999 | | 5 | 5 | 13 |
| B21 | 118 | 433 | P | A | M | SHERMAN OAKS | 1995 | 1970 | | 9 | 9 | 12 |
| B22 | 119 | 794 | R | F | R | TORRANCE | 1995 | 1990 | | 7 | 7 | 12 |
| B23 | 120 | 766 | L | N | G | BEVERLY HILLS | 1993 | 1993 | | 7 | 7 | 12 |
| B24 | 121 | 966 | P | H | L | BEVERLY HILLS | 1993 | 1993 | | 7 | 7 | 11 |
| B25 | 122 | 972 | S | J | V | SHERMAN OAKS | 1992 | 1983 | | 7 | 7 | 11 |
| B26 | 123 | 748 | S | A | L | BEVERLY HILLS | 1992 | 1983 | | 5 | 5 | 11 |
| B27 | 124 | 951 | M | | Z | SANTA MONICA | 2006 | 1998 | | 4 | 4 | 11 |
| B28 | 125 | 135 | M | A | M | ORANGE | 2015 | 2013 | | 1 | 1 | 11 |
| B29 | 126 | 842 | S | | B | NEWPORT BEACH | 1997 | 1992 | | 6 | 6 | 11 |
| B30 | 127 | 534 | O | | L | BEVERLY HILLS | 1994 | 1986 | | 7 | 7 | 11 |
| B31 | 128 | 994 | A | | S | WEST HILLS | 2007 | 2005 | | 3 | 3 | 11 |
| B32 | 129 | 683 | G | K | L | PALO ALTO | 1988 | 1987 | | 7 | 7 | 10 |
| B33 | 130 | 732 | M | R | L | VALENCIA | 1992 | 1987 | | 7 | 7 | 10 |
| B34 | 131 | 881 | M | M | M | RANCHO CUCAMONGA | 2004 | 1984 | | 5 | 5 | 10 |
| B35 | 132 | 494 | L | M | S | LAGUNA NIGUEL | 1991 | 1987 | | 7 | 7 | 10 |
| B36 | 133 | 673 | M | A | O | LA CANADA | 1989 | 1988 | | 7 | 7 | 10 |

**IDENTITY**: FIRST 3 DIGITS OF LICENSE NR (**LIC___**), INITIALS, CITY OF PRACTICE, YEAR OF GRADUATION (**YOG**), YEAR OF LICENCE (**YOL**) - **SCORS**: MBC CODE OF DISCIPLINARY RECORDS (**R**), NUMBER OF COURT COMPLAINTS (**#CC**), CORRECTED #CC WITH R (**#CC-R**); PREDICTION OF FUTURE COURT COMPLAINTS, (**#CC-PX**).

20

2019-11-04     MOTION TO TAKE JUDICIAL NOTICE OF     51 of 59
CA'S #1 „PRONE-TO-COMPLAINTS" COSMETIC SURGEON
2021.08.22     COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL     93 OF 109

The NEW ENGLAND JOURNAL of MEDICINE

SPECIAL ARTICLE

# Malpractice Risk According to Physician Specialty

Anupam B. Jena, M.D., Ph.D., Seth Seabury, Ph.D., Darius Lakdawalla, Ph.D., and Amitabh Chandra, Ph.D.

ABSTRACT

**BACKGROUND**

Data are lacking on the proportion of physicians who face malpractice claims in a year, the size of those claims, and the cumulative career malpractice risk according to specialty.

**METHODS**

We analyzed malpractice data from 1991 through 2005 for all physicians who were covered by a large professional liability insurer with a nationwide client base (40,916 physicians and 233,738 physician-years of coverage). For 25 specialties, we reported the proportion of physicians who had malpractice claims in a year, the proportion of claims leading to an indemnity payment (compensation paid to a plaintiff), and the size of indemnity payments. We estimated the cumulative risk of ever being sued among physicians in high- and low-risk specialties.

**RESULTS**

Each year during the study period, 7.4% of all physicians had a malpractice claim, with 1.6% having a claim leading to a payment (i.e., 78% of all claims did not result in payments to claimants). The proportion of physicians facing a claim each year ranged from 19.1% in neurosurgery, 18.9% in thoracic–cardiovascular surgery, and 15.3% in general surgery to 5.2% in family medicine, 3.1% in pediatrics, and 2.6% in psychiatry. The mean indemnity payment was $274,887, and the median was $111,749. Mean payments ranged from $117,832 for dermatology to $520,923 for pediatrics. It was estimated that by the age of 65 years, 75% of physicians in low-risk specialties had faced a malpractice claim, as compared with 99% of physicians in high-risk specialties.

**CONCLUSIONS**

There is substantial variation in the likelihood of malpractice suits and the size of indemnity payments across specialties. The cumulative risk of facing a malpractice claim is high in all specialties, although most claims do not lead to payments to plaintiffs. (Funded by the RAND Institute for Civil Justice and the National Institute on Aging.)

From the Department of Medicine, Massachusetts General Hospital, and Harvard Medical School, Boston (A.B.J.); RAND, Santa Monica, CA (S.S.); Schaeffer Center for Health Policy and Economics and School of Policy, Planning, and Development, University of Southern California, Los Angeles (D.L.); and the Harvard Kennedy School, Harvard University, Cambridge, MA (A.C.). Address reprint requests to Dr. Chandra at the Harvard Kennedy School, Harvard University, 79 JFK St., Cambridge, MA 02138, or at amitabh_chandra@harvard.edu.

N Engl J Med 2011;365:629-36.
Copyright © 2011 Massachusetts Medical Society.

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

MOTION TO TAKE JUDICIAL NOTICE OF
CA'S #1 „PRONE-TO-COMPLAINTS" COSMETIC SURGEON
2021.08.22   COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL   94 OF 109

*The* NEW ENGLAND JOURNAL *of* MEDICINE

DESPITE TREMENDOUS INTEREST IN medical malpractice and its reform,[1-10] data are lacking on the proportion of physicians who face malpractice claims according to physician specialty, the size of payments according to specialty, and the cumulative incidence of being sued during the course of a physician's career.[11-13] A recent American Medical Association (AMA) survey of physicians showed that 5% of respondents had faced a malpractice claim during the previous year.[14] Studies estimating specialty-specific malpractice risk from actual claims are much less recent,[15,16] including a Florida study from 1975 through 1980 showing that 15% of medical specialists, 34% of obstetricians and anesthesiologists, and 48% of surgical specialists faced at least one claim that resulted in an associated defense cost or payment to a claimant (an indemnity payment) during the 6-year study period.[17]

Each of these earlier studies has limitations, including the use of older data[15-17] with limited geographic coverage,[17] reliance on self-reports with limited sample size and low response rates,[14] limited information on physician specialty,[13,14] and a lack of information on the size of payments.[14] Although the National Practitioner Data Bank includes most cases in the United States in which a plaintiff was paid on behalf of a licensed health care provider,[18] it does not report the specialties of physicians and does not record information on cases that do not result in a payment.

Using physician-level malpractice claims obtained from a large professional liability insurer, we characterized three aspects of malpractice risk among physicians in 25 specialties: the proportion of physicians facing a malpractice claim in a given year, the proportion of physicians making an indemnity payment, and the size of this payment. In addition, we estimated the cumulative career risk of facing a malpractice claim for physicians in high- and low-risk specialties.

## METHODS

### MALPRACTICE-CLAIMS DATA

We obtained physician-level data on malpractice claims from a large, physician-owned professional liability insurer that provided coverage to physicians in every U.S. state and the District of Columbia. The procedures for safeguarding these data were approved by the institutional review board at RAND. The data included records on

closed malpractice claims for 40,916 physicians who were covered for at least one policy year from 1991 through 2005. The number of physicians grew steadily from 12,498 in 1991 to 17,376 in 2005. We identified 24 specialties that had at least 200 physicians represented in our sample. Physicians belonging to other, smaller specialties were grouped together in an "other specialty" category. Across specialties, there were 233,738 physician-years of coverage, with an average duration of coverage of 5.7 years (range, 4.6 in pediatrics to 7.3 in thoracic–cardiovascular surgery). The most common specialties in our data were anesthesiology, family general practice, and internal medicine (Table 1).

Claims were available for all years during which a physician was covered by the insurer. Claims that were not yet closed by the insurer were not available. Indemnity payments that were associated with a claim reflected payments to a claimant that arose from either a settlement with the claimant or a jury verdict.

Although the data included physicians from all 50 states, California was overrepresented in our data, accounting for 16,076 physicians (39.3%). We corrected for this oversampling by weighting each physician in our data by the relative number of physicians who are not employed by the federal government reported in the Area Resource File of the Department of Health and Human Services. After weighting, the share of physicians in California was 12.2%, which by construction matches the share reported in the Area Resource File. Because we relied on data from a single insurer, we verified that the average number of indemnity claims per physician and payment levels in our data matched similar numbers in the National Practitioner Data Bank. In a previous study, investigators also relied on claims from a single insurer.[19]

We included physicians between the ages of 30 and 70 years in the study. The average age of physicians in all specialties was 49.0 years (range, 43.2 for emergency medicine to 53.0 for gynecology). Data on other demographic characteristics (e.g., sex and race) were not available.

### DESCRIBING MALPRACTICE RISK

For each specialty, we began by calculating the proportion of physicians who faced a malpractice claim in a given year. We distinguished between claims leading to indemnity payments versus over-

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

MOTION TO TAKE JUDICIAL NOTICE OF CA'S #1 „PRONE-TO-COMPLAINTS" COSMETIC SURGEON

2021.08.22   COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL   95 OF 109

MALPRACTICE RISK ACCORDING TO PHYSICIAN SPECIALTY

| Specialty | Physician-Years of Coverage | No. of Physicians | Physician Age | Coverage Years per Physician |
|---|---|---|---|---|
| | no. | | yr | no. |
| All physicians | 233,738 | 40,916 | 49.0±9.5 | 7.2±4.4 |
| Anesthesiology | 29,952 | 5,037 | 45.6±8.5 | 7.2±3.9 |
| Cardiology | 4,155 | 777 | 49.8±8.9 | 5.9±4.4 |
| Dermatology | 3,627 | 532 | 47.8±9.9 | 8.0±5.1 |
| Diagnostic radiology | 4,905 | 808 | 48.6±9.1 | 6.6±4.3 |
| Emergency medicine | 1,631 | 352 | 43.2±8.1 | 4.8±3.3 |
| Family general practice | 25,758 | 4,975 | 48.9±9.7 | 6.2±4.2 |
| Gastroenterology | 3,981 | 639 | 50.2±8.6 | 7.0±4.7 |
| General surgery | 7,352 | 1,205 | 48.9±9.4 | 7.2±4.5 |
| Gynecology | 2,577 | 459 | 53.0±9.1 | 5.8±3.9 |
| Internal medicine | 27,268 | 4,905 | 47.8±9.4 | 7.2±4.6 |
| Nephrology | 1,373 | 248 | 47.2±9.1 | 7.3±5.0 |
| Neurology | 3,037 | 519 | 48.4±8.4 | 6.6±4.8 |
| Neurosurgery | 1,927 | 351 | 48.6±8.2 | 5.1±3.2 |
| Obstetrics and gynecology | 10,385 | 1,899 | 47.5±9.0 | 6.2±3.5 |
| Oncology | 1,207 | 245 | 49.8±7.9 | 6.1±3.5 |
| Ophthalmology | 5,203 | 807 | 50.0±9.9 | 7.6±4.9 |
| Orthopedic surgery | 11,928 | 2,224 | 48.3±8.9 | 6.0±4.4 |
| Pathology | 20,717 | 3,094 | 51.8±9.6 | 9.5±4.3 |
| Pediatrics | 7,381 | 1,616 | 45.8±9.4 | 5.2±4.1 |
| Plastic surgery | 11,882 | 1,862 | 47.4±9.0 | 7.6±4.4 |
| Psychiatry | 19,011 | 3,011 | 52.5±8.7 | 6.6±3.5 |
| Pulmonary medicine | 2,362 | 380 | 47.5±8.2 | 7.7±5.0 |
| Thoracic–cardiovascular surgery | 3,187 | 437 | 50.6±9.1 | 8.7±4.6 |
| Urology | 2,328 | 368 | 51.9±9.3 | 7.3±4.9 |
| Other specialty | 20,604 | 4,166 | 47.3±9.7 | 5.4±4.0 |

Table 1. Summary Statistics for Physician Specialties.*

* Plus–minus values are means ±SD. All calculations were performed with the use of a database of physicians covered by a large, multistate liability insurer. The numbers of physician-years and physician observations are reported for all physicians between the ages of 30 and 70 years during the period from 1991 through 2005.

all claims (those with a defense cost but not necessarily a payment). In sensitivity analysis, we adjusted for physician age, year, and state to examine whether these adjustments would affect our reported estimates.

Given the long period studied, we separated our sample into three periods (1991–1995, 1996–2000, and 2001–2003) in order to investigate how claims rates varied over time for high- and low-risk specialties, which were defined as the five specialties with the highest and lowest proportions of physicians with a claim in a year, respectively.

We did not include 2004–2005, since many claims that had been filed during that period might not have been closed by the end of 2005.

We then characterized the size of malpractice payments for each specialty by computing mean and median annual payments. We also examined how many payments exceeded $1 million to characterize specialties with outlier awards. Payments were normalized to 2008 dollars on the basis of the Consumer Price Index.

Finally, we analyzed data on physician age to estimate the cumulative career malpractice risk of

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

2019-11-04                    MOTION TO TAKE JUDICIAL NOTICE OF                    54 of 59
                 CA'S #1 „PRONE-TO-COMPLAINTS" COSMETIC SURGEON
2021.08.22    COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL    96 OF 109

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 1.** Proportion of Physicians Facing a Malpractice Claim Annually, According to Specialty.

at every age of a physician's career and for each specialty. These estimated lifetime risk profiles were then used to compute cumulative career malpractice risks for physicians in high- and low-risk specialties, as well as in each of the largest specialties in our data (internal medicine and its subspecialties, general surgery and surgical subspecialties, anesthesiology, obstetrics and gynecology, and pathology).

Our model assumes that the probability of being sued was unrelated to the duration of coverage by the insurer and that the probability of being sued at a given age was independent of being sued at an earlier age (after adjustment for physician random effects). To ensure that estimates of the cumulative risk of being sued in each specialty were not determined by the experience of a few idiosyncratic physicians, we conducted two sensitivity analyses: we excluded physicians after their first claim (consequently ignoring the subsequent experiences of physicians who were sued repeatedly) and estimated fixed-effects specifications that allow for correlation between physician characteristics (such as age) and unobserved propensities to be sued.

## RESULTS

### MALPRACTICE CLAIMS ACCORDING TO SPECIALTY

Figure 1 shows the proportion of physicians who faced a malpractice claim in a year according to specialty. Across specialties, 7.4% of physicians annually had a claim, whereas 1.6% made an indemnity payment. There was significant variation across specialties in the probability of facing a claim, ranging annually from 19.1% in neurosurgery, 18.9% in thoracic–cardiovascular surgery, and 15.3% in general surgery to 5.2% in family medicine, 3.1% in pediatrics, and 2.6% in psychiatry. Specialties in which physicians were most likely to face claims were not always specialties in which indemnity claims were most prevalent. Our estimates of rates of overall and paid claims were unaffected by adjustment for physician age, year, and state of practice.

Another measure of risk is the likelihood of a payment conditional on a claim. The payment rate can be inferred as the proportion of physicians making a payment divided by the proportion facing a claim. The proportion of physicians with a claim was not well correlated with the payment rate (Pearson's correlation, 0.17; P=0.42). For ex-

being sued at least once by a given age for both high- and low-risk specialties. We first estimated a multivariate regression model of the probability of facing at least one claim in a given year as a function of physician age, physician random effects, physician specialty, state of practice, and county–year demographic variables (per capita income, age distribution, and the proportions of residents who were white or male). We allowed the effect of age to vary according to specialty. Physician random effects were included to account for unobserved differences among physicians that might have led some physicians to have been sued more frequently than others. This estimation yielded predicted annual rates of facing a claim

N ENGL J MED 365;7   NEJM.ORG   AUGUST 18, 2011

The New England Journal of Medicine

Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

MOTION TO TAKE JUDICIAL NOTICE OF
CA'S #1 „PRONE-TO-COMPLAINTS" COSMETIC SURGEON
2021.08.22   COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL   97 OF 109

MALPRACTICE RISK ACCORDING TO PHYSICIAN SPECIALTY

ample, gynecology alone had the 12th highest average annual proportion of physicians with a claim, but it had the highest payment rate (>38%).

**TRENDS IN CLAIMS**

The proportion of physicians facing a malpractice claim varied moderately across the study period (Fig. 2). Between the 1991–1995 and 2001–2003 periods, the average annual proportion of physicians in low-risk specialties with a claim decreased from 8.3% to 5.8%. Among high-risk specialties, the proportion of physicians with a claim was highest during the 1996–2000 period. Claims with an indemnity had similar patterns, and the differences between periods were significant (P<0.001 for all comparisons). Differences in overall and indemnity claims were stable between high-risk and low-risk specialties over time.

**SIZE OF MALPRACTICE INDEMNITY PAYMENTS**

Figure 3 shows mean and median indemnity payments per physician for each specialty after the exclusion of claims that did not result in an indemnity payment. Across specialties, the mean indemnity payment was $274,887, and the median was $111,749. The difference between the mean and median payment reflects the right-skewed payment distribution. Specialties that were most likely to face indemnity claims were often not those with the highest average payments. For example, the average payment for neurosurgeons ($344,811) was less than the average payment for pathologists ($383,509) or for pediatricians ($520,924), even though neurosurgeons were several times more likely to face a claim in a year. The estimated correlation between the proportion of physicians with a claim and the average payment amount was 0.13 (P=0.52). The correlation between the proportion of physicians with an indemnity payment and the average payment was similar and was not significant. This suggests that factors driving the likelihood of a claim are largely independent of factors that drive the size of a payment.

Outlier awards, which were defined as those exceeding $1 million, were infrequent, in part because the full size of outlier awards would not have been recorded if they had exceeded individual policy limits. Among all physician-years, 66 payments exceeded this amount, accounting for less than 1% of all payments. Obstetrics and gynecology accounted for the most payments (11), fol-





**Figure 2. Trends in Overall Claims and Claims with an Indemnity Payment, According to Risk of Specialty.**
Panel A shows the proportions of physicians with an annual claim, and Panel B shows the proportion with an indemnity payment (compensation paid to a plaintiff), according to the risk associated with the specialty. High-risk and low-risk specialties were defined as the five specialties with the highest average annual proportion of physicians with a malpractice claim and the five specialties with the lowest average annual proportion, respectively.

lowed by pathology (10), anesthesiology (7), and pediatrics (7).

**CUMULATIVE CAREER MALPRACTICE RISK**

The projected proportion of physicians facing a malpractice claim by the age of 65 years was high (Fig. 4). Among physicians in low-risk specialties, 36% were projected to face their first claim by the age of 45 years, as compared with 88% of physicians in high-risk specialties. By the age of 65 years, 75% of physicians in low-risk specialties and 99% of those in high-risk specialties were projected to face a claim. The projected career risk of

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

*The* N E W  E N G L A N D  J O U R N A L  *of* M E D I C I N E



**Figure 3. Amount of Malpractice Payments, According to Specialty.**

Payments are shown in 2008 dollars. Specialties that had fewer than 30 payments (i.e., oncology and nephrology) are not listed.

of data for physicians after their first claim or in models that allowed for a correlation between physician characteristics and an unobserved propensity to be sued.

## DISCUSSION

There are few recent estimates on the likelihood of malpractice claims and the size of payments according to physician specialty. Using physician-level malpractice claims from a nationwide liability insurer, we found substantial variability across specialties in each of these descriptors of liability risk. Specialties in which the largest proportion of physicians faced a claim were not necessarily those with the highest average payment size. For example, physicians in obstetrics and general surgery — both fields that are regarded as high-risk specialties — were substantially more likely to face a claim than pediatricians and pathologists, yet the average payments among pediatricians and pathologists were considerably greater. The same pattern was noted in a national analysis that was performed more than two decades ago.[15]

For many high-risk specialties, our estimates of annual and career malpractice rates match self-reported claims rates reported in a recent AMA survey of physicians.[14] For several low-risk specialties, however, our findings suggest that the proportion of physicians facing claims is consistently higher than that reported in the AMA survey. This finding suggests underreporting by physicians in low-risk specialties, perhaps because these physicians did not report a claim or because those with previous claims were less likely to respond to the survey. Such a trend could be because the stigma of a claim is worse in specialties in which such claims are less common or because recall bias is more severe for rare events.

Our study uncovered an important aspect of malpractice liability: the high likelihood of claims that do not result in payments to a plaintiff. Annual rates of claims leading to indemnity payments ranged from 1% to 5% across specialties, whereas rates of all claims ranged from 5% to 22%. Our projections suggest that nearly all physicians in high-risk specialties will face at least one claim during their career; however, a substantial minority will not have to make an indemnity payment.

Our results may speak to why physicians consistently report concern over malpractice and the

making an indemnity payment was also large. Roughly 5% of physicians in low-risk specialties and 33% in high-risk specialties were projected to make their first indemnity payment by the age of 45 years; by the age of 65 years, the risks had increased to 19% and 71%, respectively.

Specialty-specific projections of career malpractice risk were also calculated (Table 1 in the Supplementary Appendix, available with the full text of this article at NEJM.org). Roughly 55% of physicians in internal medicine and its subspecialties were projected to face a malpractice claim by the age of 45 years, and 89% by the age of 65 years. In contrast, 80% of physicians in surgical specialties (including general surgery) and 74% of physicians in obstetrics and gynecology were projected to face a claim by the age of 45 years. The results were unchanged after the exclusion

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

MOTION TO TAKE JUDICIAL NOTICE OF
CA'S #1 „PRONE-TO-COMPLAINTS" COSMETIC SURGEON

2021.08.22   COMPLAINT 42 USC 1983 - BIRO V. KEYES ET AL   99 OF 109

MALPRACTICE RISK ACCORDING TO PHYSICIAN SPECIALTY

intense pressure to practice defensive medicine,[20] despite evidence that the scope of defensive medicine is modest.[4,21,22] Concern among physicians over malpractice risk varies far less considerably across states than do objective measures of malpractice risk according to state (e.g., rates of paid claims, average payment sizes, malpractice premiums, and state tort reforms).[1] For example, 65% of physicians practicing in states in the bottom third of rates for paid malpractice claims (5.5 paid claims per 1000 physicians) express substantial concern over malpractice, as compared with 67% of physicians in the top third (14.6 claims per 1000 physicians).[1] Although these annual rates of paid claims are low, the annual and career risks of any malpractice claim are high, suggesting that the risk of being sued alone may create a tangible fear among physicians.

The perceived threat of malpractice among physicians may boil down to three factors: the risk of a claim, the probability of a claim leading to a payment, and the size of payment. Although the frequency and average size of paid claims may not fully explain perceptions among physicians,[1] one may speculate that the large number of claims that do not lead to payment may shape perceived malpractice risk. Physicians can insure against indemnity payments through malpractice insurance, but they cannot insure against the indirect costs of litigation, such as time, stress, added work, and reputational damage.[23] Although there is no evidence on the size of these indirect costs, direct costs are large. For example, a Harvard study of medical malpractice suggested that nearly 40% of claims were not associated with medical errors and that although a low percentage of such claims led to payment of compensation (28%, as compared with 73% of claims with documented medical errors), they accounted for 16% of total liability costs in the system.[19]

Our study has several limitations. As in a previous study,[19] we used data from a single insurer, which may not be nationally representative, even though it is one of the largest in the United States and covers physicians in every state. Whether the claims rates in our study are representative of those nationwide depends on whether physicians who were covered by the insurer that we studied were more or less likely to be sued than physicians who were insured elsewhere. To assess the representativeness of the data, we compared our weighted estimates with the probability and size



**Figure 4. Cumulative Career Probability of Facing a Malpractice Claim or Indemnity Payment, According to Risk of Specialty and Age of Physician.**
Cumulative probabilities were estimated from a multivariate linear regression model with adjustment for physician random effects, physician specialty, state of practice, and county demographic characteristics.

of indemnity claims reported by the National Practitioner Data Bank. The results are reassuring: the weighted number of indemnity claims per 1000 full-time, nonfederal physicians during the period from 1991 through 2005 was 17.1 in our sample, as compared with 19.6 in the federal database. The weighted average payment in our sample was $274,887 (in 2008 dollars), which is only 4.8% less than the average in the database. These small differences may reflect the fact that the mix of specialties in our sample may not be nationally representative.

Our estimates provide a glimpse into U.S. malpractice risk among physician specialties. High rates of malpractice claims that do not lead to indemnity payments, as well as a high cumulative career malpractice risk in both high- and low-risk specialties, may help to explain perceived malpractice risk among U.S. physicians.

Supported by the RAND Institute for Civil Justice; grants (7R01AG031544, to Dr. Seabury; 7R01AG031544 and 1RC4AG039036-01, to Dr. Lakdawalla; and P01 AG19783-02, to Dr. Chandra) from the National Institute on Aging; and a grant (5P30AG024968, to Dr. Lakdawalla) from the National Institute on Aging Roybal Center at the University of Southern California.

Dr. Seabury reports receiving grant support from the RAND Institute for Civil Justice. No other potential conflict of interest relevant to this article was reported.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

MALPRACTICE RISK ACCORDING TO PHYSICIAN SPECIALTY

## REFERENCES

**1.** Carrier ER, Reschovsky JD, Mello MM, Mayrell RC, Katz D. Physicians' fears of malpractice lawsuits are not assuaged by tort reforms. Health Aff (Millwood) 2010;29:1585-92.
**2.** Danzon PM. The frequency and severity of medical malpractice claims: new evidence. Law Contemp Probl 1986;49:57-84.
**3.** Danzon P. The frequency and severity of medical malpractice claims. J Law Econ 1984;27:115-48.
**4.** Mello MM, Chandra A, Gawande AA, Studdert DM. National costs of the medical liability system. Health Aff (Millwood) 2010;29:1569-77.
**5.** Mello MM. Medical malpractice: impact of the crisis and effect of state tort reforms. Research synthesis report no. 10. Princeton, NJ: Robert Wood Johnson Foundation, 2006.
**6.** Medical malpractice tort limits and health care spending. Washington, DC: Congressional Budget Office, 2006.
**7.** Mello MM, Brennan TA. The role of medical liability reform in federal health care reform. N Engl J Med 2009;361:1-3.
**8.** Thorpe KE. The medical malpractice 'crisis': recent trends and the impact of state tort reforms. Health Aff (Millwood) 2004;Suppl Web Exclusives:W4-20–W4-30.
**9.** Sloan FA, Mergenhagen PM, Bovbjerg RR. Effects of tort reforms on the value of closed medical malpractice claims: a microanalysis. J Health Polit Policy Law 1989; 14:663-89.
**10.** Zuckerman S, Bovbjerg RR, Sloan F. Effects of tort reforms and other factors on medical malpractice insurance premiums. Inquiry 1990;27:167-82.
**11.** Chandra A, Nundy S, Seabury SA. The growth of physician medical malpractice payments: evidence from the National Practitioner Data Bank. Health Aff (Millwood) 2005;Suppl Web Exclusives:W5-240–W5-249.
**12.** Mello MM, Studdert DM, Brennan TA. The new medical malpractice crisis. N Engl J Med 2003;348:2281-4. [Erratum, N Engl J Med 2003;349:1010.]
**13.** Benson JS, Coogan CL. Urological malpractice: analysis of indemnity and claim data from 1985 to 2007. J Urol 2010;184: 1086-90.
**14.** Kane C. Policy research perspectives — medical liability claim frequency: a 2007-2008 snapshot of physicians. Chicago: American Medical Association, 2010: 1-7.
**15.** Medical malpractice: characteristics of claims closed in 1984GAO-HRD-97-55. Washington, DC: General Accounting Office, 1987.
**16.** Sowka M, ed. Malpractice claims: final compilation. Brookfield, WI: National Association of Insurance Commissioners, 1980.
**17.** Sloan FA, Mergenhagen PM, Burfield WB, Bovbjerg RR, Hassan M. Medical malpractice experience of physicians: predictable or haphazard? JAMA 1989;262: 3291-7.
**18.** Health Resources and Services Administration. National practitioner data bank. Washington, DC: Department of Health and Human Services, 2010.
**19.** Studdert DM, Mello MM, Gawande AA, et al. Claims, errors, and compensation payments in medical malpractice litigation. N Engl J Med 2006;354:2024-33.
**20.** Studdert DM, Mello MM, Sage WM, et al. Defensive medicine among high-risk specialist physicians in a volatile malpractice environment. JAMA 2005;293:2609-17.
**21.** Baicker K, Chandra A. The effect of malpractice liability on the delivery of health care. Cambridge, MA: National Bureau of Economic Research, 2004. (http://www.nber.org/papers/w10709.)
**22.** Kessler DP, McClellan MB. Do doctors practice defensive medicine? Q J Econ 1996;111:353-90.
**23.** Baicker K, Fisher ES, Chandra A. Malpractice liability costs and the practice of medicine in the Medicare program. Health Aff (Millwood) 2007;26:841-52.
*Copyright © 2011 Massachusetts Medical Society.*

**APPLY FOR JOBS AT THE NEJM CAREERCENTER**
Physicians registered at the NEJM CareerCenter can apply for jobs electronically.
A personal account created when you register allows you to apply for positions,
using your own cover letter and CV, and keep track of your job-application history.
Visit **NEJMjobs.org** for more information.

The New England Journal of Medicine
Downloaded from nejm.org on October 30, 2016. For personal use only. No other uses without permission.
Copyright © 2011 Massachusetts Medical Society. All rights reserved.

*Filed: 2016.03.04*

| | MC-025 |
|---|---|
| **SHORT TITLE:** Attachment 7a(3)—Describe Harassment | **CASE NUMBER:** BS160192 |

**ATTACHMENT (Number):** 7a(3)

*(This Attachment may be used with any Judicial Council form.)*

Since losing a small claims court case for alleged medical malpractice, Jan Biro has repeatedly harassed me and my staff. I have been the president of a number of local, state and national medical associations and societies over the past 20 years. He has sent multiple documents with libelous information to the Boards of Directors of all of these organizations. These documents are accompanied by cartoons with violent and sexual images depicting me and my staff. His frivolous law suits have included my staff, Kimberley Bitetti, for which the Superior Court of California fined. He sued the Medical Board of California over his lost case and lost them. They also fined him for the frivolous nature of his suit.

My professional colleagues across the country and a prominent doctor of psychology in Los Angeles have expressed grave concerns about the nature of these cartoons and their depiction of sex and violence. His obsession with me and the nature of his publications has alarmed them and they have warned me to be cautious for fear of violence. My family is also quite concerned.

We believe that he has impersonated me as a physician on the Internet, promising young women surgery who will meet with him. There have been postings on Craig's list pretending to be me that have admissions that I am a serial killer and need to be stopped. A police investigation is underway for this serious problem, case number 150835.

It is at the suggestion of Officer Perez from the Los Angeles Police Department that I request this Temporary Restraining Order, who after reviewing all of our documentation, shares my concern about this individual.

We have a great deal of evidence to present relative to this person's behavior. My attorney called the Karolinska Institute in Sweden, where Biro claims to have been a Professor. They stated that he was not, nor had he ever been a professor at their institution. In addition, he had problems in Sweden with the police over hate crimes. He has written numerous antisemitic publications and his cartoons also demonstrate this bigotry.

He has escalated his harassment of me on a national basis and I have grave concerns about his potential for violence.

Geoffrey R. Keyes, MD

**000006**

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page _____ of _____
*(Add pages as required)*

Form Approved for Optional Use Judicial Council of California MC-025 [Rev. July 1, 2009]

**ATTACHMENT to Judicial Council Form**

www.courtinfo.ca.gov

1
2
3
4

JAN C BIRO MD – Pro Se
1281 9th Ave, Apt 3904
San Diego, CA 92101
JC.BIRO.MD@GMAIL.COM
Phone: 619 677 26232

5
6
7

**APPELLATE DIVISION**
**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
**STANLEY MOSK COURTHOUSE**

8
9

PEOPLE OF STATE OF CALIFORNIA
Plaintiff and Respondent

Case No.: **BR054237 [**7AR 00588-01]

10

vs.

11
12

JAN C BIRO MD.,
Appellant / DefendantDefendant

**OBJECTION TO DENIAL OF PERMISSION TO FILE LATE APPELLANT'S RESPONSE BRIEF**

13
14
15
16
17

    The court denied appellant's motion for permission to file late ARB. The reason – as we understand – that the original, timely filed motion on Sept. 25th, 2019 didn't contain legitimate reason and the correction filed on October 4th 2019 was one day too late for filing.

18

    We very strongly disagree with the denial.

19
20
21
22
23

    1.) Appellant is diagnosed with depression and Post- Traumatic Stress Disorder and started anti-depressive treatment. The Illness itself and the side effects of the medication prevented him to perform his duties, including writing the ARB. This is a legitimate excuse for delay.

24
25
26
27
28

    We agree, that the original motion for permission was poorly formulated, however this mistake was also caused by the disease and not by Biro's intentional ignorance.

OBJECTION TO DENIAL OF PERMISSION TO FILE LATE APPELLANT'S RESPONSE BRIEF - 1

1          The reason for asking the court for permission to file late ARB

2    was exactly, that: we wanted to avoid this kind of ridiculous mistakes in the

3    ARB. <u>The poor quality of the motion on Sept. 25th is evidence, that Biro's</u>

4    <u>mental functions were impaired at that time i.e. the request for late filing of</u>

5    <u>ARB was legitimate and well-motivated by the disease.</u>

6

7        The symptoms of depression are cited, from the website of the American

8    Psychiatric Association (https://www.psychiatry.org/patients-families/depression/what-

9    is-depression).

10

11         *"Depression (major depressive disorder) is a common and serious medical illness that negatively affects how you feel, the way you think and how you act. Fortunately, it is also treatable. Depression causes feelings of sadness and/or a loss of interest in activities once enjoyed. It can lead to a variety of emotional and physical problems and can decrease a person's ability to function at work and at home.*

12

13

14

15         *Depression symptoms can vary from mild to severe and can include:*

16

17    - o  *Feeling sad or having a depressed mood*
      - o  *Loss of interest or pleasure in activities once enjoyed*
18    - o  *Changes in appetite — weight loss or gain unrelated to dieting*
      - o  *Trouble sleeping or sleeping too much*
19    - o  *Loss of energy or increased fatigue*
      - o  *Increase in purposeless physical activity (e.g., hand-wringing or pacing) or slowed movements and speech (actions observable by others)*
20
21    - o  *Feeling worthless or guilty*
      - o  *Difficulty thinking, concentrating or making decisions*
22    - o  *Thoughts of death or suicide"*

23         *"Difficulty thinking, concentrating or making decisions"* – is

24    especially relevant in Biro's situation.

25

26    2)  **Rule 8.811. Policies and factors governing extensions of time**

27     "(a) Policies

28    OBJECTION TO DENIAL OF PERMISSION TO FILE LATE APPELLANT'S RESPONSE BRIEF - 2

(1)  The time limits prescribed by these rules should generally be met to ensure expeditious conduct of appellate business and public confidence in the efficient administration of appellate justice.

(2)  The effective assistance of counsel to which a party is entitled includes adequate time for counsel to prepare briefs or other documents that fully advance the party's interests. Adequate time also allows the preparation of accurate, clear, concise, and complete submissions that assist the courts.

(3)  For a variety of legitimate reasons, counsel or self-represented litigants may not always be able to prepare briefs or other documents within the time specified in the rules of court. To balance the competing policies stated in (1) and (2), applications to extend time in the appellate division must demonstrate good cause under (b). If good cause is shown, the court must extend the time."

The ARB had been filed October 21st 2019. The court can recognize that it is a 6.795 words long document (**CRC 8.811(b)(3),** the subject has high complexity (**CRC 8.811(b)(4),,** it is **accurate, clear, concise, and complete submissions that will certainly assist the courts.**

The court should consider even (**CRC 8.811(b)(1)**, The degree of prejudice, if any, to any party from a grant or denial of the extension. A party claiming prejudice must support the claim in detail.

Explanation:

- There is nobody who is more motivated to complete the appellate review, than appellant himself.

- The ARB is very important for Biro, because he has the most experience with the issues involved in this case.

- The court granted 120 extension to the respondent. Denying Biro admission of an already prepared ARB for one day delay with correct

OBJECTION TO DENIAL OF PERMISSION TO FILE LATE APPELLANT`S RESPONSE BRIEF - 3

1    application for extension, (or for 15 days delay filing the final ARB) will

2    certainly be interpreted as sign of bias-, prejudice of the reviewing court.

3

4    • The decision over extensions is discretionary decision, there are no

5    statutory deadlines or strongly established rules for the deadline of filing

6    ARB.

7

8

9

We repeat our **explicit request** for permission to file the ARB (already admitted).

10

11

12

13

Dated this 26TH of October, 2019.

14

15

16

17                                        _____

JAN C BIRO MD. PhD

18                                        APPELLANT – PRO SE

19

20

21

22

23

24

25

26

27

28

OBJECTION TO DENIAL OF PERMISSION TO FILE LATE APPELLANT'S RESPONSE BRIEF - 4

"I, _Salim Karimov_, hereby certify that this the attached is a true, complete, and unaltered copy of the _Judge Alex Ricciardulli Rating Review_ that was issued on _last accessed  on 12/17/2020_. This document is not a vital record, a public record, or a publicly recordable document, certified copies of which are available from an official source other than a notary public."

_____
(Signature of the Requestor)

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of San Diego

On _December 17_, 2020, before me, _Alyona Leon_ Notary Public personally appeared _____ _Salim Karimov_ _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

ALYONA S. LEON
COMM. # 2210064
NOTARY PUBLIC-CALIFORNIA
SAN DIEGO COUNTY
My Comm. Exp. Aug. 14, 2021

Signature _____ (Seal)

12/17/2020    Southern California Appellate News: DJ profiles LASC Appellate Dept. Judge (& more)

More                                         mailboxandnotary@gmail.com    Dashboard    Sign Out

# Southern California Appellate News

SCAN: News and resources for Southern California appellate lawyers, featuring the Second and Fourth District Courts of Appeal and the Ninth Circuit Court of Appeals

**TUESDAY, MARCH 3, 2015**

## DJ profiles LASC Appellate Dept. Judge (& more)

Today's DJ profiles Alex Ricciardulli: "For the past three years, Ricciardulli has been on the appellate panel of the Los Angeles County Superior Court where he has been learning something new: how to collaborate with other judges in rendering an opinion. "It's really coming home for me," he said, "because 16 years ago, when I joined the public defender's office, I was assigned to the appellate division as a manager." In fact, out of his panoramic window in the Stanley Mosk Courthouse in downtown Los Angeles, Ricciardulli can see the Hall of Records, where he used to work as a lawyer. "I gravitated toward appeals and when I became a judge I wanted to get back to that and I'm really happy," he said."

> Judge Alex Ricciardulli ratings reviews
>
> He said there is a humbling aspect to sitting in review of other judges. "On one hand, you don't want to Monday morning quarterback what's happened in the trial court, but on the other side you're making sure that justice was done," he said. "Navigating between those two things is not always easy."

- Yesterday's DJ features PJ's Gilbert's column, *It's All About Me*. Note that he will be tickling the ivories backing The Singers in Law, Sunday, March 22, at 8:00 p.m. at Vitello's, upstairs in the E Spot Lounge, 4339 Tujunga Ave.)



-
- Appellate specialist Vangi Johnson, formerly Chair of Bonne Bridges' appellate group, has joined the appellate group at Haight Brown.

- BNA offers Peeling the Onion: Appellate Lawyers' Take on DisparateCases by Paul Hastings lawyers Sean Unger, Danielle Doremus and Stephen Kinnaird, which begins: "Appellate lawyers sometimes get asked by clients and colleagues how an appellate lawyer is different from any other type of lawyer. The answers to that question are many, but one of them is that when appellate

### Founder & Contributors
Ben Shatz (SCAN)

Nate Scott

### Subscribe To
🔊 Posts                    ⌄
🔊 Comments                 ⌄

Subscribe Now: Feed Icon

🔊 Subscribe in a reader

### Blog Archive
March (23)   ⌄

### SoCal Appellate Websites
US Supreme Court
California Supreme Court
Court of Appeal, Second District
Court of Appeal, Fourth District
Orange County Bar Assn
LA County Bar Assn -- Appellate Courts Section
Riverside County Bar Assn
Cal Academy of Appellate Lawyers

### Appellate Blog List
An Appeal to Reason
At Counsel Table
At the Lectern
California Appellate Law
California Appellate Report

TUESDAY, MARCH 3, 2015

## DJ profiles LASC Appellate Dept. Judge (& more)

Today's DJ profiles Alex Ricciardulli: "For the past three years, Ricciardulli has been on the appellate panel of the Los Angeles County Superior Court where he has been learning something new: how to collaborate with other judges in rendering an opinion. "It's really coming home for me," he said, "because 16 years ago, when I joined the public defender's office, I was assigned to the appellate division as a manager." In fact, out of his panoramic window in the Stanley Mosk Courthouse in downtown Los Angeles, Ricciardulli can see the Hall of Records, where he used to work as a lawyer. "I gravitated toward appeals and when I became a judge I wanted to get back to that and I'm really happy," he said."


Judge Alex Ricciardulli ratings reviews

He said there is a humbling aspect to sitting in review of other judges. "On one hand, you don't want to Monday morning quarterback what's happened in the trial court, but on the other side you're making sure that justice was done," he said. "Navigating between those two things is not always easy."

**Southern California Appellate News**
**SCAN: News and resources for Southern California appellate lawyers, featuring the Second and Fourth District Courts of Appeal and the Ninth Circuit Court of Appeals**

http://socal-appellate.blogspot.com/2015/03/dj-profiles-lasc-appellate-dept-judge.html
Last accessed 2020.10.22 – 9.08 AM